

# UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
#### OFFICE OF THE CLERK
85 Broad Street
CHARLESTON, SOUTH CAROLINA 29401
(843)579-1401 Fax(843)579-1402

LARRY W. PROPES
CLERK OF COURT

August 30, 2005

Nancy Mayer-Whittington, Clerk
US District Court
District of Columbia
1834 E. Barrett Prettyman US Courthouse
333 Constiution Avenue, NW
Washington, DC 20001-2802

Re:    9:05-654 PMD
       1:05-1379 (Your Number)

       MDL 1686

Dear Ms. Mayer-Whittington:

Pursuant to Conditional Transfer Order and correspondence dated June 17, 2005 in the above referenced action, please find enclosed, the original pleadings, a certified docket sheet, and a certified copy of the transmittal order. At the time of closing, there were no pending motions with out Court.

Very truly yours,

Larry W. Propes, Clerk

By:    _____S/Lisa Richberg_____
              Deputy Clerk

CLOSED, JURY

# U.S. District Court
## District of South Carolina (Beaufort)
### CIVIL DOCKET FOR CASE #: 9:05-cv-00654-PMD
#### Internal Use Only

Ali et al V. Karpinsky
Assigned to: Honorable Patrick Michael Duffy
Cause: 42:1983 Civil Rights Act

Date Filed: 03/01/2005
Jury Demand: Defendant
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Arkan Mohammed Ali**            represented by   **Ray Pratt McClain**
                                                   Ray McClain Law Firm
                                                   PO Box 608
                                                   Charleston, SC 29402
                                                   843-577-3170
                                                   Fax: 843-577-3097
                                                   Email:
                                                   ray@raymcclain-atty.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Thahe Mohammed Sabbar**         represented by   **Ray Pratt McClain**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sherzard Kamal Khalid**         represented by   **Ray Pratt McClain**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

A TRUE COPY
Attest: Larry W. Propes
By: Lisa Lichting
Deputy Clerk

**Plaintiff**

**Ali H**                           represented by **Ray Pratt McClain**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Janice Karpinski**                 represented by **Robert F Daley, Jr**
                                         US Attorneys Office
                                         1441 Main Street
                                         Suite 500
                                         Columbia, SC 29201
                                         803-929-3000
                                         Fax: 803-252-2759
                                         Email: bob.daley@usdoj.gov
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 03/01/2005 |   | ***Attorney Ray Pratt McClain for Sherzard Kamal Khalid; Ali H; Arkan Mohammed Ali and Thahe Mohammed Sabbar added. (mnew, ) (Entered: 03/01/2005) |
| 03/01/2005 |   | ***Party Janice Karpinski added. (mnew, ) (Entered: 03/01/2005) |
| 03/01/2005 | ◉1 | COMPLAINT against Janice Karpinski ( Filing fee $ 250 receipt number SCX2002512.) Service due by 6/29/2005, filed by Arkan Mohammed Ali, Thahe Mohammed Sabbar, Sherzard Kamal Khalid, Ali H.(mnew, ) (Entered: 03/01/2005) |
| 03/01/2005 | ◉ | Summons Issued as to Janice Karpinski. (mnew, ) (Entered: 03/01/2005) |

| 03/01/2005 | ◉2 | Local Rule 26.01 Answers to Interrogatories with Jury Demand by Arkan Mohammed Ali, Thahe Mohammed Sabbar, Sherzard Kamal Khalid, Ali H.(mnew, ) (Entered: 03/01/2005) |
|---|---|---|
| 03/01/2005 | | ***Set/Clear Flags (mnew, ) (Entered: 03/01/2005) |
| 03/21/2005 | | Set/Reset Deadlines: Janice Karpinski answer due 5/17/2005. (mnew, ) (Entered: 03/21/2005) |
| 04/13/2005 | ◉3 | SUMMONS Returned Executed by Arkan Mohammed Ali, Thahe Mohammed Sabbar, Sherzard Kamal Khalid, Ali H. Janice Karpinski served on 3/11/2005, answer due on 5/17/05. (cper, ) Modified Answer Due Date on 5/3/2005 (cper, ). (Entered: 04/15/2005) |
| 05/12/2005 | ◉4 | MOTION for Extension of Time to File Answer re Summons Issued, 1 Complaint by Janice Karpinski. Response to Motion due by 5/31/2005 (Attachments: # 1 Proposed Order)(Daley, Robert) (Entered: 05/12/2005) |
| 05/12/2005 | ◉5 | ORDER EXTENDING TIME FOR DEFENDANT TO RESPOND TO COMPLAINT. Signed by Judge Patrick Michael Duffy on 5/12/05. (chub, ) (Entered: 05/12/2005) |
| 05/31/2005 | | ***Deadlines terminated. Response to Motion Deadline (cper, ) (Entered: 05/31/2005) |
| 06/14/2005 | | ***Deadlines terminated. (cper, ) (Entered: 06/14/2005) |
| 06/24/2005 | | ***Motions terminated: 4MOTION for Extension of Time to File Answer re Summons Issued, 1 Complaint filed by Janice Karpinski, Per order filed on 5/12/05. (cper, ) (Entered: 06/24/2005) |
| 08/19/2005 | ◉6 | ORDER transferring case to District of District of Columbia to be included in MDL Panel 1686. (eric, ) (Entered: 08/24/2005) |

CM/ECF - scd - Docket Report

| 08/19/2005 | | Case transferred to District of District of Columbia, Washington DC. Certified copy of docket sheet sent. (eric, ) (Entered: 08/25/2005) |
|---|---|---|
| 08/25/2005 | | ***DOCUMENT MAILED 6 Order placed in U.S. Mail to Ray McClain (eric, ) (Entered: 08/25/2005) |

9:05-cv-00654-PMD    Date Filed 03/01/2005    Entry Number 1    Page 1 of 69

**FILED**

MAR 0 1 2005

LARRY W. PROPES, CLERK
CHARLESTON, SC

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH CAROLINA

## BEAUFORT DIVISION

| | |
|---|---|
| Arkan Mohammed ALI, Thahe Mohammed SABBAR, Sherzad Kamal KHALID and Ali H., <br><br> Plaintiffs, <br><br> v. <br><br> Janis KARPINSKI, <br><br> Defendant. | Case No. 9:05cv 654 .23 <br><br> **COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |

### I.    INTRODUCTION

1.    Plaintiffs are individuals who were incarcerated in U.S. detention facilities in Iraq where they were subjected to torture or other cruel, inhuman or degrading treatment or punishment, including severe and repeated beatings, cutting with knives, sexual humiliation and assault, confinement in a wooden box, forcible sleep and sensory deprivation, mock executions, death threats, and restraint in contorted and excruciating positions.

2.    The Plaintiffs, Arkan Mohammed Ali, Thahe Mohammed Sabbar, Sherzad Kamal Khalid and Ali H., are among the unknown number of U.S. detainees in Iraq who have suffered torture or other cruel, inhuman or degrading treatment.

3.    Plaintiffs bring this action against Defendant Brigadier General Janis Karpinski of the U.S. Army, who commanded U.S. military police forces in Iraq during the time Plaintiffs were detained and tortured. Defendant Karpinski's policies, patterns, practices, derelictions of

- 1 -

403155.1

A TRUE COPY
Attest: Larry W. Propes

By: _Lisa Lichleng_
Deputy Clerk

duty and command failures caused Plaintiffs' abuse. Defendant Karpinski bears responsibility for the physical and psychological injuries that Plaintiffs have suffered.

4.    Official government reports have documented, and military officials have acknowledged, many of the horrific abuses inflicted on detainees in U.S. custody. Such torture or other cruel, inhuman or degrading treatment or punishment of detainees in U.S. custody violates the United States Constitution, U.S.-ratified treaties including the Geneva Conventions, military rules and guidelines, the law of nations, and our fundamental moral values as a nation.

5.    For generations, U.S. civilian and military leaders have sought to ensure that U.S. soldiers complied with legal mandates prohibiting torture and abuse under all circumstances and at all times regardless of whether our enemies respect the same principles. U.S. Army Field Manual 34-52, which describes the legal standards governing interrogations by U.S. military personnel, unequivocally states that binding international treaties and U.S. policy "expressly prohibit acts of violence or intimidation, including physical or mental torture, threats, insults, or exposure to inhumane treatment as a means of or aid to interrogation. Such illegal acts are not authorized and will not be condoned by the U.S. Army." The Manual specifically defines "physical torture" to include "infliction of pain through chemicals or bondage," "forcing an individual to stand, sit or kneel in abnormal positions for prolonged periods of time," "food deprivation," and "any form of beating." The Manual, moreover, admonishes that "[r]evelation of use of torture by U.S. personnel will bring discredit upon the U.S. and its armed forces while undermining domestic and international support for the war effort. It also may place U.S. and allied personnel in enemy hands at a greater risk of abuse by their captors. Conversely, knowing the enemy has abused U.S. and allied [prisoners of war] does not justify using methods of interrogation specifically prohibited by [international law] and U.S. policy."

- 2 -

403155.1

6.     In stark contrast to these mandates and our traditions, the public record shows that

detainees in U.S. custody in Iraq and Afghanistan were subjected to unlawful torture and abuse.

Those abuses, which pervaded multiple U.S. detention centers in two separate countries, did not

spring from the spontaneous acts of individual soldiers. As the report of former Defense

Secretary James Schlesinger concluded, the abuses of detainees were "widespread," and "were

not just the failure of some individuals to follow known standards, and they are more than the

failure of a few leaders to enforce proper discipline. There is both institutional and personal

responsibility at higher levels."

7.     The abuses occurred on a "widespread" basis because of orders and derelictions

by Defendant Karpinski and other military commanders and Defense Department officials. Most

critically, Defendant Karpinski and others, including Secretary of Defense Donald H. Rumsfeld,

authorized or ratified an abandonment of our nation's inviolable and deep-rooted prohibition

against torture or other cruel, inhuman or degrading treatment or punishment of detainees in U.S.

military custody. These acts precipitated further violations of law and directly led to the abuse of

Plaintiffs and other detainees in Iraq. Among other consequences of Secretary Rumsfeld's

actions, high-ranking commanders, including Defendant Karpinski, permitted and implemented

an unlawful policy, pattern or practice of torture and other cruel, inhuman or degrading treatment

of detainees.

8.     In addition, Defendant Karpinski also violated her legal duty by failing to stop

torture or other cruel, inhuman or degrading treatment when she learned of it. Despite many

credible and reliable reports of torture from governmental and non-governmental sources

throughout the time of her command in 2003 and 2004, Defendant Karpinski failed to take

reasonable, necessary, timely and meaningful measures to prohibit and prevent abuses and to

- 3 -

punish perpetrators. In doing so, Defendant Karpinski violated her obligations as a commander and acted with deliberate indifference and conscious disregard of the high risk of injuries inflicted on detainees and the violations of law committed by her subordinates. These actions and omissions caused the torture and abuses to continue and to spread. Plaintiffs, among many others, were injured as a proximate result of Defendant Karpinski's conduct.

9.    Defendant Karpinski and other liable commanders cannot defend or rationalize the torture or other cruel, inhuman or degrading treatment of Plaintiffs and other detainees on the grounds that such techniques were deployed against carefully selected individuals who possessed critical intelligence information, or occurred only during the heat of battle, or were ordered under exigent circumstances. Most fundamentally, the prohibitions against torture or other cruel, inhuman or degrading treatment are absolute, non-discretionary and subject to no exception. They are designed not only to safeguard the security and dignity of every human being in times of armed conflict but also to ensure the humane treatment of U.S. soldiers when they are captured on the battlefield by enemy forces. Moreover and significantly, the International Committee of the Red Cross cited estimates by military intelligence that 70-90% of persons detained in Iraq had "been arrested by mistake." Similarly, the Army Inspector General estimated that 80% of detainees "might be eligible for release" if their cases had been properly reviewed, and an internal military report cited estimates from the field that 85-90% of detainees at Abu Ghraib "were of no intelligence value." Finally and critically, the unlawful orders, policies and practices did not issue under exigent circumstances or on the battlefield. Rather, the abuses had their genesis in and were continually reinforced by policies, patterns or practices deliberately formulated and adopted in the United States over long periods of time, were inflicted

- 4 -

403155.1

in numerous places over lengthy periods, and injured an unknown number of innocent civilian

detainees, including Plaintiffs, who posed no threat to U.S. forces.

10.    Defendant Karpinski and others have not been held accountable for their acts,

omissions and failures of command. To this day, Plaintiff victims of Defendant Karpinski's

policies, practices, patterns and actions have received no redress for their injuries. Accordingly,

Plaintiffs seek a declaration that determines the responsibility of Defendant Karpinski for the

violations of law that caused Plaintiffs' injuries, and seek monetary compensation for the injuries

the Plaintiffs suffered.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal

question jurisdiction), 28 U.S.C. § 1350 (the Alien Tort Statute), and directly under the

Constitution.

12.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1)-(2) and (e).

## III.    PARTIES

### A.    Plaintiffs

13.    The Plaintiffs in this action are all former detainees of U.S. military forces in Iraq.

Each of the Plaintiffs was tortured and/or subjected to cruel, inhuman or degrading treatment

while in U.S. military custody. Each of the Plaintiffs was eventually released from U.S. custody

without ever being prosecuted for any wrongdoing, and without ever receiving any redress for

the injuries he suffered as a result of torture and other mistreatment.

14.    Plaintiff Arkan Mohammed Ali (hereinafter "Arkan M. Ali"), age 26, is a citizen

of Iraq who was detained by the U.S. military at various locations in Iraq for almost one year,

from July 2003 to June 2004. The U.S. military assigned to Plaintiff Arkan M. Ali detainee

number 115319. During his detention by the U.S. military, Plaintiff Arkan M. Ali was subjected

- 5 -

to torture or other cruel, inhuman or degrading treatment, including but not limited to severe

beatings to the point of unconsciousness, stabbing and mutilation, isolation while naked and

hooded in a wooden coffin-like box, prolonged sleep deprivation enforced by beatings,

deprivation of adequate food and water, mock execution and death threats. During relevant time

periods, Plaintiff Arkan M. Ali was under the control and authority of Defendant Karpinski and

her subordinates.

15.    Plaintiff Thahe Mohammed Sabbar, age 36, is a citizen of Iraq who was detained

by the U.S. military for approximately six months from July 2003 to January 2004 at various

locations in Iraq. The U.S. military assigned to Plaintiff Sabbar detainee numbers 12538 and

116676. During his detention by the U.S. military, Plaintiff Sabbar was subjected to torture or

other cruel, inhuman or degrading treatment, including but not limited to severe beatings, sexual

assault and humiliation, deprivation of adequate food and water, intentional prolonged exposure

to dangerously high temperatures, mock execution and death threats. During relevant time

periods, Plaintiff Sabbar was under the control and authority of Defendant Karpinski and her

subordinates.

16.    Plaintiff Sherzad Kamal Khalid, age 34, is a citizen of Iraq who was detained by

the U.S. military at various locations in Iraq for approximately two months from July 2003

through September 2003. The U.S. military assigned to Plaintiff Khalid detainee number 12537.

During his detention by the U.S. military, Plaintiff Khalid was subjected to torture or other cruel,

inhuman or degrading treatment, including but not limited to frequent and severe beatings,

sexual abuse involving assault and threats of anal rape, deprivation of adequate food and water,

mock executions, death threats, intentional exposure to dangerously high temperatures, and

- 6 -

403155.1

prolonged sleep deprivation enforced by beatings. During relevant time periods, Plaintiff Khalid was under the control and authority of Defendant Karpinski and her subordinates.

17.    Plaintiff Ali H (hereinafter "Ali H."), age 19, is a citizen of Iraq who was detained by the U.S. military at various locations in Iraq for approximately four weeks from August to September 2003. At the time of his detention, Plaintiff Ali H. was a minor and high school student. The U.S. military assigned to Plaintiff Ali H. detainee number 14358. During his detention by the U.S. military, Plaintiff Ali H. was subjected to torture or other cruel, inhuman or degrading treatment, including but not limited to intentional withholding and delay of necessary medical treatment to cause pain, fear and humiliation; intentional infliction of pain after surgery by dragging him from one location to another and forcefully ripping away the surgical dressing, and by exposing him to infection by leaving his surgical wound half-bandaged; and intentional deprivation of adequate food and water. During relevant time periods, Plaintiff Ali H. was under the control and authority of Defendant Karpinski and her subordinates.

**B.    Defendant**

18.    Defendant Brigadier General Janis Karpinski, of the U.S. Army, served as the commander of the 800th Military Police Brigade, the unit of the U.S. Army responsible for detention facilities in Iraq, from approximately June 2003 to May 2004. She supervised and commanded all U.S. military police personnel in Iraq responsible for the care and control of detainees in U.S. military custody. Defendant Karpinski is a citizen of the United States and maintains her primary residence in South Carolina. She is sued in her individual capacity.

**C.    Related-Action Defendants**

19.    In addition to this action against Defendant Karpinski, Plaintiffs are bringing separate actions against three other high-ranking officials with responsibility for detainees in U.S. custody in Iraq in the various federal district courts that have personal jurisdiction over

- 7 -

those defendants. In addition to Defendant Karpinski, Plaintiffs are suing the following officials:

Donald H. Rumsfeld, who is and was at all relevant times the U.S. Secretary of Defense;

Lieutenant General Ricardo Sanchez, who served as Commander of the Coalition Joint Task

Force-7 ("CJTF-7"), the U.S.-led military coalition in Iraq, from June 2003 to July 2004; and

Colonel Thomas Pappas, who at relevant times commanded the 205th Military Intelligence

Brigade, oversaw military intelligence personnel in Iraq, and commanded the Joint Interrogation

and Debriefing Center at Abu Ghraib. Hereinafter, this complaint will refer to the defendants in

these other actions as the "Related-Action Defendants."

IV.    **LEGAL FRAMEWORK**

20.    The prohibition against torture is a peremptory *jus cogens* norm from which no

derogation is allowed. It is universally recognized and is binding on all persons under all

circumstances. As U.S. courts have recognized, the torturer, "like the pirate and slave trader

before him," is "*hostis humanis generis*, an enemy of all mankind." *Filartiga v. Pena-Irala*, 630

F. 2d 876 (2d Cir. 1980). Torture or other cruel, inhuman or degrading treatment of detainees is

universally prohibited by the laws of all civilized societies in clear and unambiguous terms.

Article 17 of the Third Geneva Convention, included as part of U.S. Army Field Manual 27-10,

*The Law of Land Warfare*, provides that "no physical or mental torture, nor any other form of

coercion, may be inflicted on prisoners of war to secure from them information of any kind

whatever." Article 32 of the Fourth Geneva Convention, also incorporated in Field Manual 27-

10, prohibits the torture of civilians. Article 3 Common to all Four Geneva Conventions

expressly prohibits "violence to life and person, ... murder of all kinds, mutilation, cruel

treatment and torture...." The U.N. Convention Against Torture or Other Cruel, Inhuman or

Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85, which

was ratified by the United States in 1994, confirms the nonderogable nature of this prohibition.

- 8 -

The U.S. Supreme Court recently reaffirmed that torture is among the gravest violations of the law of nations. *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2763 (2004); *id.* at 2783 (Breyer, J., concurring).

21.     U.S. military law and regulations incorporate these international and domestic prohibitions against the use of torture or other cruel, inhuman or degrading treatment, and obligate U.S. military personnel to abide by those binding norms. Article 93 of the Uniform Code of Military Justice imposes criminal liability on members of the U.S. military who mistreat detainees in their custody. Army Field Manual 34-52, which governs the conduct of interrogations by military interrogators, unambiguously prohibits "acts of violence or intimidation, including physical or mental torture, threats, insults or exposure to inhumane treatment as a means of or aid to interrogation." Army Regulation 190-8, *Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees*, prohibits "the use of physical or mental torture or any coercion to compel prisoners to provide information[,]" and provides that "[n]o form of physical torture or moral coercion will be exercised against the [civilian internee]."

22.     No circumstance excuses torture or other cruel, inhuman or degrading treatment. In 1999, the United States declared in its initial report to the U.N. Committee Against Torture:

> Torture ... is categorically denounced as a matter of policy and as a tool of state authority. ... No official of the Government, federal or state, civilian or military, is authorized to commit or to instruct anyone else to commit torture. Nor may any official condone or tolerate torture in any form. No exceptional circumstances may be invoked as a justification of torture. United States law contains no provision permitting otherwise prohibited acts of torture or other cruel, inhuman or degrading treatment or punishment to be employed on ground of exigent circumstances ... or on orders from a superior officer or public authority, and the protective mechanism of an independent judiciary are not subject to suspension.

- 9 -

23.    In the Convention Against Torture and Other Cruel, Inhuman or Degrading

Treatment or Punishment, which the United States ratified in 1994, torture is defined as "any act

by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a

person for such purposes as obtaining from him or a third person information or a confession,

punishing him for an act he or a third person has committed or is suspected of having committed,

or intimidating or coercing him or a third person ... when such pain or suffering is inflicted by or

at the instigation of or with the consent or acquiescence of a public official or other person acting

in an official capacity."

24.    In the 2003 country reports on human rights, the U.S. Department of State

condemned other countries for abuse of prisoners and identified beatings, blindfolding, denials of

food and water, dog attacks, use of forced painful positions, mock executions, slapping, sleep

deprivation, solitary confinement, stripping, and threats of sexual abuse as serious violations of

human rights.  A report posted on the White House website condemns as torture the following

acts, among others, of the Saddam Hussein regime: denial of food and water, threats to rape or

otherwise harm family members and relatives, pulling out of fingernails, extended solitary

confinement in dark and extremely small compartments, and beatings.  These condemnations

reflect an absolute U.S. policy against torture, emphasized by President Bush on June 22, 2004,

when he declared that "the values of this country are such that torture is not a part of our soul and

our being."  The Justice Department recognized in its recent Office of Legal Counsel

memorandum dated December 30, 2004 that "[t]orture is abhorrent both to American law and

values and to international norms," and endorsed court decisions that define torture to include

such conduct as death threats, frequent beatings, sleep deprivation and extended shackling.

403155.1

25.    In order to ensure that these fundamental protections are enforced, U.S. law, the law of nations, and binding treaty provisions provide for the liability of military or civilian commanders who authorize their subordinates to commit torture or other cruel, inhuman or degrading treatment of prisoners.

26.    The Fifth and Eighth Amendments to the U.S. Constitution prohibit torture or other cruel, inhuman or degrading treatment. The Fifth Amendment to the Constitution prohibits conduct against persons in U.S. custody that "shocks the conscience," including torture. *Rochin v. California*, 342 U.S. 165, 172-73 (1952). The Eighth Amendment also prohibits such conduct, as its core function is "to proscribe torture and other barbarous methods of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

27.    U.S. civilian and military commanders and officials are prohibited from violating the prohibitions of the U.S. Constitution, and are liable for injuries caused by their direct orders. Supervisors are also liable for the constitutional violations of their subordinates when (1) they knew or had reason to know that their subordinates were subjecting detainees in U.S. custody to torture and other abuse that shocks the conscience; (2) despite such knowledge, they created and left in place conditions in which torture or other cruel, inhuman or degrading treatment would occur; (3) they understood the substantial likelihood that torture and other abuse would ensue, but acted with deliberate indifference or conscious disregard of that likelihood and failed to take steps to prevent it; and (4) their actions were the proximate cause of injuries suffered by plaintiffs. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 839 (1994); *Estelle*, 429 U.S. at 106; *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988).

28.    The law of nations also imposes liability on superior officers for the acts of their subordinates. If the superior officer issues an order that is lawful on its face, liability attaches if

- 11 -

the commanding officer knows of the substantial likelihood that torture or other cruel, inhuman
or degrading treatment will result from the execution of the order. The doctrine of command
responsibility, recognized by the U.S. Supreme Court since *In re Yamashita*, 327 U.S. 1 (1946),
imposes liability on superior officers if they (1) exercised effective control over those
subordinates who engaged in torture and other mistreatment of plaintiff detainees in violation of
the law of nations; (2) knew or had reason to know of their subordinates' unlawful conduct; and
(3) despite such knowledge, failed to take reasonable and necessary measures to prevent their
subordinates' conduct.

## V.    FACTUAL ALLEGATIONS

### A.    General Allegations

29.    The U.S. military maintains detention facilities in Afghanistan and Iraq at which
Plaintiffs and others in U.S. military custody were tortured or otherwise abused by U.S. military
personnel and others acting under the direction of or with the authorization of the U.S. military,
pursuant to a policy, pattern or practice of misconduct.

30.    The torture or other cruel, inhuman or degrading treatment of Plaintiffs alleged in
this complaint occurred in enclaves under the exclusive jurisdiction of the United States and the
exclusive control of the U.S. military. Access to detainees by any person including agents or
employees of other governments and other U.S. government agencies is and was only with the
express or tacit permission of the U.S. military.

31.    Until the actions, omissions and derelictions of Defense Secretary Rumsfeld,
Defendant Karpinski and others alleged herein, the Armed Forces of the United States were
absolutely forbidden to engage in torture or other cruel, inhuman or degrading treatment or
punishment. No exceptions were permitted and no such conduct was authorized.

403155.1

32.    Related-Action Defendant Rumsfeld and other high-ranking military leaders began to abandon the absolute prohibition against torture soon after the military conflict in Afghanistan began. Secretary Rumsfeld's policies and practices authorized the use of interrogation techniques -- which were forbidden under military regulations -- against detainees arrested in Afghanistan, both in that country and at the U.S. detention facility at Guantanamo Bay, Cuba. Through further policies, practices and derelictions of duty, which extended those illegal techniques to Iraq, Secretary Rumsfeld, Defendant Karpinski and other commanders further compromised the prohibitions against torture or other cruel, inhuman or degrading treatment. Because of their policies, patterns, practices, acts, and omissions, the inviolable and deep-rooted prohibition of torture or cruel, inhuman or degrading treatment of detainees in U.S. custody was altered and abandoned.

33.    Defendant Karpinski and the Related-Action Defendants issued orders, adopted policies and granted authorizations that fundamentally altered the interrogation practices of the U.S. military. Through their actions and derelictions, these commanders, including Defendant Karpinski, expressly permitted cruel, inhuman or degrading treatment or punishment and tolerated or authorized torture. Related-Action Defendants Rumsfeld and Sanchez issued critical orders and directives that led to widespread torture and abuse. Like them, Defendant Karpinski knew of torture and abuse of detainees by her subordinates in Iraq, and failed to prevent and punish such conduct. As a direct and predictable result of Defendant Karpinski's actions and omissions, the U.S. military engaged in practices that violated the absolute prohibition against torture or other cruel, inhuman or degrading treatment.

34.    Defendant Karpinski's unlawful conduct was part of a policy, pattern or practice that originated in and was directed from the United States. The acts and omissions in the United

- 13 -

403155.1

States constituting that policy, pattern or practice include: Related-Action Defendant Rumsfeld's authorization of harsh interrogation techniques; his application of intense pressure on subordinates to obtain intelligence; his and Under Secretary of Defense Stephen Cambone's decision to send U.S. Army Major General Geoffrey Miller to Iraq to implement policies that predictably led to torture; Secretary Rumsfeld's tolerance and acceptance of torture; his command failure to investigate or punish subordinates for their acts; and his command failure to issue unequivocal orders to stop or prohibit torture or other cruel, inhuman or degrading treatment when he knew and should have known of the torture or other cruel, inhuman or degrading treatment of detainees in U.S. military custody in Afghanistan, Guantanamo and Iraq.

35.    As a consequence of Related-Action Defendant Rumsfeld's actions, including the visit of Major General Geoffrey Miller to Iraq, Related-Action Defendants Sanchez and Pappas issued policies and authorizations that expressly permitted cruel, inhuman or degrading treatment and that tolerated or authorized torture. Related-Action Defendants Sanchez and Pappas knew of torture and abuse of detainees by their subordinates, including troops under Defendant Karpinski's command, and failed to prevent and punish such conduct.

36.    As a further consequence of Related-Action Defendant Rumsfeld's actions, Defendant Karpinski, who was under Related-Action Defendant Sanchez's command and herself commanded military police in Iraq, executed the unlawful policies, patterns or practices causing torture and abuse; knew of torture and abuse of detainees by her subordinates; and failed to prevent and punish such conduct.

37.    As a further consequence of Related-Action Defendant Rumsfeld's actions, Related-Action Defendant Pappas, who was under Related-Action Defendant Sanchez's command and himself in command of military intelligence in Iraq and the Joint Interrogation and

- 14 -

Debriefing Center at Abu Ghraib, executed the unlawful policies, patterns or practices causing torture and abuse; knew of torture and abuse of detainees by his subordinates; and failed to prevent and punish such conduct.

38.    Defendant Karpinski's actions and derelictions caused the torture and abuse of detainees in Iraq to continue and to spread. Defendant Karpinski and the Related-Action Defendants knew that the abuse was widespread and systemic. They did not stop or prevent it because they accepted it and acted with deliberate indifference and conscious disregard of the high likelihood that their actions and derelictions would cause their subordinates to torture and otherwise mistreat detainees in U.S. custody.

39.    These actions, orders, authorizations, and derelictions caused the Plaintiffs in this action and at least hundreds of other civilian, non-combatant detainees in Afghanistan and Iraq to be tortured and otherwise abused in violation of the U.S. Constitution, U.S.-ratified treaties including the Geneva Conventions, and the law of nations.

40.    Defendant Karpinski is among the civilian officials and military commanders in positions of responsibility whose violations of law have come to light as a result of publicly disclosed reports, documents and other information. Upon information and belief, other civilian officials and military commanders are also liable for the torture or other cruel, inhuman or degrading treatment suffered by Plaintiffs and other detainees. Such additional individuals may also be named as defendants as additional information about their conduct comes to light.

**B.    Defendant's Actions and Failures of Command**

**1.    Defendant's Interrogation Policies, Patterns or Practices**

41.    Defendant Karpinski, along with the Related-Action Defendants, was at all relevant times personally responsible for developing, authorizing, supervising, and/or implementing the policies, patterns or practices governing the detention of detainees in Iraq

- 15 -

during the time that the Plaintiffs were in the custody of the U.S. military. These policies,

patterns or practices directly caused the widespread and systemic torture or other cruel, inhuman

or degrading treatment of Plaintiffs and other detainees in violation of the U.S. Constitution,

treaty provisions including the Geneva Conventions, military rules and guidelines, and the law of

nations.

42.    The policy, pattern or practice which ultimately led to the torture and other

mistreatment of Plaintiffs and other detainees in Iraq began at least by December 2, 2002, when

Related-Action Defendant Rumsfeld personally approved a list of illegal interrogation techniques

(the "December Rumsfeld Techniques") for use on detainees at Guantanamo. As set forth

below, the December Rumsfeld Techniques included techniques later used by subordinates in

Afghanistan and Iraq with Related-Action Defendant Rumsfeld's knowledge and approval.

These techniques were contrary to the established rules and military standards governing

detention and interrogation as set forth in Army Field Manual 34-52. The December Rumsfeld

Techniques included the following: the use of "stress positions," 20-hour interrogations, the

removal of clothing, playing upon a detainee's phobias to induce stress (such as through the use

of dogs), deception to make the detainee believe the interrogator was from a country with a

reputation for torture, the use of falsified documents and reports, isolation for up to 30 days, and

sensory deprivation.

43.    According to documents released by the U.S. government pursuant to a court

order in litigation under the Freedom of Information Act, *American Civil Liberties Union

Foundation, et al. v. Dep't of Defense, et al.*, No. 04-cv-4151 (AKH) (S.D.N.Y. 2004), the

Federal Bureau of Investigation began to document and complain about the interrogation

- 16 -

403155.1

techniques used by the military on detainees in Guantanamo as early as late 2002. FBI complaints were also communicated to Major General Miller.

44.    On January 15, 2003, Secretary Rumsfeld rescinded his blanket authorization of only some of the techniques in the December Rumsfeld Techniques. However, he failed to take any meaningful action to prevent, investigate, or punish the use of these unlawful techniques. Instead, in an order to the commander of the U.S. Southern Command, Secretary Rumsfeld stated that he personally could authorize the continued use of the otherwise-rescinded techniques, and that he wanted to be involved in the formulation of a plan to use them: "Should you determine that particular techniques in either of these categories are warranted in an individual case, you should forward that request to me. Such a request should include a thorough justification for the employment of those techniques and a detailed plan for the use of such techniques."

45.    Also on January 15, 2003, Secretary Rumsfeld directed the General Counsel of the Department of Defense to convene a "Working Group" on interrogation techniques for his personal review and consideration. For its analysis, the Working Group solicited information from U.S. military officers in Afghanistan concerning techniques being used by U.S. forces there.

46.    By December 2002, interrogators in Afghanistan had begun using harsh interrogation techniques on detainees, including the use of stress positions, dogs to induce fear, and sensory deprivation. These techniques are inconsistent with those listed in Army Field Manual 34-52. At the Working Group's request, military commanders in Afghanistan forwarded descriptions of these techniques to the Department of Defense. The Working Group did not express any objection to any of the techniques in use in Afghanistan. U.S. personnel continued

- 17 -

to use those techniques despite their inconsistency with standing military doctrine embodying international and domestic legal norms.

47.     The Working Group reported to Secretary Rumsfeld on April 4, 2003, and recommended 35 interrogation techniques for use at Guantanamo. On April 16, 2003, Secretary Rumsfeld personally approved the use of 24 of the techniques (the "April Rumsfeld Techniques"). These April Rumsfeld Techniques were based in part on information about techniques previously used by U.S. personnel in Afghanistan.

48.     At the time Secretary Rumsfeld issued the April Rumsfeld Techniques, reports of widespread and systemic detainee abuse in Afghanistan had already surfaced, and Secretary Rumsfeld knew and should have known of them.

49.     The April Rumsfeld Techniques included isolation for up to thirty days, dietary manipulation, environmental manipulation, "sleep adjustment," and "false flag" (leading detainees to believe that they have been transferred to a country that permits torture), none of which is consistent with the authorized interrogation techniques in Army Field Manual 34-52. Secretary Rumsfeld again provided that even harsher techniques could be used with his personal authorization. As set forth below, the April Rumsfeld Techniques, many of which had been used already in Afghanistan, were later used in Iraq by U.S. personnel under Defendant Karpinski's command.

50.     On information and belief, in the summer of 2003, Secretary Rumsfeld and Under Secretary of Defense Cambone knew of widespread torture and other abuse of detainees in Iraq and Guantanamo. However, they took no steps to prevent or punish these abuses. Instead, Secretary Rumsfeld took measures to increase the pressure on interrogators in a manner that he

- 18 -

403155.1

knew was highly likely to result in further torture or other cruel, inhuman or degrading treatment.

Defendant Karpinski and her subordinates carried out those measures in Iraq.

51.    On information and belief, Under Secretary Cambone supervised and

implemented, and Secretary Rumsfeld approved, the activities of a clandestine program

composed jointly of U.S. military and CIA personnel. This program began operations in Iraq in

or around the summer of 2003. On information and belief, members of this program were

authorized to use unlawful interrogation tactics, including physical and sexual humiliation,

against Iraqi detainees.

52.    In addition, Secretary Rumsfeld and Under Secretary Cambone sent Major

General Geoffrey Miller, who was then the commander of the U.S. military joint task force at

Guantanamo, to Iraq to deploy more aggressive interrogation methods on a widespread basis. In

public testimony to Congress, Under Secretary Cambone admitted that Miller was sent to Iraq

with his "encouragement" "to make certain that [the United States] had the proper conditions

within [detention facilities in Iraq] in order for . . . information to be gathered." According to

Defendant Karpinski, Miller told her that he was sent by Secretary Rumsfeld and Under

Secretary Cambone to "gitmo-ize" detention facilities there by causing Guantanamo

interrogation practices to be used on detainees in Iraq. Defendant Karpinski thus knew of and

acquiesced in Miller's activities at U.S. detention facilities in Iraq.

53.    On information and belief, Defendant Karpinski and the Related-Action

Defendants knew that Miller intended to apply in Iraq the techniques that Secretary Rumsfeld

had approved for use at Guantanamo, among others. On information and belief, Secretary

Rumsfeld also knew and should have known about the widespread detainee torture or other

cruel, inhuman or degrading treatment of detainees at Guantanamo and in Afghanistan while

- 19 -

403155.1

those techniques were in use.   Thus, Secretary Rumsfeld knew that it was highly likely that his actions in approving Miller's visit to Iraq would exacerbate the abuse of detainees there.

54.     As a result of the order by Secretary Rumsfeld and Under Secretary Cambone, Miller and his team caused illegal interrogation techniques from Guantanamo to be used against detainees in Iraq.   Miller's team consisted of 17 military personnel, all of whom had served at Guantanamo.   Miller and his team used the April Rumsfeld Techniques as a "baseline" for recommending new, harsher interrogation techniques for use at the U.S. detention facility at Abu Ghraib in Iraq.   According to Related-Action Defendant Pappas, detainee policies and procedures at Abu Ghraib were enacted as a specific result of Miller's visit.

55.     Defendant Karpinski has stated that Miller told her that detainees at Guantanamo were "treated like dogs," and that he recommended the same for detainees in Iraq.   Defendant Karpinski admitted that she did not have authority to allow military intelligence operatives to control conditions at Abu Ghraib.   However, she acquiesced in Major General Miller's plan to do so.   Defendant Karpinski has further stated that Miller informed her that Related-Action Defendant Sanchez had given Miller complete authority to take over any detention facility he wanted.   Defendant Karpinski carried out the plans of Related-Action Defendant Sanchez and Major General Miller, thus abdicating her duty as a commander to prevent torture or other cruel, inhuman or degrading treatment.

56.     Among other techniques, General Miller recommended the use of dogs with detainees in Iraq.   On information and belief, dogs were intentionally used to instill fear in detainees and the practice was based on the belief that Arabs have a culturally-based fear of dogs.   Based on Miller's recommendation, Related-Action Defendant Pappas instituted the use of dogs to "set[ ] the atmosphere for which, you know, you could get information."

- 20 -

403155.1

57.     In the summer of 2003, in anticipation of obtaining approval for harsher interrogation practices, a member of Related-Action Defendant Sanchez's staff transmitted an email message asking military intelligence personnel in Iraq to provide by August 17, 2003 a "wish list" of interrogation techniques they wished to use. The email stated the "gloves are coming off," and "we want these individuals broken."

58.     In early 2003, Captain Carolyn Wood and members of the 519th Military Intelligence Battalion under her command were transferred from Afghanistan to Iraq. Previously, while deployed in Afghanistan, members of the 519th Military Intelligence Battalion under Wood's command had killed two detainees. In July 2003, Captain Wood and her battalion were assigned to Abu Ghraib. After arriving in Iraq, Captain Wood proposed a list of 30 interrogation techniques for use at Abu Ghraib to Related-Action Defendant Sanchez for approval. Related-Action Defendant Sanchez's staff approved these techniques. On information and belief, the approved techniques included stress positions, sensory and sleep deprivation, and use of dogs.

59.     On September 14, 2003, in response to General Miller's call for Guantanamo-like interrogation policies for use in Iraq, as directed by Related-Action Defendant Rumsfeld, and a request for guidance from the 519th Military Intelligence Battalion, Related-Action Defendant Sanchez signed a memorandum authorizing the use of 29 interrogation techniques (the "September Sanchez Techniques"), 12 of which were inconsistent with Army Field Manual standards, including five that went beyond those authorized by Secretary Rumsfeld for use at Guantanamo. The September Sanchez Techniques included the use of dogs, stress positions, and sensory deprivation. The September Sanchez Techniques were based on two sources: (1) the April Rumsfeld Techniques, which General Miller gave to General Sanchez earlier in the month,

- 21 -

and (2) suggestions from Captain Wood, who brought with her a list of techniques that had been used by the 519th Military Intelligence Battalion in Afghanistan. General Sanchez issued the September Sanchez Techniques a few days after Secretary Rumsfeld visited the U.S. detention facility at Abu Ghraib.

60.     In his September Sanchez Techniques, Related-Action Defendant Sanchez specified that his personal approval was required for the use of dogs, stress positions, yelling, loud music, and light control. Thus, General Sanchez was intimately and directly involved in the use of unlawful interrogation techniques against detainees in his custody in U.S. military facilities in Iraq.

61.     On October 12, 2003, Related-Action Defendant Sanchez modified his previous September 14, 2003, authorization of particular techniques, but continued to authorize interrogators to "control" the lighting, heating, food, shelter, and clothing given to detainees. Although General Sanchez's October 12 order placed certain restrictions on the use of dogs, such as requiring a muzzle, he continued to permit the use of dogs in interrogations, provided that interrogators applied for and received prior authorization. General Sanchez indicated that he could approve the use of such techniques on a case-by-case basis.

62.     On information and belief, while in command at the Abu Ghraib prison, Related-Action Defendant Pappas authorized the following interrogation techniques: sleep deprivation, use of dogs to intimidate detainees, shackling, and forced stripping of detainees.

63.     The Related-Action Defendants issued the foregoing unlawful interrogation policies and caused other such policies to be issued by others, while they and Defendant Karpinski simultaneously pursued policies that fostered and condoned torture or other cruel, inhuman or degrading treatment. Specifically, Defendant Karpinski and the Related-Action

- 22 -

Defendants caused the implementation of unorthodox command structures, permitted personnel responsible for detention and interrogation to operate with inadequate training, and pressured subordinates to produce intelligence through interrogations at all costs.

64.    Defendant Karpinski and the Related-Action Defendants established command structures that were contrary to military doctrine, in a manner highly likely or calculated to cause torture or other cruel, inhuman or degrading treatment. For example, high-level commanders in Iraq implemented a recommendation by General Miller – whom Related Action Defendant Rumsfeld had sent to Iraq – that military intelligence and military police work together to "set the conditions for interrogations." The use of military police soldiers as assistance for interrogation was improper and done for the purpose of inflicting abuse on detainees to make them compliant during interrogation. Military intelligence officers told military police soldiers, who were untrained in detainee interrogation tactics, to "make sure" that a detainee "has a bad night," or "make sure he gets the treatment."

65.    This improper and dangerous misuse of military police personnel under Defendant Karpinski's command was specifically implemented at Abu Ghraib. On November 19, 2003, Related-Action Defendant Sanchez appointed Related-Action Defendant Pappas of the 205th Military Intelligence Brigade as the base commander for Abu Ghraib prison, and made him responsible for the support of all military police assigned to the prison. This command structure was contrary to existing military doctrine because Colonel Pappas was a military intelligence officer and should not also have commanded military police, and exacerbated the confusion as to who was in charge at the prison. Military police soldiers under the command of Colonel Pappas have stated that he encouraged them to "soften up" detainees for interrogation, which they understood to mean physical and mental abuse.

- 23 -

66.    Defendant Karpinski and the Related-Action Defendants also increased the likelihood that subordinates would torture and otherwise abuse detainees by tolerating a lack of adequate training in detainee and interrogation operations for subordinate military personnel, with knowledge that the lack of training was contributing to an atmosphere permissive of torture or other cruel, inhuman or degrading treatment.

67.    Official government reports have pointed to "intense pressure felt by the personnel on the ground to produce actionable intelligence from detainees" as the cause of the torture or other cruel, inhuman or degrading treatment.  According to Related-Action Defendant Sanchez, high-ranking officers, including, on information and belief, Related-Action Defendant Rumsfeld, placed "great pressure . . . upon the intelligence system to produce actionable intelligence."  Related-Action Defendant Pappas claims that he felt "intense pressure" placed on him by superior officers "for intelligence from interrogations."  Colonel Pappas in turn put great pressure on his subordinates for intelligence.

68.    On information and belief, Defendant Karpinski never renounced, revoked or rescinded policies, orders and authorizations that caused Plaintiffs to be tortured and subjected to cruel, inhuman or degrading treatment by Defendants' subordinates.  Despite widespread and systemic abuse of detainees, Defendant Karpinski never unequivocally revoked authorization for and prohibited use of all interrogation and detention techniques contrary to the U.S. Army Field Manual.

### 2.    Defendant's Knowledge of Torture and Abuse of Detainees

69.    Independent of the orders or authorizations of Defendant Karpinski and the Related-Action Defendants, beginning as early as 2002, and both before and throughout the time Plaintiffs were detained in U.S. custody, U.S. Defense Department and military officials knew and should have known that individuals under their actual and effective command were engaging

- 24 -

403155.1

in or permitting the torture and other abuse of detainees in U.S. custody in violation of U.S. and

international law.  Despite her knowledge of the torture and other cruel, inhuman and degrading

treatment of detainees, Defendant Karpinski failed to take reasonable and necessary steps to

prohibit, prevent and end the torture and abuse by her subordinates.

70.     Defendant Karpinski and the Related-Action Defendants had actual and

constructive knowledge of torture and other cruel, inhuman or degrading treatment based on

numerous sources including but not limited to those set forth in the following paragraphs.

71.     In or about early 2002, soon after the start of military actions in Afghanistan,

Related-Action Defendant Rumsfeld had actual notice of torture and other abuse of detainees

arrested by U.S. forces in Afghanistan.  In December 2001, John Walker Lindh, a U.S. citizen

arrested and detained by the U.S military in Afghanistan, was photographed while stripped naked

and bound to a stretcher.

72.     On January 7, 2002, the non-governmental organization Amnesty International

wrote a letter to Related-Action Defendant Rumsfeld expressing concern about the treatment of

detainees captured in Afghanistan.  It noted in the letter that "as well as hooding, the following

methods of interrogation may not be used as they violate the prohibition of torture and ill-

treatment: restraining in very painful conditions; playing of loud music; prolonged sleep

deprivation; threats, including death threats; violent shaking; and using cold air to chill the

detainee."

73.     On January 22, 2002, Amnesty International sent another letter to Related-Action

Defendant Rumsfeld, complaining about the treatment of detainees.

74.     On April 10, 2002, Amnesty International again sent a lengthy memorandum to

Secretary Rumsfeld, among others, in order to bring attention to allegations of mistreatment of

detainees in Afghanistan and at Guantanamo. Secretary Rumsfeld was questioned about the April 10, 2002, Amnesty International memorandum during a news briefing on April 15, 2002.

75.     On information and belief, in late 2002, a high-ranking Defense Department official who reported directly to Secretary Rumsfeld received complaints from agents of the Federal Bureau of Investigation ("FBI") about abusive interrogation tactics used against detainees at Guantanamo. On information and belief, Secretary Rumsfeld was aware of these complaints.

76.     Documents produced by the Department of Defense pursuant to litigation under the Freedom of Information Act, *see American Civil Liberties Union Foundation, et al. v. Dep't of Defense, et al.*, No. 04-cv-4151 (AKH) (S.D.N.Y. 2004), reveal that in August 2002, the Criminal Investigations Command found probable cause to charge a team of four U.S. military personnel with the murder of an Afghan detainee in U.S. custody and a conspiracy relating to the murder. The Criminal Investigations Command also found probable cause to charge a fifth U.S. soldier with being an accessory after the fact, and found that the team's commander had instructed a soldier to destroy incriminating photographs of the victim's body. Despite the Criminal Investigations Command's findings, the Commander's Report recorded no court-martial proceedings in the case and no disciplinary action other than a single written reprimand of one soldier.

77.     Secretary Rumsfeld and other U.S. civilian officials and military commanders knew of widespread detainee mistreatment in Afghanistan on or before December 26, 2002, when the Washington Post reported on regular, systemic abuses at the U.S. Air Base at Bagram, including the use of "stress and duress" techniques that constitute torture or other cruel, inhuman or degrading treatment. Regarding the interrogation of detainees at the U.S. military base by

- 26 -

agents of the Central Intelligence Agency, the article quoted a U.S. government official as

saying, "if you don't violate someone's human rights some of the time, you probably aren't

doing your job." The same article reported that U.S. military personnel were used to "soften up"

detainees for interrogation.

78.    In December 2002, two Afghan detainees, Mullah Habibullah and Dilawar, were

killed in U.S. custody at the Bagram detention facility while being interrogated by members of

the 519th Military Intelligence Battalion. Although U.S. military physicians had concluded that

the cause of the detainees' deaths was homicide, the commander of U.S. military forces in

Afghanistan continued to insist publicly that the two detainees had died of natural causes.

79.    On December 26, 2002, the nongovernmental organization Human Rights Watch

wrote to President Bush and transmitted a copy of the letter to Related-Action Defendant

Rumsfeld, asking that allegations of torture at the Bagram detention facility in Afghanistan be

investigated immediately.

80.    On January 14, 2003, executive directors of various human rights organizations

wrote to Deputy Secretary of Defense Paul Wolfowitz and asked that the United States

promulgate clear guidelines to prevent torture. On information and belief, Secretary Rumsfeld

received notice of that letter.

81.    On February 5, 2003, Amnesty International met with William J. Haynes, the

General Counsel of the Department of Defense, to discuss allegations of torture and ill-treatment

of detainees in Guantanamo and Afghanistan. On information and belief, the General Counsel of

the Department of Defense reports directly to Secretary Rumsfeld.

82.    In March 2003, prominent newspapers such as the *New York Times*, *Los Angeles*

*Times*, *Wall Street Journal, and Atlanta Journal-Constitution* published articles on persistent

- 27 -

reports of serious human rights violations at detention centers at Guantanamo and in

Afghanistan, including deaths of detainees under suspicious circumstances in Afghanistan.

83.    On March 10, 2003, Amnesty International sent a letter to President Bush, with a

copy to Secretary Rumsfeld, calling upon the U.S. government to investigate allegations of

torture and other abuse at the Bagram detention facility. The letter described specific cases of

abuse.

84.    Starting in May 2003, the International Committee of the Red Cross began

sending reports detailing abuses of detainees in U.S. custody in Iraq to the U.S. Central

Command in Qatar. The May 2003 report described 200 allegations of torture and other abuse of

detainees by U.S. soldiers. The medical delegate of the International Committee of the Red

Cross observed marks on the detainees' bodies that corroborated the allegations of abuse.

85.    General John Abizaid, the commander of the U.S. Central Command, confirmed

that his office received the report in May 2003.

86.    U.S. Secretary of State Colin Powell confirmed that Secretary Rumsfeld knew of

the various reports by the International Committee of the Red Cross, stating that he and Secretary

Rumsfeld kept President Bush regularly apprised of their contents throughout 2003.

87.    On May 15, 2003, Amnesty International publicized allegations of torture and

other abuse of Iraqi detainees by U.S. and British forces, including beatings and electric shocks.

88.    On June 23, 2003, Amnesty International sent a letter to Secretary Rumsfeld

expressing concern about the death of an Afghan detainee held in U.S. custody.

89.    In June 2003, Amnesty International wrote to Ambassador Paul Bremer, who was

then the Administrator of the Coalition Provisional Authority governing Iraq, to express its

concerns about the treatment of detainees in U.S. custody in Iraq. On information and belief,

- 28 -

Bremer met on a frequent basis with Related-Action Defendant Sanchez, who was responsible for military support for Bremer and the Coalition Provisional Authority.

90.    In early July 2003, the International Committee of the Red Cross sent U.S. military forces in Iraq – many of whom were commanded by Defendant Karpinski at the time – a working paper detailing approximately 50 allegations of abuse and violence against detainees in Iraq. Among the abuses detailed in the report are the following: striking detainees with rifle butts, taking aim at detainees with rifles, slaps, punches, prolonged exposure to the sun, isolation in dark cells, and threats of indefinite detention or detention of family members.

91.    On July 15, 2003, the late Sergio Vieira de Mello, then the U.N. High Commissioner for Human Rights, raised concerns regarding the treatment of detainees in U.S. custody with Ambassador Bremer.

92.    On information and belief, Ambassador Bremer met with Secretary Rumsfeld in August 2003 and repeatedly urged him to improve conditions in U.S.-controlled detention facilities in Iraq.

93.    On July 23, 2003, Amnesty International released a second report criticizing the United States for mistreatment of detainees in Iraq. Allegations included the use of electric shocks, sleep deprivation, and stress positions. Major newspapers, including the *New York Times*, reported on Amnesty International's allegations.

94.    Secretary Rumsfeld personally visited Abu Ghraib prison on September 6, 2003. His visit to Abu Ghraib coincided with General Miller's visit, and took place during the period in which abuses were taking place. Photographs depicting Secretary Rumsfeld at the prison and meeting with Defendant Karpinski were published in the *New York Times*. According to an official U.S. military investigation, during the time of Secretary Rumsfeld's visit, military

- 29 -

403155.1

intelligence personnel at Abu Ghraib were requesting and encouraging military police personnel

to abuse detainees in violation of established policies and laws.

95.    Approximately one month after the visits of Secretary Rumsfeld and General

Miller to Abu Ghraib, from October 9 through 12 and October 21 through 23, 2003, the

International Committee of the Red Cross visited Abu Ghraib and determined that detainees in

U.S. custody were being subjected to "physical and psychological coercion" which was in some

cases "tantamount to torture." The abuses witnessed by the International Committee of the Red

Cross included: threats, sleep deprivation, tight handcuffs that caused lesions and wounds, and

holding of detainees in total darkness in bare concrete cells, while completely naked. U.S.

military personnel told representatives of the International Committee of the Red Cross that such

treatment was "part of the process." During this visit, the International Committee of the Red

Cross found that detainees at Abu Ghraib had physical signs of injury and psychological

symptoms such as suicidal tendencies, memory loss, and acute anxiety reactions.

96.    The International Committee of the Red Cross conveyed its concerns to U.S.

military commanders in Iraq through reports and briefings in October and November 2003.

Defendant Karpinski and Related-Action Defendants Sanchez and Pappas were notified of the

details of abuse by the Red Cross by November 2003. Defendant Karpinski and Related-Action

Defendant Pappas received at least one written report of torture and other abuses from the

International Committee of the Red Cross during that time period.

97.    In response to the International Committee of the Red Cross's oral and written

reports of torture and other unlawful abuses in October and November 2003, Related-Action

Defendant Pappas revoked the International Committee of the Red Cross's access to

interrogation areas and denied the International Committee of the Red Cross's requests to

403155.1

interview specified detainees. Related-Action Defendant Sanchez's staff approved those denials
of access. Defendant Karpinski and Related-Action Defendants Sanchez and Pappas did not do
anything to stop the torture and other unlawful abuses.

98.    Defendant Karpinski responded to the International Committee of the Red Cross
November 2003 report in a letter dated December 24, 2003. According to an official
investigative report by Major General George Fay (the "Fay Report"), Defendant Karpinski's
response "gloss[ed] over, close to the point of denying[,] the inhumane treatment, humiliation,
and abuse identified by the [International Committee of the Red Cross]."

99.    On November 12, 2003, the Lawyers Committee for Human Rights (now known
as Human Rights First) wrote to the commander of U.S. forces in Afghanistan and transmitted a
copy to Secretary Rumsfeld requesting information about the current status of military
investigations into the deaths of three detainees who died in U.S. custody in Afghanistan.

100.    On information and belief, on November 14, 2003, Amnesty International wrote a
letter to Secretary Rumsfeld concerning reports of abuse of Iraqi detainees by the U.S. military.

101.    In December 2003, Colonel Stuart Herrington of the U.S. Army submitted an
investigative report (the "Herrington Report") to Major General Barbara Fast, a high-level
military intelligence commander in Iraq who reported directly to Related-Action Defendant
Sanchez. Herrington reported details of abuses committed against detainees in Iraq by a joint
task force of military Special Operations and Central Intelligence Agency officers, known as
Task Force 121. Herrington reported that military medical personnel found the detainees showed
signs of having been beaten. Herrington concluded in his December 2003 report: "It seems
clear that TF 121 needs to be reined in with respect to its treatment of detainees." Herrington
further reported that TF 121 had detained the family members of suspects and refused to release

- 31 -

the family members until the suspects turned themselves in – a practice Herrington described as "having a 'hostage' feel." On information and belief, Related-Action Defendant Sanchez received the December 2003 Herrington report and forwarded it to his superior officers.

102.   On January 13, 2004, a U.S. soldier stationed at Abu Ghraib gave Army criminal investigators a copy of a CD containing photographs depicting individuals under Defendant Karpinski's actual and effective command engaging in gross acts of torture or other cruel, inhuman or degrading treatment.

103.   Related-Action Defendants Rumsfeld and Sanchez were notified of the photographs.

104.   On January 16, 2004, the U.S. Army released a five-sentence press release acknowledging allegations of detainee abuse in Iraq.

105.   In February 2004, the International Committee of the Red Cross issued an exhaustive report of torture and abuse at U.S. detention facilities in Iraq. On information and belief, Secretary Rumsfeld knew of this report by mid-February 2004. During that time period, Secretary Rumsfeld informed President Bush that the Department of Defense was investigating allegations of detainee mistreatment in Iraq.

106.   In late February or early March 2004, Army Major General Antonio Taguba provided an investigative report (the "Taguba Report"), detailing torture in Abu Ghraib, to Related-Action Defendant Sanchez. On information and belief, Secretary Rumsfeld received the Taguba Report shortly after it was completed.

107.   General John Abizaid, commander of the U.S. Central Command encompassing Iraq and Afghanistan, admitted in testimony before the Senate Armed Services Committee on

May 19, 2004, that "we should have known. And we should have uncovered it and taken action

before it [abuse of detainees] got to the point that it got to. I think there's no doubt about that."

108.    According to an official investigative report by Army Lieutenant General

Anthony Jones (the "Jones Report"), the following "indications and warnings" informed Related-

Action Defendant Sanchez's command of detainee abuse at Abu Ghraib and other detention

facilities in Iraq: "the investigation of an incident at Camp Cropper, [International Committee of

the Red Cross] reports on handling of detainees in subordinate units, [International Committee of

the Red Cross] reports on Abu Ghraib detainee conditions and treatment, [Army Criminal

Investigations Command] investigations and disciplinary actions being taken by commanders,

the death of an OGA detainee at Abu Ghraib, the lack of an adequate system for identification

and accountability of detainees, and division commanders' continual concerns that intelligence

information was not returning to the tactical level once detainees were evacuated to the central

holding facility."

109.    The report of an official investigation headed by former Secretary of Defense

James Schlesinger (the "Schlesinger Report") also states that Defendant Karpinski and Related-

Action Defendant Pappas "knew, or should have known, abuses were taking place and taken

measures to prevent them."

110.    A military lawyer for an enlisted soldier charged with the abuse of detainees

stated in court that his client told him that Related-Action Defendant Sanchez was personally

present at Abu Ghraib during interrogations and may have witnessed abuse.

111.    On information and belief, Related-Action Defendant Pappas was frequently

present at Abu Ghraib during relevant time periods, resided at the Abu Ghraib facility for some

403155.1

period of time, and was present in a cellblock at Abu Ghraib on the night that a detainee was killed during interrogation.

112.    On information and belief, numerous additional reports and documents of the International Committee of the Red Cross and the U.S. military as well as other sources of information document the abuse and torture of detainees in U.S. military custody in Guantanamo, Afghanistan and Iraq. On information and belief, Secretary Rumsfeld has personal knowledge of the content of additional documents and reports documenting abuse and torture of detainees in Guantanamo, Afghanistan and Iraq.

113.    As set forth above, Defendant Karpinski and the Related-Action Defendants were well aware of the widespread torture and other cruel, inhuman or degrading treatment of detainees in U.S. custody as early as the time she took command of military police forces in Iraq and throughout the period before the public disclosure in the spring of 2004 of specific abuses at Abu Ghraib. However, Defendant Karpinski did not take steps to stop or prevent torture and other abuses at any point, and none of the Related-Action Defendants took such steps until after the public outcry regarding abuses at Abu Ghraib. It was only then that U.S. military officials made some public statements critical of the abuses and some measures were taken against a few individuals. These measures were not only too late in coming, but also inadequate, as set forth below.

### 3.    Defendant's Failure to Act upon Knowledge to End Torture and Abuse of Detainees

114.    Defendant Karpinski and the Related-Action Defendants did not take reasonable and necessary steps at any stage to ensure that no further abuses would occur. As a proximate result, Plaintiffs were tortured and subjected to other cruel, inhuman or degrading treatment while detained in U.S. military facilities.

- 34 -

403155.1

115.    The official report by U.S. Army Major General George Fay found that "inadequate interrogation doctrine and training, and acute shortage of MP [military police] and MI [military intelligence] [s]oldiers, the lack of clear lines of responsibility between the MP and MI chains of command, the lack of a clear interrogation policy for the Iraq Campaign, and intense pressure felt by the personnel on the ground to produce actionable intelligence from detainees" resulted in the abuse of detainees in Iraq.

116.    As documented in numerous official U.S. government reports, from the outset of and throughout the military actions in Iraq, Defendant Karpinksi and the Related-Action Defendants knowingly failed to provide for adequate training of U.S. military personnel charged with the detention and interrogation of detainees. Despite receiving notice of the torture or other cruel, inhuman or degrading treatment that ensued, Defendant Karpinski failed to take any steps to correct her initial failure to train subordinates in the proper treatment of detainees. Defendant Karpinski knew and should have known that this lack of adequate training, combined with her other policies and practices, would lead to the further torture or other cruel, inhuman or degrading treatment of detainees in U.S. custody.

117.    Defendant Karpinski and the Related-Action Defendants each continued to put untrained personnel in charge of detainees, after receiving notice that these untrained personnel were torturing and otherwise abusing detainees. The Taguba Report found that "there is no evidence that the command, although aware of these deficiencies [in training], attempted to correct them in any systemic manner other than ad hoc training by individuals with civilian corrections experience." In particular, the Schlesinger Report blamed Defendant Karpinski and Related-Action Defendant Pappas for the abuses at Abu Ghraib, and specifically cites Colonel

- 35 -

Pappas' failure "to ensure that his subordinates were properly trained and supervised" as contributing to the abuses at Abu Ghraib.

118.    Defendant Karpinski and the Related-Action Defendants also failed to take sufficient and meaningful measures to discipline subordinates who committed torture or other cruel, inhuman or degrading treatment against detainees. Rather than taking timely and effective actions, Defendant Karpinski and the Related-Action Defendants indeed expanded or maintained the authority of these subordinates to use harsh measures against detainees, even though they knew and should have known that these subordinates previously had allowed, authorized or committed torture or abuse.

119.    Superior officers and commanders, including Related-Action Defendant Sanchez, failed to discipline Captain Wood in connection with the two murders committed in Afghanistan by personnel under her command in the 519th Military Intelligence Battalion. Instead, within weeks of the murders, Wood was awarded the first of two Bronze Star medals for "exceptionally meritorious service."

120.    Also, in lieu of discipline, Wood and her subordinates were assigned to interrogation duty in Iraq, including Abu Ghraib, where predictably they continued to torture and otherwise abuse detainees. On information and belief, none of the members of the 519th Military Intelligence Battalion were disciplined prior to the battalion's redeployment to Iraq. Wood's reassignment, along with "word of mouth," meant that the same techniques used on detainees in Afghanistan were put into effect in Iraq. The list of interrogation techniques Wood proposed to Related-Action Defendant Sanchez, which his staff approved, were "a near copy of" techniques used by her unit in Afghanistan.

- 36 -

403155.1

121.    Upon information and belief, no charges were brought against any members of the 519th Military Intelligence Battalion who were involved in the homicides at the Bagram detention facility until August 2004, when one Army sergeant was charged in connection with the torture and murder of the two Afghan detainees.

122.    The refusal of Related-Action Defendant Sanchez and others to take timely action against U.S. military personnel responsible for the deaths of the two Afghan detainees resulted in further torture and other abuse. A third Afghan detainee was tortured to death in March 2003, several months after the first two died in U.S. custody.

123.    In May 2003, soldiers commanded by Colonel Jerry Phillabaum, an officer under the command of Defendant Karpinski and Related-Action Defendant Sanchez, tortured detainees at the Camp Bucca facility. Defendant Karpinski was aware of the conduct of Phillabaum's soldiers. Neither she nor Related-Action Defendant Sanchez punished Phillabaum. Instead, Defendant Karpinski and Related-Action Defendant Sanchez placed Colonel Phillabaum in command of the Abu Ghraib prison, where soldiers under his command again tortured and otherwise abused detainees.

124.    The soldiers in Phillabaum's command who tortured and abused detainees at Camp Bucca in May 2003 were given extremely light sanctions. The most severe was a "less-than-honorable discharge." As Defendant Karpinski admitted, the inconsequential sanctions "communicated to the soldiers, the worst that's gonna happen is, you're gonna go home."

125.    By at least November 2003, Related-Action Defendant Sanchez knew and should have known that soldiers under the command of Defendant Karpinski and Colonel Phillabaum again had tortured detainees, this time at Abu Ghraib. The Taguba Report described Phillabaum's battalion as "the most troubled battalion guarding, by far, the largest number of

- 37 -

detainees in the 800th MP [military police] Brigade." However, Related-Action Defendant

Sanchez took no action against Defendant Karpinski and Phillabaum until he suspended

Phillabaum's command on January 17, 2004, about eight months after receiving notice of torture

committed by Phillabaum's soldiers. Related-Action Defendant Sanchez issued a formal

admonishment to Defendant Karpinski on January 17, 2004, but left her in command of all

detainee operations in Iraq until the torture and other abuses at Abu Ghraib were publicly

exposed in the media in May 2004.

126.    Documents produced by the Department of Defense in litigation under the

Freedom of Information Act, *see American Civil Liberties Union Foundation, et al. v. Dep't of

Defense, et al.*, No. 04-cv-4151 (AKH) (S.D.N.Y. 2004), demonstrate that Defendant Karpinski

and the Related-Action Defendants failed to investigate detainee deaths adequately and failed to

punish soldiers responsible for deaths. For example, on September 11, 2003, a U.S. soldier shot

and killed an Iraqi detainee under suspicious circumstances. The Army Criminal Investigations

Command did not receive a report on the shooting until September 15, 2003. During the

intervening time, the crime scene was significantly altered, the weapon and bullet had not been

collected, and no autopsy was conducted. Although the Army Criminal Investigations Command

determined that probable cause existed for a murder charge, it was too late. The Army held a

hearing under Article 32 of the Uniform Code of Military Justice to determine whether there was

cause to charge the soldier with voluntary manslaughter. The result was a decision not to

prosecute. The soldier had received a reduction in rank and was discharged from the Army

before the Criminal Investigations Command's investigation was concluded.

127.    The documents obtained through the Freedom of Information Act further reveal

that in November 2003, the Army Criminal Investigations Command at Fort Stewart, Georgia,

received a U.S. soldier's sworn statement that he had observed "war crimes" by U.S. military personnel against detainees in Iraq and that his "chain of command did nothing to stop these war crimes and allowed them to happen." Among other things, the soldier stated that detainees were forced to stay outdoors in extremely hot weather for up to 12 hours, with their hands bound so tightly behind their backs that their hands turned purple. The soldier also stated that U.S. military personnel drove a Bradley fighting vehicle toward detainees in order to "spook" them. The Criminal Investigations Command closed its investigation on the purported ground that "a thorough investigation failed to produce any logical subjects and there is no serious injury, and ... furtherance of the investigation would be of little or no value or leads remaining to be developed are not significant."

128.    Related-Action Defendants Sanchez and Rumsfeld have also failed and continue to fail in their duty to investigate the responsibility of high-level commanders and civilian officials for the torture or other cruel, inhuman or degrading treatment of detainees. Although General Sanchez and Secretary Rumsfeld ordered investigations into the torture of prisoners, they knowingly limited those investigations in a manner that precluded finding wrongdoing by or assigning responsibility to high-ranking civilian or military commanders or officials, including themselves.

129.    Despite having notice of torture or other cruel, inhuman or degrading treatment at multiple detention facilities throughout Iraq, General Sanchez ordered Generals Fay and Taguba to investigate torture only in relation to Abu Ghraib and only in relation to certain brigades and for certain time periods. General Sanchez thus intentionally and knowingly avoided a meaningful and thorough inquiry into the knowledge and conduct of higher-level officials, as well as an investigation into the widespread nature of torture in Iraq.

- 39 -

130.    Official reports by Army investigators Generals Taguba, Jones and Fay concluded that Defendant Karpinski and Related-Action Defendant Pappas, among others, were responsible for the abuses at Abu Ghraib through their failures of leadership. However, Related-Action Defendants Sanchez and Rumsfeld refused to bring charges against anyone other than soldiers who personally tortured or otherwise abused detainees, despite having information that those soldiers acted at the direction of superior officers.

131.    Although the U.S. military has taken some steps to punish personnel who committed homicide, torture or other cruel, inhuman or degrading treatment, those steps began primarily after media attention to the Abu Ghraib scandal in May 2004, which was far too late to prevent the torture or other cruel, inhuman or degrading treatment inflicted on Plaintiffs.

132.    In March 2004, approximately two months after military commanders in Iraq came into possession of photographs of torture at Abu Ghraib but before those photographs became public, a detainee in U.S. custody in Mosul, Iraq, stated that he had been tortured by U.S. personnel. According to government documents produced in litigation under the Freedom of Information Act, the detainee stated that U.S. personnel bent his thumb backwards, kicked him, hit him in the neck with the butt of a gun, deprived him of sleep, slammed his head against a wall, and repeatedly burned him with hot liquids and a lamp. A U.S. Army noncommissioned officer stated that he believed Navy SEALs might have physically abused the detainee and a U.S. military medical screening record reflected that the detainee had second-degree burns and singed tissue on his body. The Criminal Investigations Command nonetheless concluded that there was insufficient evidence to prove or disprove the detainee's statements, and it ended its investigation.

- 40 -

133.    Other belated steps have been inadequate to stop the abuse of detainees, as

demonstrated by the continued torture or other cruel, inhuman or degrading treatment of

detainees disclosed in documents produced pursuant to litigation under the Freedom of

Information Act.

134.    For example, the Freedom of Information Act documents reveal that prior to June

25, 2004, officers of the Defense Intelligence Agency witnessed members of a U.S. military unit

known as Task Force 626 punching a detainee in the face "to the point that the individual needed

medical attention." The Defense Intelligence Agency officers also observed that detainees

arriving at a temporary detention facility in Baghdad had bruises and burn marks on their backs.

When task force members learned that a Defense Intelligence Agency officer had photographed

some detainees' injuries, the task force members confiscated the photographs and threatened the

officer. Task force members also seized the Defense Intelligence Agency officers' vehicle keys

and ordered them not to leave the U.S. military compound. On information and belief, Related-

Action Defendant Rumsfeld was aware of the activities of Task Force 626 because he had

established and directed activities of an intelligence-gathering unit that worked closely with Task

Force 626.

135.    The Freedom of Information Act documents further reveal that on or about May

11, 2004, a Defense Intelligence Agency officer witnessed detainees in Baghdad, Iraq, being

abused by U.S. military personnel during an interrogation. The officer witnessed four or five

non-interrogator military personnel enter the interrogation room and begin slapping the detainee

as he was attempting to answer questions.

- 41 -

### C. Consequences of Defendant's Conduct

#### 1. Defendant's Policies, Patterns or Practices Resulted in Widespread Torture and Abuse of Detainees in Iraq

136.    As set forth above, the policy, pattern or practice of torture and other cruel, inhuman and degrading treatment of detainees in U.S. custody in Iraq had its genesis in the interrogation and detention procedures used by U.S. forces in Afghanistan.

137.    On information and belief, the U.S. military has detained and continues to detain individuals at approximately 22 locations in Afghanistan, including facilities in Asadabad, Kabul, Jalalabad, and Khost under the control of the U.S. military and has lasted well beyond the declared end of major combat.

138.    As a result of Related-Action Defendant Rumsfeld's policies, patterns or practices, the torture and abuse of detainees in U.S. military custody in Afghanistan has been widespread and systemic.  It began soon after the commencement of military actions.

139.    In December 2001, John Walker Lindh, a U.S. citizen, was arrested and detained by the U.S military in Afghanistan.  Photographs taken at the time of his arrest show him emaciated, stripped naked, and bound to a stretcher.

140.    In January 2002, U.S. soldiers detained a number of Afghan men for more than two weeks following a nighttime raid on a village, during which time the detainees were beaten and kicked.  Upon their release, a spokesman for the U.S. Defense Department admitted that the detainees had not been part of the Taliban or Al Qaeda.

141.    As widely documented in press reports, U.S. military personnel have subjected detainees in U.S. custody in Afghanistan to the following forms of torture or other cruel, inhuman or degrading treatment, among others:

- 42 -

a.  Extreme physical abuse: Soldiers severely beat detainees, forced them into painful and contorted positions for hours or days on end, and dumped cold water over detainees in the middle of the winter. Beatings were for the specific purpose of making detainees more susceptible to interrogation.

b.  Sexual abuse and humiliation: Detainees were kept naked for prolonged periods in the presence of male and female soldiers and in front of other detainees. Soldiers, both male and female, subjected detainees to sexual taunts, with knowledge that such treatment would be particularly offensive and humiliating by Afghan cultural norms.

c.  Use of dogs to frighten and intimidate detainees.

d.  Sensory deprivation: Detainees were kept hooded or goggled, held in dark cells, and kept in isolation for prolonged periods.

e.  Sleep deprivation: Detainees were forced to stay awake for prolonged periods by methods such as shining bright lights, blaring loud music, shouting at them or beating them if they fell asleep.

142.    Detainees have been killed by torture or other cruel, inhuman or degrading treatment while in U.S. custody in Afghanistan. For example:

a.  According to documents produced by the Defense Department pursuant to litigation under the Freedom of Information Act, the Army Criminal Investigation Command concluded in September 2002 that a U.S. Army captain and three noncommissioned officers murdered a detainee in Afghanistan.

- 43 -

b.  Two other Afghan detainees, Mullah Habibullah and Dilawar, died in
    December 2002 at the Bagram detention facility in Afghanistan while in the
    custody of the U.S. military. During interrogation by members of the U.S.
    Army's 519th Military Intelligence Battalion, the detainees were shackled to
    the ceiling with their hands suspended over their shoulders for prolonged
    periods. Both had suffered blunt force trauma to the legs, and investigators
    determined that they had been beaten by multiple soldiers. Military
    pathologists determined within days of the deaths that the cause was
    homicide. Nevertheless, for months afterwards, and until the *New York Times*
    obtained a copy of Dilawar's autopsy report, the military falsely asserted that
    the men had died of natural causes.

c.  Another detainee, Jamal Naseer, died at a U.S. firebase in Gardez after being
    tortured and abused while in U.S. custody. Naseer and seven other members
    of the Afghan Army were arrested in March 2003; they were detained by U.S.
    forces and interrogated at Gardez for 17 days. The detainees were beaten
    regularly by U.S. interrogators, some reportedly while shackled or while
    suspended upside down. Some were subjected to electric shocks and
    immersion in cold water. They were denied medical treatment for the injuries
    they received.

143.    On information and belief, multiple other detainees have died while in U.S.
military custody in Afghanistan under circumstances suggesting the cause of death was
homicide.

- 44 -

144.    The U.S. Army Criminal Investigations Command determined that members of the 377th Military Police Battalion and military intelligence officers based in Fort Bragg, North Carolina (apparently referring to the 519th Military Intelligence Battalion) committed abuses against detainees in Afghanistan, including the following: slamming detainees into walls, twisting handcuffs to cause pain, kneeing detainees, forcing a detainee to maintain painful, contorted positions, shackling a detainee's arms to the ceiling, and forcing water into the mouth of a detainee until he could not breathe.

145.    On information and belief, the U.S. military has detained and continues to detain individuals at numerous detention facilities in Iraq under the control of the U.S. military. The policies, patterns or practices of torture and abuse of detainees that commenced in Afghanistan were extended and used against detainees in Iraq as a result of the actions and derelictions of Defendant Karpinski and the Related-Action Defendants.

146.    The U.S. government, the International Committee of the Red Cross, and non-governmental human rights organizations have documented hundreds of cases of abuse committed at U.S. detention facilities in Iraq.

147.    These reports demonstrate that detainees in facilities under the exclusive control of the U.S. military have been subjected to torture or other cruel, inhuman or degrading treatment on a widespread basis in Iraq. U.S. personnel have engaged in this unlawful conduct at facilities including but not limited to the notorious Abu Ghraib prison; the detention facility known as "Camp Cropper" at the Baghdad international airport; a facility near the city of Umm Qasr known as Camp Bucca; facilities in or near the cities of Tikrit and Mosul; and numerous locations in or near the city of Baghdad.

- 45 -

403155.1

148.    According to reports by the U.S. military, the International Committee of the Red Cross, and other non-governmental human rights organizations, and as revealed in voluminous documents produced by the government pursuant to litigation under the Freedom of Information Act, U.S. personnel inflicted the following types of torture or other cruel, inhuman or degrading treatment, among others, on detainees at numerous U.S. facilities in Iraq:

    a.  Extreme physical abuse: Soldiers tore out detainees' toenails, administered electric shocks, beat detainees with hard objects (including pistols and rifles), slapped and punched detainees, kicked them with knees or feet on various parts of the body (legs, sides, lower back, groin), forcefully pressed detainees' faces into the ground by stepping on their heads, purposely exposed detainees to severe heat and sun for prolonged periods, and forced detainees to stay in "stress" positions (kneeling, squatting, standing with arms raised over their heads) for hours at a time.

    b.  Various forms of sexual abuse and humiliation: Detainees were stripped naked and forced to stand for prolonged periods in public view, with arms raised or with women's underwear over their heads, while male and female guards observed and laughed. Detainees were photographed in these positions. Detainees were paraded naked in front of other detainees. Detainees were kept naked in solitary confinement for periods of several days.

    c.  Threats of death, abuse, reprisals against family members, imminent execution or transfer to the military detention facility at Guantanamo: Soldiers aimed rifles at detainees, sometimes putting firearms directly against detainees' heads or torsos.

- 46 -

403155.1

d. Sensory deprivation: Hooding detainees to prevent them from seeing, to disorient them, and to prevent them from breathing freely. Hooding was sometimes used in conjunction with beatings, thus increasing fear because blows were unanticipated. The practice of hooding also allowed the interrogators to remain anonymous and thus to act with impunity. Detainees were also held in total darkness for prolonged periods.

e. Painful and humiliating restraints: Soldiers applied flexi-cuffs to detainees' wrists so tightly and for such extended periods that they caused skin lesions and long-term nerve damage. Soldiers restrained detainees repeatedly over periods of several days, for several hours each time, with handcuffs to the bars of their cell doors in humiliating (i.e. naked or in underwear) and/or uncomfortable positions causing physical pain.

149.    Official U.S. military reports have documented the notorious abuses at Abu Ghraib prison, among other detention facilities. These reports determined that soldiers inflicted the following torture or other cruel, inhuman or degrading treatment on detainees at Abu Ghraib:

a. Homicide: A Navy SEAL beat a detainee to death. He struck the detainee in the head with a rifle butt. After the detainee lost consciousness, he was placed in a shower room with a sandbag over his head, and, when guards returned 30-45 minutes later, he was dead.

b. Extreme physical abuse: Soldiers punched, kicked and slapped detainees. A soldier knocked a detainee unconscious, and another punched a second detainee in the chest so hard that he could not breathe. Soldiers beat detainees with a broom handle and a chair. Soldiers broke chemical lights and poured

- 47 -

403155.1

the contents on detainees. A soldier slammed a detainee against a wall so
hard that he required stitches, and then an ordinary military police guard was
permitted to stitch the wound. A detainee was forced to "bark like a dog" and
crawl on his stomach while military police personnel spit and urinated on him
and beat him until he lost consciousness.

c.  Sexual abuse and humiliation: Soldiers threatened to rape detainees. An
    interpreter allegedly raped a juvenile male detainee while a female U.S.
    soldier watched and took pictures. Soldiers forced a naked detainee to stand
    on a box with a sandbag on his head, and attached wires to his fingers, toes
    and penis to simulate electric torture. Soldiers stripped detainees naked and
    kept them naked for prolonged periods. Soldiers photographed and
    videotaped naked detainees, sometimes while forcibly posed in sexual
    positions, forcibly dressed in women's underwear, or forced to masturbate.
    Soldiers arranged naked detainees in a pile and then jumped on them.
    Soldiers placed a dog leash around a naked male detainee's neck, posed a
    female soldier next to him and photographed him.

d.  Use of military dogs to intimidate and attack detainees: In at least one case,
    soldiers caused a dog to bite and severely injure a detainee. Some soldiers
    referred to the use of dogs to frighten or attack detainees as "doggy dance"
    sessions. On one occasion, soldiers placed vicious dogs into a cell with two
    juvenile detainees. Witnesses reported that the children screamed in terror as
    the dogs lunged and snapped at them, and that the younger child tried to hide
    behind the older one. On another occasion, two military dog handlers held a

- 48 -

403155.1

"contest" in which they competed against each other to see who could force

detainees to lose control of their bladders or bowels out of fear.

e.  Sensory deprivation:  Soldiers kept detainees in solitary confinement,

sometimes in empty concrete cells in total darkness.

150.  In reports presented to U.S. government officials and military commanders, the

International Committee of the Red Cross documented hundreds of additional individual

allegations of abuse committed at U.S. military detention facilities throughout Iraq.  Fifty

incidents of torture and other abuse were reported as occurring at the Camp Cropper detention

facility alone.  Among the "illustrative" cases of torture reported by the International Committee

of the Red Cross are the following:

a.  At least two detainees were forced to sit or lie down on blistering surfaces,

causing severe burns that resulted in large crusted lesions and, in one case,

three months' hospitalization, the amputation of a finger and large skin grafts.

b.  Military interrogators hooded and restrained a detainee with flexi-cuffs,

threatened to torture and kill him, urinated on him, kicked him in the head,

lower back and groin, force-fed him a baseball which was tied into his mouth,

and deprived him of sleep for four consecutive days.  When the detainee said

he would report the abuse to the International Committee of the Red Cross,

interrogators beat him again.

**2.    Plaintiffs Injured in Iraq By Defendant's Actions and Derelictions**

151.  Plaintiffs Arkan M. Ali, Sabbar, Khalid and Ali H. are among the countless

detainees who were tortured and otherwise abused at U.S. military facilities in Iraq as a result of

the Defendant's policy, pattern or practice of torture or other cruel, inhuman or degrading

treatment.  The Plaintiffs are and were non-combatant innocent civilians who pose no threat to

- 49 -

the United States, were not engaged in hostilities against the United States, were not prosecuted

for criminal violations and were released from custody by the U.S. military after being brutally

abused and tortured.

### a.   Arkan M. Ali

152.   Plaintiff Arkan M. Ali was detained by U.S. military forces in Iraq for

approximately 11 months, from approximately July 2003 to June 2004. Plaintiff Arkan M. Ali

was detained at various locations in Iraq, including a civil defense station in Baghdad, a military

prison at the Baghdad international airport, Camp Bucca, and the Abu Ghraib prison.

153.   For the purpose of causing severe pain and injuring, interrogating, intimidating,

degrading and abusing him while he was in U.S. military custody, care and control, U.S. military

forces, including Defendant Karpinski's subordinates, subjected Plaintiff Arkan M. Ali to the

following forms of torture or other cruel, inhuman or degrading treatment, among others:

  a.   Subjecting Plaintiff Arkan M. Ali to severe beatings by groups of military

   personnel throughout his eleven months in U.S. custody, including twice

   beating him to unconsciousness during interrogation, using hands, feet, chains

   and weapons;

  b.   Forcibly restraining Plaintiff Arkan M. Ali and using a large knife to

   repeatedly stab and slice his forearm causing extreme pain, bleeding and

   scarring;

  c.   Burning or shocking Plaintiff Arkan M. Ali's forearm with a small metal

   device;

  d.   Subjecting Plaintiff Arkan M. Ali to prolonged sensory and sleep deprivation;

- 50 -

403155.1

e.  Repeatedly locking Plaintiff Arkan M. Ali for several days in a wooden coffin-like box, sometimes after stripping him naked and tying a hood over his head;

f.  Urinating on Plaintiff Arkan M. Ali intentionally to humiliate and degrade him;

g.  Detaining Plaintiff Arkan M. Ali in a "silent tent" for days at a time, during which he was denied sleep and dragged face-down along the ground and severely beaten by soldiers whenever it appeared he might be falling asleep;

h.  Subjecting Plaintiff Arkan M. Ali to multiple death threats, including but not limited to the following: threats to transfer him to Guantanamo where he was told soldiers could kill detainees with impunity; mock executions by threatening to run Plaintiff Arkan M. Ali and other detainees down with a large military vehicle; brandishing guns and threatening to shoot Plaintiff Arkan M. Ali and other detainees; approaching Plaintiff Arkan M. Ali with a sword and threatening to slaughter him;

i.  Falsely telling Plaintiff Arkan M. Ali and other detainees during transport between prisons that they were being taken to another country, in order to terrorize and disorient them and to lead them to believe that they would never see their families again;

j.  Denying Plaintiff Arkan M. Ali food and water for long periods, intentionally causing extreme hunger and thirst; and

- 51 -

k.  Repeatedly desecrating the Quran in the presence of Plaintiff Arkan M. Ali
and other detainees to demean and degrade them, including having a military
dog pick up the Quran in its mouth.

154.    Upon Plaintiff Arkan M. Ali's release from U.S. custody, a U.S. official
threatened him by specifically telling him that if he ever reported or discussed the abuse he and
others suffered in detention, the U.S. government would find him and he would never see his
family again.  Plaintiff Arkan M. Ali understood the official to mean that such future detention
would be retaliatory and would include further torture or other cruel, inhuman or degrading
treatment or even death.

155.    As a result of torture or other cruel, inhuman or degrading treatment while in U.S.
custody, Plaintiff Arkan M. Ali suffered severe physical and psychological injuries.  He
continues to suffer the lasting effects of those injuries.  Among other things, he suffers from pain
in the kidneys, colon and urinary tract.  He also bears severe scars on his arm from the stabbing
and burning he suffered.  He has severe depression, frequent severe nightmares, and episodes of
shortness of breath and an involuntary gulping reflex, which he never experienced prior to his
detention.  As a result of his continuing injuries, Plaintiff Arkan M. Ali has been unable to
maintain employment and his personal relationships with his family and others have deteriorated.

**b.    Thahe M. Sabbar**

156.    Plaintiff Thahe M. Sabbar was detained by U.S. military forces in Iraq from
approximately July 2003 to January 2004.  Plaintiff Sabbar was detained at various locations in
Iraq, including locations in Baghdad known as al-Qasr al-Jumhouri and al-Qasr al-Sujood, the
prison at the Baghdad international airport, Camp Bucca, and Abu Ghraib.

157.    For the purpose of causing severe pain and injuring, interrogating, intimidating,
degrading and abusing him while he was in U.S. military custody, care and control, U.S. military

- 52 -

403155.1

forces, including Defendant Karpinski's subordinates, subjected Plaintiff Sabbar with the
following forms of torture or other cruel, inhuman or degrading treatment, among others:

    a.  Frequent severe beatings, including beating Plaintiff Sabbar with their fists
and guns while he was handcuffed and helpless, hitting him in the genitals,
and forcing him and other detainees to run through a gauntlet of 10 to 20
uniformed soldiers who were screaming at them and beating them with
wooden batons;

    b.  Twice using a gun-shaped device to inflict excruciating electrical shocks on
Plaintiff Sabbar;

    c.  Sexually assaulting Plaintiff Sabbar: One or more soldiers in the presence of
male and female soldiers inserted their fingers into Plaintiff Sabbar's anus and
grabbed and fondled his buttocks and penis while making moaning sounds
and jeering at him in a sexually degrading and intimidating manner;

    d.  Staging extraordinary mock executions of Plaintiff Sabbar and other detainees
to terrorize, humiliate and degrade them and to extract false confessions,
including: forcing Plaintiff Sabbar and other detainees to stand against a wall
and staging a mock firing squad with simulated gunfire, laughing as detainees
lost control of their bladders in their terror; and threatening to send Plaintiff
Sabbar to Guantanamo and informing him that he would be killed there;

    e.  Using extreme restraints, hooding him and applying handcuffs so tightly that
Plaintiff Sabbar suffered extreme pain and experienced numbness in his hands
and wrists;

403155.1

      f.  Shackling Plaintiff Sabbar's hands to a fence behind his back, subjecting him

to that position for several hours at temperatures exceeding 120 degrees

Fahrenheit (50 degrees Celsius) while denying him any water or food, and

other prolonged periods of exposure to extremely hot conditions and denial of

water, to the point that he lost consciousness on several occasions;

      g.  Intentionally causing humiliation and extreme hunger by depriving Plaintiff

Sabbar of food and water for extended periods of time, or by providing him

with food containing pork or foul-smelling and spoiled food which caused

detainees to vomit when they tried to eat it;

      h.  Intentionally humiliating Plaintiff Sabbar by denying him the use of toilet

facilities for extended periods while he was shackled thereby causing him to

soil his pants; and

      i.  Desecrating the Quran in the presence of Plaintiff Sabbar and other detainees

to demean and degrade then, including throwing the book to the floor and

stepping on it.

158.    After his release from U.S. custody, Plaintiff Sabbar returned to Abu Ghraib to

seek return of property confiscated from them by U.S. forces and to inquire about a business

partner who remained in custody. Plaintiffs Sabbar and Khalid were detained in a locked room

by military personnel and were then released without receiving any response to their inquiries.

As a result of this experience, Plaintiff Sabbar fears that U.S. forces will detain him again if he

pursues remedies for his injuries and losses from U.S. military officials in Iraq.

159.    As a result of torture or other cruel, inhuman or degrading treatment while in U.S.

custody, Plaintiff Sabbar suffered severe physical and psychological injuries. He continues to

- 54 -

suffer the lasting effects of those injuries. Among other things, Plaintiff Sabbar continues to
suffer from nerve damage and pain in his shoulder, severe nightmares, incontinence, impotence,
and uncontrollable bouts of shaking and crying as a direct result of the torture and abuse he
experienced.

### c.    Sherzad K. Khalid

160.    Plaintiff Sherzad K. Khalid was detained by U.S. military forces in Iraq from
approximately July to September 2003. Plaintiff Khalid was detained at various locations in
Iraq, including locations in Baghdad known as al-Qasr al-Jumhouri and al-Qasr al-Sujood, a
prison at the Baghdad international airport, and Camp Bucca.

161.    For the purpose of causing severe pain and injuring, interrogating, intimidating,
degrading and abusing him while he was in U.S. military custody, care and control, U.S. military
forces, including Defendant Karpinski's subordinates, subjected Plaintiff Khalid to the following
forms of torture or other cruel, inhuman or degrading treatment, among others:

> a.    Kicking and punching Plaintiff Khalid over a period of hours while he was
> shackled and hooded and seated on the ground, terrorizing and injuring him
> with random and unanticipated blows;
>
> b.    Forcing Plaintiff Khalid and other detainees to run a gauntlet of approximately
> 10 to 20 uniformed U.S. soldiers who beat them with batons; grabbing
> Plaintiff Khalid by the head, shoving him to the ground, and stepping on his
> head; interrogating Plaintiff Khalid on numerous occasions and beating him
> severely before each interrogation; and routinely beating Plaintiff Khalid
> throughout his period of detention, such that his body was covered with deep
> bruises at the time of his release;

- 55 -

c.  Sexually assaulting and humiliating Plaintiff Khalid by grabbing his buttocks
and simulating anal rape by pressing a water bottle against the seat of his
pants; putting a hand inside Plaintiff Khalid's pants and grabbing his buttocks
during a severe beating, punching him in the mouth breaking one of his teeth
when he protested, and then brandishing a long wooden pole and threatening
to sodomize him on the spot and every night of his detention;

d.  Using extreme restraints, applying tight hoods that restricted Plaintiff Khalid's
breathing and vision, and handcuffing him so tightly that he suffered severe
and long-lasting pain, in order to cause pain and fear;

e.  Shackling Plaintiff Khalid's hands to a fence behind his back, subjecting him
to that painful position for several hours at temperatures exceeding 120
degrees Fahrenheit (50 degrees Celsius) while denying him any water or food,
in order to cause extreme thirst, pain, and humiliation, and other prolonged
periods of exposure to extremely hot conditions;

f.  Subjecting Plaintiff Khalid to prolonged sleep deprivation in a so-called
"silent tent" for several days and severely beating him whenever he started to
fall asleep;

g.  Subjecting Plaintiff Khalid to extraordinary mock executions and death threats
to coerce false confessions, including placing a gun to Plaintiff Khalid's head
and demanding a confession and placing him in a mock firing squad with
simulated gunfire;

h.  Intentionally causing Plaintiff Khalid severe hunger and humiliation by
denying him food and water for extended periods, or providing him with food

- 56 -

containing pork or foul-smelling, spoiled food that caused detainees to vomit when they tried to eat it;

i.   Intentionally humiliating Plaintiff Khalid by denying him the use of toilet facilities for extended periods while he was shackled thereby causing him to soil his pants;

j.   Deliberately depriving Plaintiff Khalid of adequate medical attention and acting with deliberate indifference to his medical needs, including refusing to provide adequate treatment for severe abdominal pains, which were diagnosed after his release as caused by a serious stomach infection.

162.    After his release from U.S. custody, Plaintiff Khalid accompanied Plaintiff Sabbar to Abu Ghraib to seek return of property confiscated by U.S. forces and to inquire about a mutual business partner who remained in custody. Both Plaintiff Sabbar and Plaintiff Khalid were detained in a locked room by military personnel and were then released without receiving any response to their inquiries. As a result of this experience, Plaintiff Khalid fears that U.S. forces will detain him again if he pursues remedies for his injuries and losses from U.S. military officials in Iraq.

163.    As a result of torture or other cruel, inhuman or degrading treatment while in U.S. custody, Plaintiff Khalid suffered severe physical and psychological injuries. He continues to suffer the lasting effects of those injuries. As a result of the untreated stomach infection he suffered in detention, he now has ulcers of the stomach and is required to take medication. Since his detention, he has continued to suffer from increased and high blood pressure and severe back pain. In addition, he suffers from severe depression and nightmares that have caused serious difficulties in his work and family relationships.

- 57 -

403155.1

### d.    Ali H.

164.    Plaintiff Ali H. was detained by U.S. military forces in Iraq from approximately
August to September 2003, when he was 17 years old.  Plaintiff Ali H. was detained at various
locations in Iraq, including a former Baghdad police station, a facility in or near the city of Al-
Tasfeerat, the Baghdad airport prison, Abu Ghraib, and facilities near the cities of Yusufiya and
Mosul and in the Jarf al-Sakhr desert.

165.    For the purpose of causing severe pain and injuring, interrogating, intimidating,
degrading and abusing him while he was in U.S. military custody, care and control, U.S.
personnel, including Defendant Karpinski's subordinates, subjected Plaintiff Ali H. to the
following forms of torture or other cruel, inhuman or degrading treatment, among others:

        a.  At the time of arrest, shooting Plaintiff Ali H., hitting him with a gun,
throwing him to the ground, and stepping on his head even though he was
innocent of any wrongdoing, bleeding profusely from two gunshot wounds,
and posed no threat to the arresting soldiers;

        b.  Refusing to provide medical care for gunshot wounds inflicted by U.S. forces
for several hours and then removing bullets from Plaintiff Ali H.'s neck and
back without anesthetic, intentionally causing excruciating pain;

        c.  Refusing to provide Plaintiff Ali H. with food, water, and pain medication for
one-and-a-half days, despite his gunshot wounds, in order to cause pain,
hunger, thirst, and humiliation;

        d.  Refusing to provide Plaintiff Ali H. with adequate medical care and pain
medication when he received a life-threatening shrapnel wound during a
mortar attack, while he was housed in an outdoor tent at Abu Ghraib.  U.S.
military personnel intentionally inflicted pain and torture on Plaintiff Ali H.

- 58 -

while he was recovering from abdominal surgery by: roughly dragging him
from one location to another after surgery, in a way calculated to cause severe
pain; keeping him shackled hand and foot to a bed with a blanket placed over
his face; transferring him to a prison where he was forced to sleep on the
ground outdoors in extremely hot weather without any shelter, despite being
in excruciating pain and having an intravenous tube in his arm; and refusing to
change the bandages on his surgical wounds and humiliating him when he
requested medical assistance, thereby causing his surgical wound to become
infected and leak pus, and inflicting further extreme pain and humiliation by
roughly ripping away the bandage and then intentionally leaving the wound
half-exposed in order to humiliate and injure him; and

e. Intentionally releasing Plaintiff Ali H. in a manner intended to terrorize and
degrade him by first informing him that he would be released, then telling him
he would be sent to another prison, and then cutting off his identification
bracelet, confiscating his release papers and physically throwing him from a
bus to the ground outside while he still had an intravenous tube in his arm, in
a manner calculated to prevent him from seeking relief for the injuries he
suffered while in custody.

166.    As a result of torture or other cruel, inhuman or degrading treatment while in U.S.
custody, Plaintiff Ali H. suffered severe physical and psychological injuries. He continues to
suffer the lasting effects of those injuries. Among other things, he suffers severe abdominal pain,
particularly in cold weather and while lifting objects. His physician has advised him not to lift
objects weighing over two pounds and has further advised that his condition may worsen over

- 59 -

time. Plaintiff Ali H. has frequent nightmares relating to the abuse he suffered and witnessed in detention, and awakens his parents during the night when he screams and cries in his sleep. In addition, he is often forced to leave school because of debilitating fatigue, severe depression and abdominal pains.

### D.    Additional Allegations

167.    Defendant Karpinski has neither denied nor refuted the widespread torture or other cruel, inhuman or degrading treatment of detainees in Iraq under the effective control and exclusive care and custody of U.S. military forces under his command.

168.    Defendant Karpinski was at relevant times the military commander of U.S. military police personnel in Iraq. She at relevant times had authority and control over the detention facilities in Iraq at which Plaintiffs were tortured. She had effective control over personnel within those detention facilities who carried out, authorized or allowed the widespread and systematic torture or other cruel, inhuman or degrading treatment of detainees. Defendant Karpinski also had effective policymaking authority over the detention of detainees in U.S. military police custody.

169.    The Plaintiffs were detained under the complete and exclusive jurisdiction and control of military police, military intelligence or other individuals or agents under the direction and control of the U.S. military.

170.    Defendant Karpinski's actions and omissions were the proximate cause of the torture or other cruel, inhuman or degrading treatment of Plaintiffs and other detainees in U.S. military custody in Iraq and are the proximate cause of injuries suffered by Plaintiffs. In that conduct, Defendant Karpinski acted under color of law beyond the scope of her lawful and delegated authority.

- 60 -

171.    Defendant Karpinski acted under color of law in formulating, authorizing, ratifying, implementing, and/or failing to prevent a policy, pattern or practice causing detainees in U.S. military facilities under the exclusive custody and control of the United States to be tortured and subjected to other cruel, inhuman or degrading treatment. Defendant Karpinski knew and should have known that subordinate personnel in U.S. military facilities were engaging in such unlawful conduct on a widespread basis, yet she failed to ensure that those subordinate personnel acted lawfully. As a result, Plaintiffs and other prisoners in U.S. military custody in Iraq have been tortured or subjected to other cruel, inhuman or degrading treatment. Thus, by her acts, omissions and derelictions, Defendant Karpinski is liable for the injuries that Plaintiffs suffered as victims of the widespread policy, pattern or practice of torture or other cruel, inhuman or degrading treatment in violation of law.

172.    At the time the Plaintiffs were detained by U.S. military forces, Defendant Karpinski and the Related-Action Defendants knew and had notice of widespread torture by subordinates but failed to take steps to stop the unlawful conduct.

173.    Each of the Plaintiffs suffered serious physical and psychological injury as a result of Defendant Karpinski's actions and omissions.

174.    Defendant Karpinski's subordinates maliciously and sadistically inflicted unnecessary pain and harm on Plaintiffs. Defendant Karpinski could foresee these actions by her subordinates because she had notice that the U.S. military was engaging in torture or other cruel, inhuman or degrading treatment. Defendant Karpinski thus acted with conscious disregard of the excessive risk of harm to Plaintiffs.

175.    In carrying out her unlawful policies, patterns, practices and procedures, and in her other actions and omissions described above, Defendant Karpinski violated clearly

- 61 -

established constitutional rights and other domestic and international laws, and knew that she was doing so.

176.    Absent judicial action, Plaintiffs have no meaningful avenue for obtaining adequate redress for their injuries, including a declaration of their rights against Defendant Karpinski.

177.    Plaintiffs have no effective means to prevent the policy, pattern, or practice at issue in this suit except through an action against high-ranking civilian and military U.S. commanders and officials.

178.    Plaintiffs and each of them fear and are at risk of detention by the U.S. military and of continued injury and abuse in violation of law.  On information and belief, Related-Action Defendant Rumsfeld has not rescinded his authorizations for harsh interrogation and detention policies that caused Plaintiffs' torture or other cruel, inhuman or degrading treatment.  Secretary Rumsfeld's policy, pattern or practice that caused Plaintiffs' injuries continues in effect.

## VI.    JURY DEMAND

179.    Plaintiffs request a trial by jury in this action on each and every count alleged herein.

## VII.    CLAIMS

### First Cause Of Action

#### Violation Of Fifth Amendment Due Process Clause

180.    Paragraphs 1 through are 179 incorporated as if set forth fully herein.

181.    Defendant's actions described herein violate the Due Process Clause of the Fifth Amendment to the Constitution, which prohibits any person acting under color of U.S. law from engaging in or allowing torture, abuse or other treatment that "shocks the conscience," of any person in U.S. custody or control.

- 62 -

403155.1

182.    In her conduct set forth in this Complaint, Defendant acted under color of federal law.

183.    Defendant's actions, orders, authorizations, approvals and omissions caused the torture and abuse of Plaintiffs in violation of the Fifth Amendment and gives rise to a cause of action for damages directly under the Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

184.    Defendant had actual and constructive knowledge that her subordinates were violating the constitutional rights of Plaintiffs, and had actual and constructive knowledge that it was highly likely that these constitutional violations would occur as a result of her actions, orders, policies, practices and omissions. Despite this knowledge, Defendant acted with reckless and deliberate indifference to her subordinates' unconstitutional actions. Through her actions and failures to act, Defendant expressly and tacitly authorized her subordinates' unlawful conduct.

185.    Defendant had power to formulate policies relating to the detention of detainees, and exercised that power to generate illegal practices, namely, the torture or other cruel, inhuman or degrading treatment of detainees in Iraq.

186.    Defendant directly and knowingly authorized her subordinates to engage in conduct that shocks the conscience — namely, the torture or other cruel, inhuman or degrading treatment of detainees.

### Second Cause Of Action

#### Violation Of The Fifth And Eighth Amendment Prohibition On Cruel And Unusual Punishment

187.    Paragraphs 1 through 186 are incorporated as if set forth fully herein.

188.    Defendant's actions described herein violate the prohibition on cruel and unusual punishment in the Due Process Clause of the Fifth Amendment and the Cruel and Unusual

- 63 -

Punishment Clause of the Eighth Amendment to the Constitution. Those amendments prohibit

any person under color of U.S. law from engaging in or allowing torture, or other cruel, inhuman

or degrading treatment or punishment or other treatment that constitutes deprivation of basic

human needs such as food and reasonable safety, and the unnecessary and wanton infliction of

pain on any person in U.S. custody or control. The Cruel and Unusual Punishment Clause of the

Eighth Amendment and the Due Process Clause of the Fifth Amendment give rise to a cause of

action for damages directly under the Constitution pursuant to *Bivens v. Six Unknown Named

Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

189.    Defendant Karpinski and her subordinates authorized, ratified, and failed to stop

and prevent the torture or other cruel, inhuman or degrading treatment of Plaintiffs and other

detainees in U.S. custody, which occurred as a form of summary punishment for perceived or

alleged wrongdoing and constituted imposition of sentence on Plaintiffs without an adjudication

of guilt.

190.    Defendant had power to formulate policies relating to the detention of detainees,

and exercised that power to generate illegal practices, namely, the torture or other cruel, inhuman

or degrading treatment of detainees in Iraq.

191.    Defendant was responsible for the command and supervision of individuals who

subjected Plaintiffs and other detainees to torture or other cruel, inhuman or degrading treatment.

Defendant knew that her subordinates had engaged in such unlawful activity, including actions

undertaken maliciously and sadistically for the very purpose of causing unnecessary pain and

harm to further unlawfully the interrogation, punishment, intimidation or coercion of Plaintiffs

and other detainees. Defendant also knew that it was highly likely that her subordinates would

continue to engage in such unlawful torture or other cruel, inhuman or degrading treatment or

- 64 -

403155.1

punishment. Yet Defendant acted with deliberate indifference and conscious disregard of the high likelihood of injury, and failed to take steps to prevent her subordinates from engaging in such conduct.

### Third Cause Of Action

### Torture In Violation Of The Law Of Nations

192.    1 through 191 are incorporated as if set forth fully herein.

193.    Defendant's actions described herein violate the law of nations which prohibits engaging in or permitting torture. The prohibition against torture is a "specific, universal, and obligatory" norm, from which no derogation is allowed. *See Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2763, 2766 (2004); *id.* at 2783 (Breyer, J., concurring); U.N. Convention Against Torture or Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85.

194.    Defendant's actions and omissions are the direct and proximate cause of Plaintiffs' injuries and give rise to a cause of action for a tort in violation of the law of nations.

195.    Defendant had effective command and control of individuals who intentionally and knowingly subjected each of the Plaintiffs to torture, which is prohibited by the law of nations.

196.    Defendant had actual and constructive knowledge of her subordinates' torture of detainees in U.S. custody and violated her duty as a commander to punish the perpetrators or otherwise to prevent further acts of torture.

### Fourth Cause Of Action

### Cruel, Inhuman Or Degrading Treatment In Violation Of The Law Of Nations

197.    Paragraphs 1 through 196 are incorporated as if set forth fully herein.

- 65 -

403155.1

198.    Defendant's actions described herein violate the law of nations which prohibits engaging in or permitting cruel, inhuman or degrading treatment or punishment. The prohibition against cruel, inhuman or degrading treatment is an international law norm, which applies without exception. *See, e.g.*, International Covenant on Civil and Political Rights, 999 U.N.T.S. 171, Mar. 23, 1976; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Art. 147 & Art. 3 Common to all Four Geneva Conventions. Defendant's actions and omissions are the direct and proximate cause of Plaintiffs' injuries and give rise to a cause of action for a tort in violation of the law of nations.

199.    Defendant had effective command and control of individuals who intentionally and knowingly subjected each of the Plaintiffs to cruel, inhuman or degrading treatment, which is prohibited by the law of nations.

200.    Defendant had actual and constructive knowledge of her subordinates' torture of detainees in U.S. custody, but did not fulfill her duty as a commander to punish the perpetrators or otherwise to prevent further acts of cruel, inhuman or degrading treatment or punishment.

### Fifth Cause Of Action

#### Violation Of The Geneva Conventions

201.    Paragraphs 1 through 200 are incorporated as if set forth fully herein.

202.    Plaintiffs were tortured and subjected to other cruel, inhuman or degrading treatment during their detentions in U.S. custody in violation of specific provisions of the Third and Fourth Geneva Conventions, including but not limited to Article 3 Common to all Four Conventions.

203.    Violations of these provisions of the Geneva Conventions are direct and enforceable treaty violations as well as violations of the law of nations.

- 66 -

403155.1

204.    Defendant is liable for violations of Plaintiffs' rights under the Geneva

Conventions because Defendant formulated, authorized, approved, directed or ratified the torture

or other cruel, inhuman or degrading treatment of Plaintiffs as part of a policy, pattern or

practice.  In addition, Defendant is liable because her subordinates deliberately and intentionally

engaged in the torture or other cruel, inhuman or degrading treatment of Plaintiffs while acting

under her effective command and control, and Defendant knew and should have known of her

subordinates' actions but failed to prevent or punish them.

### Sixth Cause Of Action

### Declaratory Relief For Violation Of The Law Of Nations, Of The Geneva Conventions And Of The Constitution

205.    Paragraphs 1 through 204 above are incorporated as if fully set forth herein.

206.    There is a real and actual controversy between Plaintiffs and Defendant as to

whether she has violated the Plaintiffs' legal rights under the law of nations, binding treaties and

the U.S. Constitution as a result of torture or other cruel, inhuman or degrading treatment or

punishment of Plaintiffs while in U.S. custody.

207.    Plaintiffs reasonably fear that they are at risk of and will again be subjected to

Defendant's unlawful and unconstitutional actions, and seek a judicial declaration that

Defendant's conduct deprived them of their rights under the law of nations, provisions of the

Geneva Conventions, and the Fifth and Eighth Amendments to the U.S. Constitution.

208.    The Court therefore should grant declaratory relief and any further necessary and

proper relief as set forth below, pursuant to 28 U.S.C. §§ 2201, 2202.

403155.1

## PRAYER FOR RELIEF

Plaintiffs therefore respectfully request that the Court enter a judgment including but not limited to:

- a. A declaration that the acts alleged herein are unlawful and violate the Constitution, treaty provisions including provisions of the Geneva Conventions, military rules and guidelines, and the law of nations;

- b. A declaration that the policy, pattern, or practice of the Defendant alleged herein is unlawful and violates the Constitution, treaty provisions including provisions of the Geneva Conventions, military rules and guidelines, and the law of nations;

- c. A declaration that assigns responsibility for Plaintiffs' injuries to Defendant for her failure to take necessary and adequate measures to prevent persons under her effective command from engaging in the torture or other cruel, inhuman or degrading treatment or punishment of Plaintiffs and her failure to punish persons under her effective command for engaging in such conduct;

- d. Compensatory damages for violation of the law of nations and the Constitution in an amount that is fair, just and reasonable;

- e. Attorneys' fees and costs; and

- f. All other appropriate relief as may be just and proper.

- 68 -

403155.1

Respectfully submitted,

Counsel:

_RAY P. McCLAIN_
38 Broad Street, Third Floor
Post Office Box 608
Charleston, SC 29402-0608
(843) 577-3170
(843) 577-3097 (facsimile)
email: rpmcclain@att.net
Federal I.D. # 2768

_LUCAS GUTTENTAG_[2]
CECILLIA WANG
American Civil Liberties Union
    Foundation
Immigrants' Rights Project
405 14th Street, Suite 300
Oakland, CA 94612
(510) 625-2010

STEVEN R. SHAPIRO
OMAR JADWAT
AMRIT SINGH
American Civil Liberties Union
    Foundation
125 Broad Street
New York, NY 10004
(212) 549-2500

_BILL LANN LEE_[1]
CHIMÈNE I. KEITNER
NIREJ S. SEKHON
Lieff Cabraser Heimann & Bernstein LLP
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111-3339
(415) 956-1000

ERWIN CHEMERINSKY
Duke University School of Law
Science Drive & Towerview Rd.
Durham, NC 27707
(919) 613-7173

DAVID RUDOVSKY
Kairys, Rudovsky, Epstein & Messing LLP
924 Cherry St.
Suite 500
Philadelphia PA 19107
(215) 925-4400

PAUL HOFFMAN
Schonbrun DeSimone Seplow Harris &
    Hoffman LLP
723 Ocean Front Walk
Venice, CA 90291
(310) 396-0731

---

[1] *Pro Hac Vice* application to follow.
[2] *Pro Hac Vice* application to follow.

- 69 -

9:05-cv-00654-PMD     Date Filed 03/01/2005     Entry Number 2     Page 1 of 5 **FILED**

MAR 0 1 2005

LARRY W. PROPES, CLERK
CHARLESTON, SC

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH CAROLINA, BEAUFORT DIVISION

| | |
|---|---|
| Arkan Mohammed ALI, Thahe Mohammed SABBAR, Sherzad Kamal KHALID and Ali H., | Case No. 9:05cv 654 |
| Plaintiffs, | |
| v. | **PLAINTIFFS' ANSWERS TO INTERROGATORIES (LOCAL RULE 26.01)** |
| Janis KARPINSKI, | |
| Defendant. | |

Plaintiff hereby responds to the standard interrogatories as provided under

Rule 26.01 of the Local District Court:

(A)     State the full name, address and telephone number of all persons or legal entities who may have a subrogation interest in each claim and state the basis and extent of said interest.

**ANSWER**

(A)     Neither Plaintiff knows of any one or any company who would have a subrogation interest in this claim.

(B)     As to each claim, state whether it should be tried jury or nonjury and why.

**ANSWER**

(B)     Plaintiffs have requested a jury, as provided by the Seventh Amendment to the United States Constitution, treaty violations and international laws.

(C)     State whether the party submitting these responses is a publicly owned company and separately identify: (1) each

402426.1

-1-

A TRUE COPY
Attest: Larry W. Propes
By: _____
Deputy Clerk

publicly owned company of which it is a parent, subsidiary, partner, or affiliate; (2) each publicly owned company which owns ten percent or more of the outstanding shares or other indicia of ownership of the party; and (3) each publicly owned company in which the party owns ten percent or more of the outstanding shares.

**ANSWER**

(C)    Neither Plaintiff is a publicly owned company.

(D)    State the basis for asserting the claim in the division in which it was filed (or the basis of any challenge to the appropriateness of the division).

**ANSWER**

(D)    Plaintiff asserted the claim in the Beaufort Division Defendant KARPINSKI resides in the Beaufort Division.

(E)    Is this action related in whole or in part to any other matter filed in this District, whether civil or criminal? If so, provide (1) a short caption and the full case number of the related action; (2) an explanation of how the matters are related; and (3) a statement of the status of the related action. Counsel should disclose any cases which may be related regardless of whether they are still pending. Whether cases are related such that they should be assigned to a single judge will be determined by the Clerk of Court based on a determination of whether the cases: arise from the same or identical transactions, happenings or events; involve the identical parties or property; or for any other reason would entail substantial duplication of labor if heard by different judges.

**ANSWER**

(E)    None known to either Plaintiff or her attorney.

(F) and (G) not applicable; for defendants only.

402426.1

-2-

Respectfully submitted,


RAY P. McCLAIN
38 Broad Street, Third Floor
Post Office Box 608
Charleston, SC 29402-0608
(843) 577-3170
(843) 577-3097 (facsimile)
email: rpmcclain@att.net
Federal I.D. # 2768


LUCAS GUTTENTAG
CECILLIA WANG
American Civil Liberties Union
    Foundation
Immigrants' Rights Project
405 14th Street, Suite 300
Oakland, CA 94612
(510) 625-2010


STEVEN R. SHAPIRO
OMAR JADWAT
AMRIT SINGH
American Civil Liberties Union
    Foundation
125 Broad Street
New York, NY 10004
(212) 549-2500

BILL LANN LEE
CHIMÈNE I. KEITNER
NIREJ S. SEKHON
Lieff Cabraser Heimann & Bernstein LLP
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111-3339
(415) 956-1000


ERWIN CHEMERINSKY
Duke University School of Law
Science Drive & Towerview Rd.
Durham, NC 27707
(919) 613-7173


DAVID RUDOVSKY
Kairys, Rudovsky, Epstein & Messing LLP
924 Cherry St.
Suite 500
Philadelphia PA 19107
(215) 925-4400


PAUL HOFFMAN
Schonbrun DeSimone Seplow Harris &
    Hoffman LLP
723 Ocean Front Walk
Venice, CA 90291
(310) 396-0731


402426.1

-3-

9:05-cv-00654-PMD    Date Filed 04/13/2005    Entry Number 3    Page 1 of 1

AO 440 (Rev. 10/93) Summons in a Civil Action

9:05CV654-PMD

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me[1] | DATE | 3/11/2005 1130am | RECEIVED CLERK OF COURT |
|---|---|---|---|

| NAME OF SERVER (PRINT) WILLIAM E RAPP SR | TITLE PRIVATE INVESTIGATOR | 2005 APR 13  P 3: 52 |
|---|---|---|

*Check one box below to indicate appropriate method of service*

☒ Served personally upon the defendant. Place where served:  18 SEA OLIVE RD HILTON HEAD S.C.  US.
JANIS KARPINSKI

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

_____

_____

☐ Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $65.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on  3/11/2005 1130am     *William E Rapp Sr*
　　　　　　　　　Date　　　　　　　　Signature of Server

p.o.box 6104 HILTON HEAD S.C.
*Address of Server*
843-785-8800

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

A TRUE COPY
Attest: Larry W. Propes
By: *Lisa Pichlana*
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

|  |  |
|---|---|
| **Arkan Mohammed ALI, Thahe Mohammed SABBAR, Sherzad Kamal KHALID, Ali H.,** |  |
| **Plaintiffs,** | **Case No. 9:05-654-PMD** |
| **v.** |  |
| **Janis KARPINSKI,** |  |
| **Defendant.** |  |

A TRUE COPY

Attest: Larry W. Propes

By: _Lisa Lichleng_

Deputy Clerk

### DEFENDANT'S CONSENT MOTION FOR ENLARGEMENT OF TIME TO FILE RESPONSIVE PLEADING

Defendant Colonel Janis Karpinski hereby moves, with the consent of the Plaintiffs, for a 60-day enlargement of time to file a response to Plaintiffs' Complaint. In support of this motion, Colonel Karpinski states the following:

1.    Plaintiffs filed this lawsuit on March 1, 2005. Their Complaint seeks both damages and declaratory relief.

2.    Plaintiffs personally served Colonel Karpinski on March 13, 2005. Service on the Attorney General of the United States, as required by Fed. R. Civ. P. 4(i)(1)(B), was effected on March 18, 2005. Service on the United States Attorney for the District of South Carolina, as required by Fed. R. Civ. P. 4(i)(1)(A), occurred on March 18, 2005.

2.    Under Fed. R. Civ. P. 12(a)(3), Colonel Karpinski is required to respond to Plaintiffs' Complaint within 60 days of service on the United States Attorney. Colonel Karpinski's response is currently due on May 17, 2005.

3.    On March 14, 2005, Plaintiffs filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") requesting transfer and consolidation of this lawsuit, pursuant



to 28 U.S.C. § 1407, with three actions filed in other districts.

4.     The Department of Justice, representing Colonel Karpinski in her official capacity, filed an opposition to Plaintiffs' motion on April 4, 2005, and the JPML has set a hearing on Plaintiffs' transfer motion for May 26, 2005.

5.     Because the JPML will not rule on Plaintiffs' motion prior to May 17, 2005, the Parties have agreed that Colonel Karpinski should have an additional 60 days to respond to Plaintiffs' Complaint. The Parties have also agreed that Colonel Karpinski will not file any pleadings or motions in this case, other than the present motion, until the deadline for responding to Plaintiffs' Complaint.

For these reasons, Colonel Karpinski, with the consent of the Plaintiffs, respectfully requests a 60-day enlargement of time to respond to Plaintiffs' Complaint. A 60-day enlargement of time would require Colonel Karpinski to respond to Plaintiffs' Complaint on July 18, 2005.

2

Dated: May 12, 2005

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY S. BUCHOLTZ
Deputy Assistant Attorney General

TIMOTHY P. GARREN
Director,
Torts Branch, Civil Division

s/ J. Marcus Meeks
J. MARCUS MEEKS
Trial Attorney
United States Dept. of Justice
Torts Branch, Civil Division
P. O. Box 7146
Ben Franklin Station
Washington, D.C. 20044
(202) 616-4176 (voice)
(202) 616-4314 (fax)


JONATHAN S. GASSER
ACTING UNITED STATES ATTORNEY

By:  s/ Robert F. Daley, Jr.
        Robert F. Daley, Jr. (ID # 6460)
Assistant United States Attorney
1441 Main Street Suite 500
Columbia, South Carolina 29201
(803) 929-3000


Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that he/she has caused service of the attached **DEFENDANT'S CONSENT MOTION FOR ENLARGEMENT OF TIME TO FILE RESPONSIVE PLEADING** by a legal assistant employed in the Office of the United States Attorney for the District of South Carolina and is a person of such age and discretion as to be competent to serve papers.

That on May 12, 2005, my legal assistant served copies of the foregoing documents by placing said copies in a postpaid envelope addressed to the person(s) hereinafter named, at the place(s) and address(es), and by depositing said envelope and contents in the United States Mail at U.S. Attorney's Office, 1441 Main Street, Suite 500, Columbia, SC 29201, to the following:

Bill Lann Lee
Elizabeth J. Cabraser
Chimène I. Keitner
Nirej S. Sekhon
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, Suite 3000
San Francisco, CA 9411-3339

s/ Robert F. Daley, Jr.
Robert F. Daley, Jr.
Assistant United States Attorney

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT

Arkan Mohammed ALI, Thahe Mohammed
SABBAR, Sherzad Kamal KHALID, Ali H.,

　　　Plaintiffs,

　　　v.

Janis KARPINSKI,

　　　Defendant.

Case No. 9:05-654-PMD

## ORDER

Defendant Colonel Janis Karpinski hereby moves, with the consent of the Plaintiffs, for a 60-day enlargement of time to file a response to Plaintiffs' Complaint.

Plaintiffs filed this lawsuit on March 1, 2005. Their Complaint seeks both damages and declaratory relief.

Plaintiffs personally served Colonel Karpinski on March 13, 2005. Service on the Attorney General of the United States, as required by Fed. R. Civ. P. 4(i)(1)(B), was effected on March 18, 2005. Service on the United States Attorney for the District of South Carolina, as required by Fed. R. Civ. P. 4(i)(1)(A), occurred on March 18, 2005.

Under Fed. R. Civ. P. 12(a)(3), Colonel Karpinski is required to respond to Plaintiffs' Complaint within 60 days of service on the United States Attorney. Colonel Karpinski's response is currently due on May 17, 2005.

On March 14, 2005, Plaintiffs filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") requesting transfer and consolidation of this lawsuit, pursuant to 28 U.S.C. § 1407, with three actions filed in other districts.

The Department of Justice, representing Colonel Karpinski in her official capacity, filed an opposition to Plaintiffs' motion on April 4, 2005, and the JPML has set a hearing on Plaintiffs' transfer motion for May 26, 2005.

Because the JPML will not rule on Plaintiffs' motion prior to May 17, 2005, the Parties have agreed that Colonel Karpinski should have an additional 60 days to respond to Plaintiffs' Complaint. The Parties have also agreed that Colonel Karpinski will not file any pleadings or motions in this case, other than the present motion, until the deadline for responding to Plaintiffs' Complaint.

For the reasons aforesaid, the Court hereby grants the Motion for Enlargement of Time to respond to Plaintiffs' Complaint. Colonel Karpinski shall respond to Plaintiffs' Complaint by July 18, 2005.

IT IS SO ORDERED this _____ day of May, 2005.


_____
Honorable Patrick Michael Duffy
United States District Judge

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

Arkan Mohammed ALI, Thahe Mohammed
SABBAR, Sherzad Kamal KHALID, Ali H.,

Plaintiffs,

v.                                                    Case No. 9:05-654-PMD

Janis KARPINSKI,

Defendant.

## ORDER

Defendant Colonel Janis Karpinski hereby moves, with the consent of the Plaintiffs, for a 60-day enlargement of time to file a response to Plaintiffs' Complaint.

Plaintiffs filed this lawsuit on March 1, 2005. Their Complaint seeks both damages and declaratory relief.

Plaintiffs personally served Colonel Karpinski on March 13, 2005. Service on the Attorney General of the United States, as required by Fed. R. Civ. P. 4(i)(1)(B), was effected on March 18, 2005. Service on the United States Attorney for the District of South Carolina, as required by Fed. R. Civ. P. 4(i)(1)(A), occurred on March 18, 2005.

Under Fed. R. Civ. P. 12(a)(3), Colonel Karpinski is required to respond to Plaintiffs' Complaint within 60 days of service on the United States Attorney. Colonel Karpinski's response is currently due on May 17, 2005.

On March 14, 2005, Plaintiffs filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") requesting transfer and consolidation of this lawsuit, pursuant to 28 U.S.C. § 1407, with three actions filed in other districts.

A TRUE COPY
Attest: Larry W. Propes
By: _Lisa Pickens_
Deputy Clerk

The Department of Justice, representing Colonel Karpinski in her official capacity, filed an opposition to Plaintiffs' motion on April 4, 2005, and the JPML has set a hearing on Plaintiffs' transfer motion for May 26, 2005.

Because the JPML will not rule on Plaintiffs' motion prior to May 17, 2005, the Parties have agreed that Colonel Karpinski should have an additional 60 days to respond to Plaintiffs' Complaint. The Parties have also agreed that Colonel Karpinski will not file any pleadings or motions in this case, other than the present motion, until the deadline for responding to Plaintiffs' Complaint.

For the reasons aforesaid, the Court hereby grants the Motion for Enlargement of Time to respond to Plaintiffs' Complaint. Colonel Karpinski shall respond to Plaintiffs' Complaint by July 18, 2005.

IT IS SO ORDERED this 12th day of May, 2005.

S/Patrick Michael Duffy
Honorable Patrick Michael Duffy
United States District Judge

Charleston, South Carolina

2