## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ARKAN MOHAMMED ALI, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-1379-TFH |
| | ) | |
| JANIS KARPINSKI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT JANIS KARPINSKI'S MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant Janis Karpinski hereby moves to dismiss all causes of action in Plaintiffs' Consolidated Amended Complaint. Plaintiffs' first and second causes of action, which seek damages for alleged constitutional violations under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), fail to state claims for which relief may be granted. Plaintiffs' third, fourth, and fifth causes of action, which seek damages for alleged violations of international law, must be dismissed because the Westfall Act, 28 U.S.C. § 2679 (2006), requires that the United States be substituted for Defendant Karpinski, and the United States is entitled to absolute immunity from these claims. In addition, all of Plaintiffs' claims should be dismissed because there are "special factors counseling hesitation" and, in any event, Karpinski is entitled to qualified immunity from all of Plaintiffs' claims. Finally, the Political Question doctrine requires that all of Plaintiffs' claims be dismissed. The grounds for dismissing Plaintiffs' claims are set forth in the accompanying memorandum of points and authorities. A proposed order is attached.

Respectfully submitted,


_____/s/_____
Michael L. Martinez, DC Bar #347310
Aryeh S. Portnoy, DC Bar #464507
David E. Bell, DC Bar # 477903
Matthew F. Scarlato, DC Bar # 484124
Rhonda M. Galaz, DC Bar # 489999
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, DC 20004
(202) 624-2500

Counsel for Defendant Janis Karpinski

March 6, 2006

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| ARKAN MOHAMMED ALI, *et al.,*    ) | |
| ) | |
| Plaintiffs,    ) | |
| ) | |
| v.    ) | Case No. 05-1379-TFH |
| ) | |
| JANIS KARPINSKI,    ) | **ORAL ARGUMENT** |
| ) | **REQUESTED** |
| Defendant.    ) | |
| _____ ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JANIS KARPINSKI'S MOTION TO DISMISS</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PLAINTIFFS' ALLEGATIONS ......................................................................... 1

BACKGROUND ................................................................................................. 2

    A.    Congress Authorizes the Use of Military Force Against a New
Enemy. ..................................................................................... 2

    B.    Confusion Pervades Interrogation Methods in Iraq. ............................... 4

    C.    Congressional Efforts to Provide Clarification. ...................................... 6

ARGUMENT ...................................................................................................... 9

I.    Karpinski Is Entitled to Absolute Immunity From Suit On Plaintiffs'
Claims For Violations of the Law of Nations and The Geneva
Conventions. ........................................................................................ 10

    A.    The Attorney General's Certification Should Be Given Effect. ............. 11

    B.    Karpinski Was Acting Within the Scope of Her Employment. .............. 12

II.    The Court Should Dismiss Plaintiffs' Claims On Both Special Factors and
Qualified Immunity Grounds. .......................................................... 16

    A.    Special Factors Preclude Plaintiffs' *Bivens* Claims For Alleged
Violations of the Fifth and Eighth Amendments. ............................. 16

        1.    The Special Factors Doctrine ................................................. 17

        2.    Judicial Consideration of This Case Would Threaten
Interference With Military Policy Judgments Reserved For
the Political Branches ........................................................... 18

        3.    The Political Branches Have Exercised Their Authority to
Respond to the Allegations of Abuse at Abu Ghraib ................. 23

    B.    Defendant Karpinski is Entitled to Qualified Immunity From Suit
On Each of Plaintiffs' Claims. ........................................................ 27

        1.    Plaintiffs Cannot Establish the Deprivation of a
Constitutional Right. ............................................................ 28

        2.    Plaintiffs Have Failed to Identify a Right That Was
"Clearly Established" at the Time of the Alleged Violation. ....... 31

3.   Karpinski's Actions Were Objectively Reasonable.................................. 33

III.  The Political Question Doctrine Renders All of Plaintiffs' Claims Non-Justiciable. ................................................................................................. 34

A.   The Political Question Doctrine .......................................................... 35

B.   The Factors Established By the Supreme Court In *Baker v. Carr* All Support Dismissal Under Rule 12(b)(1). ...................................... 36

1.   Plaintiffs' Claims Raise Policy Questions That Are Textually Committed to the Political Branches of Government. .......................................................................... 37

2.   There Are No Judicially Discoverable and Manageable Standards For Resolving Plaintiffs' Claims. ........................... 38

3.   It Would Be Impossible to Adjudicate Plaintiffs' Claims Without Making an Initial Policy Determination Clearly Reserved For the Political Branches. ....................................... 40

4.   It Would Be Impossible For This Court to Resolve Plaintiffs' Claims Without Expressing a Lack of Proper Respect For the Political Branches. ......................................... 41

5.   There is an "Unusual Need" in the Area of Wartime Military Affairs for "Unquestioning Adherence" to the Political Decisions Made by Congress and the Executive Branch. .............................................................................. 42

6.   Permitting Plaintiffs' Claims to Go Forward Would Create a Substantial Risk of Embarrassment For the Government as a Result of "Multifarious Pronouncements" By the Various Branches of Government. ......................................... 43

IV.  Plaintiffs Cannot State a Claim For Violation of the Geneva Conventions.................... 45

CONCLUSION ............................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*32 County Sovereignty Comm. v. Dep't of State,*
   292 F.3d 797 (D.C. Cir. 2002) ....................................................... 30

*Al-Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003)........................................ 31

*Anderson v. Creighton*, 483 U.S. 635 (1987) ........................................................ 29

*\*Baker v. Carr,*  369 U.S. 186 (1962) ..................................................... *passim*

*Bancoult v. McNamara*, 370 F. Supp. 2d 1 (D.D.C. 2004) .................................. 43, 44

*Bell v. Wolfish*, 441 U.S. 520 (1979)........................................................... 29

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
   403 U.S. 388 (1971) ................................................................... *passim*

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ................................................ 32

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ................................... 10

*Bush v. Lucas*, 462 U.S. 367 (1983).......................................................... *passim*

*Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ...................... 29

*\*Chappell v. Wallace*, 462 U.S. 296 (1983) ...................................... *passim*

*Chung v. U.S. Dept. of Justice*, No. 00-1912,
   2001 WL 34360430 (D.D.C. Sept. 20, 2001) ....................................... 18

*Comm. of United States Citizens v. Reagan,* 859 F.2d 929 (D.C. Cir. 1988)............... 37

*Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) ......................... 16

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ............................... 29

*Crockett v. Reagan*, 720 F.2d 1355 (D.C. Cir. 1983)........................................ 39

*Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918 (D.C. Cir. 2003)............. 39

*El-Shifa Pharmaceutical Industries Co. v. United States,*
   402 F. Supp. 2d 267 (D.D.C. 2005)..............................................37, 39, 40

*Ex parte Quirin*, 317 U.S. 1 (1942) .................................................................. 20

*F.D.I.C. v. Meyer*, 510 U.S. 471 (1994) ............................................................ 17

*Farmer v. Moritsugo*, 163 F.3d 610 (D.C. Cir. 1998) ...................................... 28

*Garber v. United States*, 578 F.2d 414 (D.C. Cir. 1978) .................................. 12

*Gilligan v. Morgan*, 413 U.S. 1 (1973) ............................................................ 18

*Haddon v. United States*, 68 F.3d 1420 (D.C. Cir. 1995) ........................... 12, 14

*\*Hamdan v. Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005) ...................................... 45

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ........................................................... 2

*\*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ................................................ 28, 31

*Hechinger Co. v. Johnson*, 761 A.2d 15 (D.C. 2000) ....................................... 12

*Hunter v. Bryant,* 502 U.S. 224 (1991) ......................................................... 28, 33

*In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) ........... 31, 32

*Industria Panificadora, S.A. v. United States,*
   763 F. Supp. 1154 (D.D.C. 1991) ................................................................ 40

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986)................. 35

*Jifry v. F.A.A.*, 370 F.3d 1174 (D.C. Cir. 2004)................................................ 30

*\*Johnson v. Eisentrager*, 339 U.S. 763 (1950)............................................ *passim*

*Jones v. Dept. of Defense*, No. 94-5294,
   1995 WL 225125 (D.C. Cir. Mar. 14, 1995) ................................................ 18

*Kalka v. Hawk*, 215 F.3d 90 (D.C. Cir. 2000) .................................................. 28

*\*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005)...................................... *passim*

*Koch v. United States*, 209 F. Supp. 2d 89 (D.D.C. 2002) ............................... 12

*Lauro v. Charles*, 219 F.3d 202 (2d Cir. 2000) ................................................ 34

*Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976)................................................... 14

*Mac'Avoy v. Smithsonian Institution*, 757 F. Supp. 60 (D.D.C. 1991) ........................................ 18

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ............................................................ 35, 37

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ...................................................................... 28, 32

*Mundy v. Weinberger*, 554 F. Supp. 811 (D.D.C. 1982) ............................................................. 12

*Murray v. Gardner*, 741 F.2d 434 (D.C. Cir. 1984) ............................................................... 31

*Oetjen v. Cent. Leather Co.*, 246 U.S. 297 (1918) ................................................................ 37

*Olaniyi v. District of Columbia*, ___ F. Supp. 2d ___,
    2006 WL 389743 (D.D.C. Feb. 17, 2006) .................................................................... 33

*Orloff v. Willoughby*, 345 U.S. 83 (1953) ...................................................................... 19

*Pauling v. McLeroy*, 278 F.2d 252 (D.C. Cir. 1960) ............................................................. 30

*Rasul v. Bush*, 542 U.S. 466 (2004) ............................................................................ 31

*Rasul v. Rumsfeld*, ___ F. Supp. 2d. ___,
    2006 WL 266570 (D.D.C. Feb. 6, 2006) .............................................................. *passim*

*Rogan v. City of Boston*, 267 F.3d 24 (1st Cir. 2001) ........................................................... 28

*Rostker v. Goldberg*, 453 U.S. 57 (1981) ........................................................................ 18

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985) .............................................. 17, 20, 21

*Saucier v. Katz,* 533 U.S. 194 (2001) ........................................................................ 31, 33

*Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004) ............................................ 12, 40, 41, 42

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) ............................................... *passim*

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) ......................................................... 17, 23, 26, 27

*Simpkins v. District of Columbia Government*, 108 F.3d 366 (D.C. Cir. 1997) ..................................... 11

*Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004) .................................................................. 16

*Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) ................................................... 17, 23, 26

*Spradley v. Spaniol*, 684 F. Supp. 10 (D.D.C. 1988) ............................................................. 18

*Stokes v. Cross*, 327 F.3d 1210 (D.C. Cir. 2003) ........................................................ 14

*Tarpeh-Doh v. United States,* 28 F.3d 120 (D.C. Cir. 1994) ...................................... 12

*Thomas v. Principi*, 394 F.3d 970 (D.C. Cir. 2005) .................................................... 17

*Thompson v. Pope*, 397 F. Supp. 2d 28 (D.D.C. 2005) ............................................... 23

*United States ex rel. Joseph v. Cannon*, 642 F.2d 1373 (D.C. Cir. 1981) .................. 35

*United States v. Gilman*, 347 U.S. 512 (1954) ............................................................ 17

*United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818) ........................................... 35

*United States v. Smith*, 499 U.S. 160 (1991) .............................................................. 11

*\*United States v. Stanley*, 483 U.S. 669 (1987) ................................................ *passim*

*\*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ................................. 30, 32

*Wardlaw v. Pickett*, 1 F.3d 1297 (D.C. Cir. 1993) ...................................................... 33

*Weinberg v. Johnson*, 518 A.2d 985 (D.C. 1986) ....................................................... 14

*Wilson v. Layne*, 526 U.S. 603 (1999) ........................................................................ 32

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .................................................................... 30

*Zerilli v. Evening News Assoc.*, 628 F.2d 217 (D.C. Cir. 1980) ................................. 18

**Statutes**

10 U.S.C § 893 ................................................................................................................ 9

10 U.S.C. § 928 ............................................................................................................... 9

10 U.S.C. § 933 ............................................................................................................... 9

10 U.S.C. §§ 801-946A ................................................................................................. 24

*28 U.S.C. § 2679 (Westfall Act) ............................................................................. 1, 11

*28 U.S.C. §§ 2671-80 (Federal Tort Claims Act) ........................................................ 11

Authorization for Use of Military Force Against Iraq Resolution of 2002,
Pub. L. No. 107-243, 116 Stat. 1498 (2002) ......................................................... 3, 42

Authorization for Use of Military Force,
   Pub. L. No. 107-40, 115 Stat. 224 (2001).......................................................... 2, 3

Department of Defense, Emergency Supplemental Appropriations to
   Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act,
   2006, Pub. L. No. 109-148, §§ 1001 – 1006, 119 Stat. 2680 (2005) .........................7, 8, 25, 41

Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005,
   Pub. L. No. 108-375 § 1091(b)(3), 118 Stat. 1811 (2004) .................................... 7,8

Uniform Code of Military Justice, Pub. L. No. 81-506, 64 Stat. 107-149 (1950)................. 9, 24

**Other Authorities**

151 Cong. Rec. S11,061-03 (2005)............................................................... *passim*

Army Field Manual 34-52 .......................................................................4, 5, 6, 8

Restatement (Second) of Agency ............................................................... 12, 13

**Rules**

Federal Rule of Civil Procedure 12(b)(1)....................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) ........................................................ 10

**Regulations**

49 Fed. Reg. 17152 (Apr. 13, 1984)............................................................... 9

Military Order of November 13, 2001, Detention, Treatment, and Trial of
   Certain Non-Citizens in the War Against Terrorism,
   66 Fed. Reg. 57,833-36 (Nov. 16, 2001) ..................................................... 3

**Constitutional Provisions**

Article I........................................................................................7, 19, 24

Article II....................................................................................... 19

Fifth Amendment ................................................................................ 1

Eighth Amendment................................................................................ 1, 29

## INTRODUCTION

Plaintiffs have asked this Court to do what no court has done before: authorize a damages remedy against an officer of the U.S. Army for her subordinates' conduct in connection with the wartime interrogation of alien enemy prisoners on foreign soil. Plaintiffs' Consolidated Amended Complaint ("Complaint" or "Compl.") against Janis Karpinski ("Karpinski") must be dismissed for at least five independent reasons.

*First*, pursuant to the Westfall Act, 28 U.S.C. § 2679, Karpinski is entitled to absolute immunity from suit for Plaintiffs' claims under the Law of Nations and the Geneva Conventions;

*Second*, there are "special factors counseling hesitation" that require the Court to dismiss the Complaint;

*Third*, Karpinski is entitled to qualified immunity from suit;

*Fourth*, the Political Question Doctrine requires dismissal of the Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure;

*Fifth*, Plaintiffs have failed to state a claim for violations of the Geneva Conventions.

## PLAINTIFFS' ALLEGATIONS

Plaintiffs are non-U.S. citizens who claim that, during the U.S. war with Iraq, they "were detained in U.S. military custody in Iraq … where they were subjected to torture and other cruel, inhuman, or degrading treatment or punishment." Compl. ¶ 1. They allege that Karpinski and others "bear legal responsibility for the policies, patterns, practices, derelictions of duty and command failures" that caused their injuries. Compl. ¶ 3. The Complaint also alleges that Defendants "violated their legal duty to prevent and prohibit torture and other cruel, inhuman or degrading treatment by subordinates when they knew and had reason to know of it." Compl. ¶ 9.

Plaintiffs plead six causes of action: Counts One and Two for violations of the Fifth and Eighth Amendments of the Constitution; Counts Three and Four for violations of the Law of

1

Nations; Count Five for violation of the Geneva Conventions; and Count Six for Declaratory

Relief.[1]  However, as set forth more fully below, the Complaint suffers fatal defects and is

plagued by contradictory statements that fail to articulate grounds under which Karpinski may be

held liable for Plaintiffs' alleged injuries.  Accordingly, the Complaint should be dismissed for

lack of subject matter jurisdiction and for failure to state a claim upon which relief may be

granted.

## BACKGROUND

On September 11, 2001, terrorists launched upon the United States the deadliest attack in

this country's history, claiming the lives of more than 3,000 innocent civilians.  *See Hamdi v.

Rumsfeld*, 542 U.S. 507, 510 (2004).  This tragedy was a watershed moment in national security,

foreign policy, and military affairs, as the United States embarked on an unprecedented war with

invisible, unidentifiable, and untraceable enemies against whom conventional U.S. military

operations were untested.

### A.    Congress Authorizes the Use of Military Force Against a New Enemy.

On September 18, 2001 Congress issued a Joint Resolution authorizing the use of

military force in response to the September 11 attacks, in order to "exercise [the U.S.'s] rights to

self-defense and to protect United States citizens both at home and abroad."  Authorization for

Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("First Joint Resolution").

Specifically, in recognition of the continuing "unusual and extraordinary threat to the national

security and foreign policy of the United States," Congress resolved:

---

[1]    Plaintiffs' Count Six, seeking declaratory relief, appears to be directed only to Defendant
Rumsfeld.  Compl. ¶¶  260-263.  Karpinski, therefore, does not address that claim in this Motion.  To the
extent Plaintiffs seek to advance this claim against Karpinski, it should be dismissed for the reasons set
forth herein.  Karpinski also incorporates by reference the government's arguments on this claim.

> That the President is authorized to use all necessary and
> appropriate force against those nations, organizations, or persons
> he determines planned, authorized, committed, or aided the
> terrorist attacks that occurred on September 11, 2001, or harbored
> such organizations or persons, in order to prevent any future acts of
> international terrorism against the United States by such nations,
> organizations or persons.

*Id*. On October 16, 2002, Congress passed another Joint Resolution, specifically extending the same authorization for use of military force to Iraq based, *inter alia*, on Iraq's (a) threat to U.S. national security; (b) known support of terrorist organizations; and (c) harboring of terrorists. Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498 (2002).

Shortly after Congress issued the First Joint Resolution, the President issued a Military Order delegating to the Secretary of Defense responsibility for the trial and detention of certain non-U.S. citizens determined to be affiliated with terrorism, and authorized him to issue orders and regulations necessary to execute that responsibility. Military Order of November 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833-36 (Nov. 16, 2001). The President also ordered that foreign detainees had to be tried under military tribunal procedures, thereby balancing the need to provide detainees with a "full and fair trial" with the overwhelming need to "identify terrorists and those who support them, to disrupt their activities, and to eliminate their ability to conduct or support such attacks" in a timely manner. *Id*. at 57,835. The Order further prescribed that detainees had no related (1) right to seek any remedy or maintain a claim in any U.S. court (state or federal), or (2) enforceable legal or equitable rights against the United States or any of its departments, agencies, entities, officers or employees. *Id*. at 57,835-36.

**B.      Confusion Pervades Interrogation Methods in Iraq.**

Historically, military interrogators were guided by Army Field Manual 34-52 ("FM 34-52"). Compl. ¶¶ 6, 32; Dept. of the Army, Army Field Manual 34-52, Intelligence Interrogation (1992) (http://www.fas.org/irp/doddir/army/fm34-52.pdf). FM 34-52 set forth basic principles for military interrogations, including a prohibition on "torture." *Id*. at 1-7–1-9. In the context of this unprecedented military struggle, however, questions arose regarding the viability and continuing effectiveness of historic interrogation methods to modern warfare and, specifically, the terrorist threat. Extensive analysis related to this concern began as early as 2002, when counsel from a wide range of government offices began deliberating questions fundamental to the development of lawful yet effective interrogation methods, including, *inter alia*, how torture is to be defined, and whether the U.S. definition of torture conflicts with international law. *See* Compl. ¶¶ 54-65. Senior military officials, including government legal advisors, weighed in on the issue, proffering conflicting answers to these questions. *See* Compl. ¶¶ 34, 62-63.[2]

In December 2002, in the wake of these inconsistent analyses, Secretary of Defense Rumsfeld approved a list of interrogation techniques ("December Rumsfeld Techniques") for use on detainees held in Guantanamo Bay, Cuba ("GTMO" or "Guantanamo"). Compl. ¶ 52.[3]

---

[2]      Referring to Memorandum from J.S. Bybee, Asst. Atty. Gen., to A.R. Gonzales, Counsel to the President, re Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A (Aug. 1, 2002) (concluding that an act constitutes torture only where it is specifically intended to inflict severe pain or suffering on the detainee) (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/02.08.01.pdf); Memorandum from D. Levin, Acting Asst. Atty Gen., to J.B. Comey, Deputy Atty. Gen., re Legal Standards Applicable Under 18 U.S.C. §§ 2340-2340A (Dec. 30, 2004) (supplanting Aug. 1, 2002 Bybee Memo) (http://www.usdoj.gov/olc/dagmemo.pdf).

[3]      Referring to Action Memo from W.J. Haynes, Gen. Counsel of the Dept. of Def., to Sec'y of Def., re Counter-Resistance Techniques (Nov. 27, 2002) (approved by D. Rumsfeld, Sec'y of Def., Dec. 2, 2002) (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/02.12.02.pdf).

Rumsfeld rescinded them only a month and a half later. *Id.* ¶ 56.[4] However, Plaintiffs allege, "in an order to the commander of the U.S. Southern Command, [Rumsfeld] stated that he personally could authorize the continued use of the otherwise-rescinded techniques, and that he wanted to be involved in the formulation of a plan to use them." *Id.* Rumsfeld subsequently issued a new list of approved interrogation techniques for GTMO in April 2003. *Id.* ¶ 64.[5]

While the GTMO interrogation methods were being debated, the war on terrorism officially had spread to Iraq, and with it, the same authorization for aggressive interrogation techniques in the Iraqi theater of war. *See, e.g.*, Compl. ¶ 67. Formal authorization followed on September 14, 2003, when Lt. Gen. Ricardo Sanchez authorized an approved list of 29 interrogation techniques ("September Sanchez Techniques"). *Id.* ¶ 81.[6] The list was comprised of an assortment of techniques based, *inter alia*, on those approved by the Secretary of Defense and those authorized under FM 34-52, and it included techniques Plaintiffs allege caused their injuries. *See id.* ¶¶ 80-83; *see also* FM 34-52 at 3-13–3-20. According to Plaintiffs, the Secretary of Defense has never "renounced or formally revoked or rescinded policies, orders and authorizations that [allegedly] caused Plaintiffs to be tortured and abused." Compl. ¶ 227.

The military guidelines were intended to leave a substantial amount of discretion to the interrogator. *See*, *e.g.*, FM 34-52 at 3-1 ("[t]he Commander's intelligence needs and the [intelligence staff's] estimate of the enemy's intentions dictate the extent to which these

---

[4] Referring to Memorandum from D. Rumsfeld, Sec'y of Defense, to Commander USSOUTHCOM, re Counter Resistance Techniques (Jan. 15, 2003) (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/03.01.15.pdf).

[5] Referring to Memorandum from D. Rumsfeld, Sec'y of Defense, to the Commander, U.S. Southern Command, re Counter-Resistance Techniques in the War on Terrorism (Apr. 16, 2003) (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/03.04.16.pdf).

guidelines can be applied").  Similarly, the various memoranda authorizing interrogation

techniques often were extremely broad and/or provided different goals or definitions for the

same categories of interrogation.  For example, one technique, "Fear Up (Harsh)," was defined

under FM 34-52 as the attempt to "convince the source that he does indeed have something to

fear; that he has no option but to cooperate."  FM 34-52 at 3-16.  The Sanchez techniques

specific to the operations in Iraq were even broader, stating that to employ the "Fear Up (Harsh)"

technique is to "significantly increase[] the fear level in a detainee."  September Sanchez

Techniques at 3.  Plaintiffs highlight the extent to which an interrogator's understanding of

authorized methods could have varied, alleging that terms like "environmental manipulation,"

"stress positions," and "sleep adjustment," were understood by subordinates as "authorizations to

include practices such as keeping detainees in ice water near the point of death by hypothermia,

using strobe lights and music to disorient detainees, and using large dogs to terrify blindfolded

detainees."  Compl. ¶ 66.  According to Plaintiffs, "[a]s a result of the proliferation of

interrogation memoranda issued by Defendant Sanchez, military interrogators in Iraq became

increasingly confused about the legal limits of their conduct toward detainees."  Compl. ¶ 85.

### C.    Congressional Efforts to Provide Clarification.

Plaintiffs allege that the lack of consistent military orders, policies, and authorizations for

interrogation "foreseeably led to the widespread torture and abuse of detainees," Compl. ¶ 40,

and that military investigations confirmed this conclusion, finding that "the proliferation of

---

(…continued)

6      Referring to Memorandum from Lt. Gen. R.S. Sanchez, U.S. Army Commanding, to
Commander, U.S. Cent. Command, re CJTF-7 Interrogation and Counter-Resistance Policy (Sept. 14,
2003) (http://www.aclu.org/FilesPDFs/september%20sanchez%20memo.pdf).

techniques in the various theaters of war 'became confusing....'"[7] Compl. ¶ 67. Members of

Congress, too, have agreed that this "pattern of abuses...occurred because soldiers did not know

what was acceptable under this administration's vague detention and interrogation policies." 151

Cong. Rec. S11,061-03, S11,061 – S11,075 (2005) (Senate floor discussion of H.R. 2863).[8]

Following the disclosure of conditions at the Abu Ghraib prison in Iraq, Congress and

military officials responded in accordance with their respective authorities. Pursuant to its

responsibility under the Constitution to "make rules concerning captures on land and water" and

"to make rules for the government and regulation of the land and naval forces," U.S.

Constitution, article I, section 8, members of Congress initiated the first of several attempts to

clarify and provide guidance regarding the scope of acceptable military interrogation methods.

151 Cong. Rec. S11,061-03, S11,069 (2005). In October 2004, Congress passed legislation

emphasizing that "it is the policy of the United States...to ensure that all personnel...understand

their obligations in both wartime and peacetime to comply with the legal prohibitions against

torture, cruel, inhuman, or degrading treatment of detainees...." Ronald W. Reagan National

Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375 § 1091(b)(3), 118 Stat.

1811 (2004) ("Reagan Act"). The Reagan Act further called for policies guaranteeing that

detention and interrogation facility commanders properly train all personnel regarding the laws

---

[7]      *See also* Compl. ¶¶ 7, 89, 157 (referencing J.R. Schlesinger, Final Report of the Independent Panel to Review DoD Detention Operations (Aug. 24, 2004) (http://www.defenselink.mil/news/Aug2004/d20040824finalreport.pdf); LTG A.R. Jones and MG G.R. Fay, Investigation of Intelligence Activities at Abu Ghraib (Aug. 23, 2004) (http://www.defenselink.mil/news/Aug2004/d20040825fay.pdf); Maj. Gen. A. Taguba, Article 15-6 Investigation of the 800th Military Police Brigade (Mar. 12, 2004) (http://www.aclu.org/torturefoia/released/TR3.pdf).

[8]      No fewer than nine of the ten Senators who contributed to the Senate Floor discussion of H.R. 2863 (codified as Pub. L. No. 109-148, §§ 1001 – 1006, 119 Stat. 2680 (2005)) commented specifically on the state of confusion regarding acceptable interrogation methods. *See* 151 Cong. Rec. S11,061-03 (2005).

of war, and establish "standard operating procedures for the treatment of detainees." *Id*.

§ 1092(b)(1)(b). However, "Congress…recognized that the punishment of those in violation of

the Act is and should remain with the military and the military judicial process." *Khalid v. Bush*,

355 F. Supp. 2d 311, 325 n.18 (D.D.C. 2005) (citations omitted), *appeal docketed*, No. 05-5063

(D.C. Cir. Mar. 2, 2005).

     Out of continuing concern over the lack of clarity regarding detainee rights and

interrogation methods in Iraq and elsewhere, Congress again passed legislation in 2005

establishing the Army Field Manual as the official standard for military interrogation procedures,

and providing further assurances of the prohibition against torture. Department of Defense,

Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and

Pandemic Influenza Act, 2006, Pub. L. No. 109-148, §§ 1001 – 1006, 119 Stat. 2680 (2005)

("Army Field Manual Act"). Congress thereby affirmed that "[t]he people, through their elected

representatives, should set the rules for how detainees and prisoners under U.S. control are

treated and interrogated." 151 Cong. Rec. S11,061-03, S11,067 (2005). Senator Lindsey

Graham noted Congress' responsibility for what had occurred in Iraq, observing that the military

personnel at Abu Ghraib "did not have consistency when it came to interpreting the interrogation

policies because the policies made no sense … [Congress was] giving confusing policies in this

new war on terror…. We need to standardize our techniques." *Id*. at S11,066

     In addition to these legislative remedies, the political branches also utilized their

comprehensive Congressional scheme – in place for over 50 years – for the trial and punishment

of military personnel, to address allegations of detainee abuse at Abu Ghraib. Compl. ¶ 104,

152, 158, 165, 167; s*ee also* An Act to Unify, Consolidate, Revise, and Codify the Articles of

War, the Articles for the Government of the Navy, and the Disciplinary Laws of the Coast

Guard, and to Enact and Establish a Uniform Code of Military Justice ("UCMJ"), Pub. L. No.

81-506, 64 Stat. 107-149 (1950) (codified at 10 U.S.C. § 801 *et seq.*).  Through the UCMJ,

which serves as the basis of the military justice system for the U.S. armed forces, Congress

established the court-martial system, including specific procedural, evidentiary, and appellate

rules for adjudicating alleged offenses committed by members of the armed forces.  *See id.*

(setting forth pre-trial procedures, trial procedures, and post trial procedures, and creating the

U.S. Court of Appeals for the Armed Forces); *see also* Exec. Order 12473, Manual for Courts-

Martial, United States, 49 Fed. Reg. 17,152 (Apr. 13, 1984) (amended annually).  The UCMJ

provides specifically for the prosecution of military personnel for cruelty, oppression, or

maltreatment toward persons subject to the defendant's orders; attempted or threatened unlawful

force or violence; or conduct unbecoming an officer.  *See, e.g.*, 10 U.S.C. §§ 893, 928, 933.  In

establishing the UCMJ, Congress determined that such cases would be tried pursuant to the

military justice system, not by Article III courts.  The political branches thus have exercised

consistently their Constitutional authority to regulate this area in order to deter and punish the

sort of abuse alleged by Plaintiffs.

## ARGUMENT

"Federal courts are courts of limited jurisdiction, and the law presumes that a cause lies

outside this limited jurisdiction."  *Rasul v. Rumsfeld*, ___ F. Supp. 2d. ___, 2006 WL 266570,[9] at

*3 (D.D.C. Feb. 6, 2006) (citations omitted).  For this reason, when faced with a motion to

dismiss under Rule 12(b)(1), it is plaintiffs' burden to establish that the court has subject-matter

---

[9] For this Court's ease of reference, all currently unpublished decisions are attached hereto as Exhibit 2.

jurisdiction. The court may dismiss a complaint if plaintiffs "can prove no set of facts in support of [their] claim that would entitle [them] to relief." *Id.* at *4 (citation omitted). In deciding whether subject-matter jurisdiction exists, the court must scrutinize plaintiffs' factual allegations more closely than would be required under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, and may consider materials outside the pleadings. *Id.* (citations omitted).

A Rule 12(b)(6) motion, on the other hand, tests the legal sufficiency of the complaint. *Id.* at *3. (citing *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). For purposes of such a motion, the court must treat a plaintiff's factual allegations as true. *Rasul* 2006 WL 266570, at *4. The court, however, "need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations." *Id.*

In this case, Rules 12(b)(1) and 12(b)(6) independently require that this Court dismiss all of Plaintiffs' claims against Karpinski with prejudice. As demonstrated below, Plaintiffs allege facts in their Complaint that require this Court to refrain from exercising jurisdiction over their claims. Further, there is no set of facts that entitles Plaintiffs to relief in this forum.

I. **Karpinski Is Entitled to Absolute Immunity From Suit On Plaintiffs' Claims For Violations of the Law of Nations and The Geneva Conventions.**

Plaintiffs' two causes of action against Karpinski alleging violations of the "Law of Nations," and another under the Geneva Conventions (Counts 3-5) are disposed of easily. Compl. ¶¶ 247-259. The Attorney General's designee has certified that Karpinski was acting within the scope of her employment "at the time of the conduct alleged in the complaint." Timothy P. Garren, Director, Torts Branch, Civil Division, U.S. Dept. of Justice, Certification of Scope of Employment, Mar. 1, 2006 (attached as Exhibit 1). In addition, it is clear that an Karpinski has met the requisite standard for acting within the scope of her employment. As a

result, Plaintiffs' non-constitutional claims against Karpinski are barred by the Federal

Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. section 2679 (the

"Westfall Act"), and Plaintiffs only may seek relief against the United States pursuant to the

Federal Tort Claims Act, 28 U.S.C. sections 2671-80 ("FTCA").  *Simpkins v. District of

Columbia Government*, 108 F.3d 366, 372 (D.C. Cir. 1997).  Indeed, Judge Urbina of this district

recently dismissed nearly identical claims on this very basis.  *See Rasul*, 2006 WL 266570, at

*10.  This Court should do the same.

> ### A.    The Attorney General's Certification Should Be Given Effect.

The Westfall Act confers absolute immunity upon federal employees "by making an

FTCA action against the Government the exclusive remedy for torts committed by Government

employees in the scope of their employment."  *Id.* at *5 (quoting *United States v. Smith*, 499 U.S.

160, 163 (1991), and 28 U.S.C. § 2679(b)(1)).  Thus, upon certification by the Attorney General

or his designee that a government employee was acting within the scope of her office or

employment at the time of the alleged incident(s) out of which the claim arose, (1) the United

States "shall be substituted as the sole defendant," and (2) the suit is converted to an action

against the United States under the FTCA.  *Id.*; 28 U.S.C. § 2679(d)(1)-(2).

Even when the Attorney General has certified that a government employee was acting

within the scope of her employment, a plaintiff may challenge that certification on a motion to

dismiss.  The certification, however, is entitled to "*prima facie* effect," and it is Plaintiffs' burden

to allege facts that, if true, would establish by a preponderance of the evidence that the

defendant's actions exceeded the scope of her employment.  *Rasul*, 2006 WL 266570, at *5.[10]

---

[10]    Although Karpinski disputes the facts alleged in the Complaint for purposes of any decision on the merits, there is no dispute as to the facts for purposes of this motion to dismiss.  In such

(continued…)

11

### B.     Karpinski Was Acting Within the Scope of Her Employment.

Any challenge to the Attorney General's certification is futile in this case.  In the District of Columbia, the applicable legal standard is derived from the Restatement (Second) of Agency.[11]  *Haddon v. United States*, 68 F.3d 1420, 1423 (D.C. Cir. 1995).  The Restatement provides that an employee's conduct is deemed to be within the scope of her employment if (1) it is of the kind she is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the master; and (4) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.  Restatement (Second) of Agency § 228 ; *Rasul*, 2006 WL 266570 at *6; *Hechinger Co. v. Johnson*, 761 A.2d 15, 24, n.5 (D.C. 2000).[12]  Applying this standard, and based on Plaintiffs' own allegations, there can be no question that, as a matter of law, Karpinski acted within the scope of her employment at all times.

---

(…continued)

circumstances, Plaintiffs are not entitled to discovery or evidentiary hearings on the issue of scope of employment, and the court should resolve the claims as a matter of law.  *See Koch v. United States*, 209 F. Supp. 2d 89, 92-93 (D.D.C. 2002).

[11]     To determine whether a federal employee was acting within the scope of her employment, the court must apply the law of the state where the tortious act occurred.  *See Rasul*, 2006 WL 266570, at *5 (citing *Tarpeh-Doh v. United States,* 28 F.3d 120, 123 (D.C. Cir. 1994), and *Garber v. United States*, 578 F.2d 414, 415 (D.C. Cir. 1978)).  In cases like this, where the alleged conduct arises from military or other government-sponsored conduct outside the United States, District of Columbia courts have applied the law of the District to resolve questions of scope of employment.  *See Rasul,* 2006 WL 266570, at *5. (applying District of Columbia law for alleged conduct at Guantanamo Bay because the acts were "inextricably bound up with the District of Columbia in its role as the nation's capital") (quoting *Mundy v. Weinberger*, 554 F. Supp. 811, 818 (D.D.C. 1982)).

[12]     In this case in particular, it is important to recognize that "[d]efining an employee's scope of employment is not a judgment about whether the alleged conduct is deleterious or actionable; rather, this procedure merely determines *who* may be held liable for that conduct, an employee or [her] boss." *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265 (D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005), (emphasis in original).  Therefore, Plaintiffs cannot overcome the *prima facie* effect of the Attorney General's certification simply by alleging that Karpinski's conduct violated certain international norms (or even military regulations).

12

*First*, Plaintiffs effectively concede, as they must, that the conduct they allege against Karpinski was of the type she was employed to perform, and was undertaken within the space and time limitations authorized by her employer (*i.e.*, the U.S. military). The District of Columbia "liberally construes" this first element, which requires only that the conduct be "of the same general nature as that authorized" or "incidental to the conduct authorized." *Rasul*, 2006 WL 266570, at *6; Restatement (Second) of Agency § 229 . Here, Plaintiffs allege that Karpinski was, at all relevant times, the commander of the U.S. Army unit responsible for detention facilities in Iraq, and that her job was to supervise and command personnel responsible for the care and control of detainees in U.S. custody. Compl. ¶ 29.[13] Boiled to its essentials, the Complaint alleges that Karpinski violated Plaintiffs' rights by inadequately performing her duties as Brigadier General when she failed to prevent subordinate officers from implementing interrogation policies and practices that were established and authorized by senior military officials, including the Secretary of Defense.[14] *See*, *e.g.*, Compl. ¶¶ 29, 43, 77, 97, 156.

Plaintiffs' allegations fall squarely within the Restatement definition for conduct of the kind Karpinski was employed to perform. As Judge Urbina recently observed, "[t]he courts in the District of Columbia categorize practically any conduct as falling within the scope of, or

---

[13]    With respect to all Defendants, Plaintiffs allege that they "were at all relevant times personally responsible for developing, authorizing, supervising, and/or implementing the policies, patterns or practices governing the detention and interrogation of detainees in Afghanistan and/or Iraq during the time that Plaintiffs were in the custody of the U.S. military." Compl. ¶ 50.

[14]    On the one hand, Plaintiffs allege that Karpinski "furthered and implemented" the Secretary of Defense's "policy, pattern or practice of torture and other cruel, inhuman or degrading treatment of detainees … which caused the torture and abuse of Plaintiffs." Compl. ¶ 8. On the other, Plaintiffs allege that Karpinski acted "[a]s a consequence of Defendant Rumsfeld's and Defendant Sanchez's actions *and on her own initiative*." Compl. ¶ 43 (emphasis added). Plaintiffs cannot avoid dismissal by having it both ways. As in *Schneider v. Kissinger*, 412 F.3d 190, 199 (D.C. Cir. 2005), Plaintiffs have alleged explicitly that their injuries resulted from actions and policy decisions of senior Executive Branch officials. Based on Plaintiffs' allegations, any alleged conduct by Karpinski "can hardly be called anything other than [implementation of] foreign policy," *id*. at 199, and certainly was within the scope of her employment.

incidental to, that authorized by their employer so long as the action has some nexus to the action authorized." *Rasul*, 2006 WL 266570, at *6. Indeed, in two seminal cases, the D.C. Court of Appeals and D.C. Circuit respectively held that a Laundromat employee who *shot a customer over a dispute regarding clothes left in a washing machine*, and a furniture deliveryman who *sexually assaulted a customer following an argument over the inspection and payment of delivered goods*, were acting in the scope of their employment. *See Weinberg v. Johnson*, 518 A.2d 985 (D.C. 1986); *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976). The *Rasul* court stated the point plainly. "If the doctrine of *respondeat superior* is panoptic enough to link sexual assault with a furniture deliveryman's employment because of the likely friction that may arise between deliveryman and customer, it must also include torture and inhumane treatment wrought upon captives by their captors." 2006 WL 266570, at *7. There is no question that Karpinski's carrying out her duties as Brigadier General (even if conducted inadequately, as Plaintiffs allege) was "a direct outgrowth of [her] instructions [and] job assignment," and within the scope of her employment. *Id.* (quoting *Haddon*, 68 F.3d at 1424).

    *Second*, Plaintiffs have alleged no facts to overcome the presumption under D.C. law that Karpinski, by acting in the course of performing her job duties, intended, at least in part, to promote her employer's interests. *See Weinberg*, 518 A.2d at 989.[15] Not only do Plaintiffs fail to allege anywhere that Karpinski acted, even in part, out of a personal motive, their allegations rely entirely on the theory that Karpinski was (a) following orders and implementing policies

---

[15]    The law affords this presumption no less weight where Plaintiffs allege that the employee has engaged in intentional torts. "[T]he employer does not avoid liability for the employee's intentional torts … if the tort is committed partially because of a personal motive . . . as long as 'the employee [is] actuated, at least in part, by a desire to serve his principal's interest.'" *Rasul*, 2006 WL 266570, at *7 (citations omitted); *see also Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003) ("[t]he intent criterion … is broad enough to embrace any intentional tort arising out of [conduct] that 'was originally undertaken on the employer's behalf'") (quoting *Weinberg*, 518 A.2d at 992).

14

from her superiors (which Plaintiffs allege authorized and caused their mistreatment), and (b) was acting, at all times, pursuant to her responsibilities over U.S. military detention facilities in Iraq. Compl. ¶¶ 8, 10, 27-29, 50-56, 71-77. Thus, even assuming Plaintiffs could demonstrate that Karpinski somehow was responsible for the most egregious claims set forth in the Complaint – a proposition wholly unsupported by their allegations – there can be no dispute that any alleged conduct by Karpinski, even if true, was motivated exclusively by an intention to serve the United States and its military leadership.

*Third*, Plaintiffs cannot credibly argue that it was "unexpectable" that soldiers in Iraq would use force to facilitate information-gathering from Iraqi prisoners considering (a) the post-9/11 military and national security environment in which the United States had determined to use all available means to forestall future terrorist attacks abroad or on American soil; (b) the specific authorization for, and pressure to implement, aggressive interrogation tactics (including those Plaintiffs characterize as "torture") by military superiors and senior Executive Branch officials;[16] (c) confusion among lawyers, lawmakers, and courts regarding the legality of the conduct in question; and (d) the fact that Plaintiffs were prisoners in a military prison *during the course of a war. See, e.g., Rasul*, 2006 WL 266570, at *8 ("[i]n the present case, the heightened climate of anxiety, due to the stresses of war and pressures after September 11 to uncover information leading to the capture of terrorists, would naturally lead to a greater desire to procure information and, therefore, more aggressive techniques for interrogations"); *see also* Compl. ¶¶ 16, 40-46, 49, 51-66, 71-84. Such a conclusion would require this Court to ignore completely

---

[16] Plaintiffs themselves characterize as "reasonabl[e]" their interrogators' understanding that the "harsh interrogation methods" which allegedly resulted in their injuries were authorized by "command headquarters." Compl. ¶ 70.

the context in which this conduct allegedly occurred, not to mention the entire direction of U.S.

military and national security policy since September 11, 2001.

Regardless of whether Plaintiffs agree with how Karpinski conducted her duties, it is

beyond dispute that she acted within the scope of her employment and that the United States

should be substituted as Defendant in Counts Three to Five, resulting in dismissal of those counts

against Karpinski with prejudice.

## II.     The Court Should Dismiss Plaintiffs' Claims On Both Special Factors and Qualified Immunity Grounds.

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388

(1971), the Supreme Court authorized a lawsuit for personal damages against federal officials

whose actions violated an individual's constitutional rights, despite the lack of express

Congressional authorization for the suit.  Although courts continue to entertain *Bivens* actions,

they gradually have limited the availability of *Bivens* remedies in federal court.[17]  In this case,

there are at least two independent reasons Plaintiffs cannot maintain their claims against

Karpinski.  *First*, a *Bivens* action may not lie where, as here, there are "special factors counseling

hesitation" by the Court in considering claims "in the absence of affirmative action by

Congress."  *Id*. at 396.  *Second*, Karpinski is entitled to qualified immunity from suit.

### A.     Special Factors Preclude Plaintiffs' *Bivens* Claims For Alleged Violations of the Fifth and Eighth Amendments.

In *Bivens*, the Supreme Court suggested in *dictum* that it would be inappropriate to allow

damages actions against federal officials where there are "special factors counseling hesitation in

---

[17]     As Justice Scalia recently observed in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) "[w]hile *Bivens* stands, the ground supporting it has eroded.  For the past 25 years, 'we have consistently refused to extend *Bivens* liability to any new context.'  *Bivens* is 'a relic of the heady days in which this Court assumed common-law powers to create causes of action.'"  *Id.* at 742 (Scalia, J., concurring) (quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68, 75 (2001) (Scalia, J., concurring)).

16

the absence of affirmative action by Congress." *Id.* In subsequent Supreme Court decisions,

"that dictum became holding." *See United States v. Stanley*, 483 U.S. 669, 679 (1987). This

"special factors" doctrine precludes extension of a *Bivens* remedy in the instant case.

### 1.    The Special Factors Doctrine

The special factors doctrine relates "not to the merits of the particular remedy, but 'to the

question of who should decide whether such a remedy should be provided.'" *Sanchez-Espinoza*

*v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (quoting *Bush v. Lucas*, 462 U.S. 367 (1983)); *see*

*also Spagnola v. Mathis*, 859 F.2d 223, 226 (D.C. Cir. 1988) (*en banc*) (same). Thus, for

example, where the issue in the case "'involves a host of considerations that must be weighed

and appraised,' its resolution 'is more appropriately for those who write the laws, rather than for

those who interpret them.'" *Sanchez-Espinoza*, 770 F.2d at 208 (quoting *Bush*, 462 U.S. at 380,

and *United States v. Gilman*, 347 U.S. 507, 512-13 (1954)). The Supreme Court has applied this

doctrine to dismiss *Bivens* claims where Congress has established a comprehensive scheme to

address the circumstances raised in the Complaint and/or where Congress' failure to afford

specific remedies to the plaintiffs was not "inadvertent." *See, e.g.*, *Schweiker v. Chilicky*, 487

U.S. 412, 423-26 (1988).

Applying these underlying principles, courts often have dismissed *Bivens* claims on

"special factors" grounds. *See, e.g.*, *F.D.I.C. v. Meyer*, 510 U.S. 471 (1994) (wrongful

discharge); *Schweiker*, 487 U.S. 412 (social security termination benefits); *Bush*, 462 U.S. 367

(defamation and retaliatory demotion); *Stanley*, 483 U.S. 669 (damages resulting from secret

administration of LSD to military serviceman pursuant to Army experiment); *Chappell v.*

*Wallace*, 462 U.S. 296 (1983) (race discrimination claim by Navy enlisted men against their

superior officers); *Thomas v. Principi*, 394 F.3d 970 (D.C. Cir. 2005) (denial of benefits to army

veteran based on failure to disclose medical diagnosis); *Spagnola*, 859 F.2d 223 (harassment and

17

denial of promotion); *Zerilli v. Evening News Ass'n*, 628 F.2d 217 (D.C. Cir. 1980) (damages

arising from disclosure of information disclosed in violation of Fourth Amendment); *Chung v.*

*U.S. Dept. of Justice*, No. 00-1912, 2001 WL 34360430 (D.D.C. Sept. 20, 2001), *rev'd in part on*

*other grounds*, 333 F.3d 273 (D.C. Cir. 2003) (violation of rights under the Privacy Act);

*Mac'Avoy v. Smithsonian Inst.*, 757 F. Supp. 60 (D.D.C. 1991) (recovery of artwork from a U.S.

government museum); *Spradley v. Spaniol*, 684 F. Supp. 10 (D.D.C. 1988) (denial of access to

courts and equal protection).

> **2.      Judicial Consideration of This Case Would Threaten
>          Interference With Military Policy Judgments Reserved For the
>          Political Branches.**

The Supreme Court and judges of this Circuit specifically have applied the special factors

doctrine to bar *Bivens* claims that seek remedies arising from actions incident to military service.

*See, e.g.*, *Stanley*, 483 U.S. at 683-84; *Chappell*, 462 U.S. at 304-05; *cf. Jones v. Dept. of Def.*,

No. 94-5294, 1995 WL 225125, at *1 (D.C. Cir. Mar. 14, 1995) ("there is no *Bivens* remedy

available for injuries arising out of … activity incident to military service").  Indeed, the

Supreme Court often has cited the particular concerns raised by judicial review of military

decisions as requiring judicial abstention in this area expressly reserved for the political

branches:

> It would be difficult to think of a clearer example of the type of
> governmental action that was intended by the Constitution to be
> left to the political branches directly responsible – as the Judicial
> Branch is not – to the electoral process.  Moreover, it is difficult to
> conceive of an area of government activity in which the courts
> have less competence.

*Chappell*, 462 U.S. at 302 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)); *see also Rostker*

*v. Goldberg*, 453 U.S. 57, 64-65 (1981) ("[t]he case arises in the context of Congress' authority

over national defense and military affairs, and perhaps in no other area has the Court accorded

Congress greater deference"); *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953) ("[j]udges are not given the task of running the Army … [o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters"). As the Supreme Court held in *Stanley*, the "insistence … with which the Constitutional confers authority over the Army, Navy, and militia upon the political branches…counsels hesitation in [judicial] creation of damages remedies in this field." 483 U.S. at 682. Legal research in this area has failed to uncover a single case where a court has awarded a *Bivens* remedy to an alien prisoner of the U.S. military based on alleged constitutional violations by U.S. soldiers in a theater of war.

This commitment of military decision-making to the political branches may be traced back to this country's origins. The Supreme Court observed in *Chappell* that many of the Framers themselves had experienced recently "the rigors of military life and were well aware of the difference between it and civilian life." 462 U.S. at 300. When drafting the Constitution, they applied that experience to anticipate the kinds of issues that might be raised in cases such as this involving potential inter-branch disputes over military affairs. The result was a clear delineation of authority among the various branches of government. To Congress, the Framers provided an "explicit grant of plenary authority," *inter alia*, "[t]o raise and support Armies" and "[t]o make Rules for the Government and Regulation of the land and naval forces." *Id*. at 301 (quoting U.S. Const. art. I, § 8, 12-14). To the President, they conferred the exclusive position of Commander in Chief of the U.S. Army, U.S. Constitution article II, section 2, and the authority "to wage war which Congress has declared, and to carry into effect all laws passed by Congress for the conduct of war and for the government and regulation of the Armed Forces, and all laws defining and punishing offenses against the law of nations, including those which pertain to the

conduct of war." *See Ex parte Quirin*, 317 U.S. 1, 26 (1942). "Of course," the Supreme Court

has observed, the "grant of war power includes all that is necessary and proper for carrying these

powers into execution." *Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950). The Framers

conferred *no* authority, however, on the Judiciary Branch to resolve questions regarding military

policy. *See Schneider*, 412 F.3d at 195 (the Constitution "provides no authority [to the judiciary]

for policymaking in the realm of foreign relations or provision of national security").

Following the Framers' lead, the Supreme Court has refused in *Bivens* cases to pass

judgment on *internal* military decisions – where the rights of *American* citizens were at issue –

observing that "[t]he special nature of military life, the need for unhesitating and decisive action

by military officers and equally disciplined responses by enlisted personnel, would be

undermined by a judicially created remedy exposing officers to personal liability at the hands of

those they are charged to command." *Chappell*, 462 U.S. at 304. Moreover, recognizing that

Congress – "the constitutionally authorized source of authority over the military system of

justice" – has not conferred a damages remedy for constitutional claims by military personnel

against their superiors, the Court has held that any judicial recognition of such a remedy "would

be plainly inconsistent with Congress' authority in this field." *Id.* In sum, the Court has held

that the unique nature of the United States military, and Congress' failure to establish judicial

remedies arising from military action "constitute 'special factors' which dictate that it would be

inappropriate to provide enlisted military personnel a *Bivens*-type remedy against their superior

officers." *Id.* (citation omitted); *see also Stanley*, 483 U.S. at 679.

So, too, the courts have applied the same "special factors" analysis to avoid adjudicating

disputes involving military action against *foreign* nationals that plaintiffs allege was authorized –

or ordered – by the political branches and/or senior military officials. In *Sanchez-Espinoza*, the

plaintiffs brought an action against President Reagan and other Executive officials for their

alleged support of Nicaraguan "Contra" forces.  The D.C. Circuit rejected plaintiffs' claims

based on the special factors doctrine:

> Just as the special needs of the armed forces require the courts to
> leave to Congress the creation of damage remedies against military
> officers for allegedly unconstitutional treatment of soldiers, *see
> Chappell v. Wallace, supra,* so also the special needs of foreign
> affairs must stay our hand in the creation of damage remedies
> against military and foreign policy officials for allegedly
> unconstitutional treatment of foreign subjects causing injury
> abroad.

770 F.2d at 208-09.  The D.C. Circuit left no question regarding the perils of such claims:

"Whether or not the present litigation is motivated by considerations of geopolitics rather than

personal harm, we think that as a general matter the danger of foreign citizens using the courts in

situations such as this to obstruct the foreign policy of our government is sufficiently acute that

we must leave to Congress the judgment whether a damage remedy should exist."  *Id.*

Here – where Plaintiffs ask the Court to endorse judicial remedies (unrecognized by

Congress) exposing military officers to personal liability for wartime conduct at the hands of

*their enemies*[18] – the risks of judicial involvement are at their greatest.  There is no room for

judicial second-guessing of military decisions undertaken in a field of battle pursuant to a grant

of authority by Congress and the Executive Branch and guidance from senior military officials.

"Even putting aside the risk of erroneous judicial conclusions (which would becloud military

decisionmaking), the mere process of arriving at *correct* conclusions would disrupt the military

---

[18]     According to the Supreme Court, "an alien enemy is the subject of a foreign state at war with the United States."  *Eisentrager,* 339 U.S. at 769, n.2 (citations omitted); *see also id.* at 772 ("in war, 'every individual of the one nation must acknowledge every individual of the other nation as his own enemy – because the enemy of his country") (citations omitted).  Putting aside any potential confusion about the particular status of each Plaintiff, it is beyond dispute that the Iraqi Plaintiffs were "alien enem[ies]" at the time of the events at issue in this case.

regime." *Stanley*, 483 U.S. at 683 (emphasis added).  Fifty years ago, the Supreme Court

explained this concern:

> Such trials would hamper the war effort and bring aid and comfort
> to the enemy.  They would diminish the prestige of our
> commanders, not only with enemies but with wavering neutrals.  It
> would be difficult to devise more effective fettering of a field
> commander than to allow the very enemies he is ordered to reduce
> to submission to call him to account in his own civil courts and
> divert his efforts and attention from the military offensive abroad
> to the legal defensive at home.  Nor is it unlikely that the result of
> such enemy litigiousness would be a conflict between judicial and
> military opinion highly comforting to enemies of the United States.

*Eisentrager*, 339 U.S. at 779.[19]  These words hold true today.

In *Bush*, the Court addressed the deleterious chilling effect threatened by judicial review

of, and potential personal liability for, civil service disciplinary decisions  462 U.S. at 389.  Here,

the decisions made by U.S. military personnel often are, quite literally, a matter of life and death,

not only for the soldiers, but for U.S. citizens at home.  "[I]f nothing else, the attacks on 9/11

exposed the weaknesses in, and the importance of, our intelligence gathering capabilities in

preventing future terrorist attacks against our country."  *Khalid*, 355 F. Supp. 2d at 320.  *A

fortiori*, U.S. military personnel in the post-9/11 world cannot be deterred by judicial review

from taking measures consistent with orders or guidance from the political branches and their

superiors to obtain information which could save American lives.  *Id.*  (AUMF cannot be

interpreted in such a way as to "unduly hinder both the President's ability to protect our country

from future acts of terrorism and his ability to gather vital intelligence regarding the capability,

operations, and intentions of this elusive and cunning adversary").

-------

[19]     The view that alien enemies could utilize our courts to adjudicate wartime complaints was
rejected summarily even by the dissenting justices in *Eisentrager*:  "It would be fantastic to suggest that

(continued…)

A judicial decision allowing claims like Plaintiffs' to proceed would compel the soldiers

upon whom the United States relies for its safety and national security to make decisions based

not on the orders of their commanders or the policy decisions of the U.S. Government, but out of

fear of being haled into court by their prisoners.  U.S. military efforts cannot be impeded in this

way by private lawsuits by enemy prisoners.  *See Eisentrager*, 339 U.S. at 774 ("Executive

power over enemy aliens, *undelayed and unhampered by litigation*, has been deemed, throughout

our history, essential to war-time security") (emphasis added).  Nor, once the military's

jurisdiction has been established, may courts "inquire into any issues as to a [military prisoner's]

internment."  *Id.* at 775 (citation omitted).[20]

> ### 3.    The Political Branches Have Exercised Their Authority to Respond to the Allegations of Abuse at Abu Ghraib.

This is not to say that there is no recourse for improper military action.[21]  Aggrieved

captives may have rights under international conventions which they can address through other

_____

(…continued)

alien enemies could [hale] our military leaders into judicial tribunals to account for their day to day activities on the battlefront."  *Id.* at 796 (J. Black, dissenting).

[20]    For internal military disputes, the Court applies an "incident to service" test, "a line that is relatively clear and that can be discerned with less extensive inquiry into military matters."  *Stanley*, 483 U.S. at 683.  The same bright line should be applied where foreigners seek to hale military officials into federal court to answer for their wartime decisions.

[21]    Plaintiffs here argue that judicial deference to military decision-making will deprive them of an adequate remedy, Compl. ¶ 171, but this argument, too, has been rejected squarely by the Supreme Court: "[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [Plaintiffs] . . . an 'adequate' federal remedy for [their] injuries.  The 'special facto[r]' that 'counsel[s] hesitation' is not the fact that Congress has chosen to afford some manner of relief in the particular case, but the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate."  *Stanley*, 483 U.S. at 683.  *See also Spagnola*, 859 F.2d at 227 (citing *Schweiker*, 487 U.S. at 423, for proposition that "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder that counsels judicial abstention"); *see also id.* at 228 (preclusive effect of *Bush* extends even to those claimants for whom Congress has provided "no remedy whatsoever"); *Thompson v. Pope*, 397 F. Supp. 2d 28, 34 (D.D.C. 2005) (in determining availability of *Bivens* remedy, court need not conduct case-by-case examination of the remedies available to the plaintiffs).

means, though they may not address them in Article III courts. *See, e.g.*, *Eisentrager*, 339 U.S. at 789, n.14 (noting the "obvious scheme" of the 1929 Geneva Convention that "responsibility for observance and enforcement of [rights under the Convention] is upon political and military authorities"). The *Eisentrager* court recognized these rights, but cautioned that the "[r]ights of alien enemies are vindicated under it *only* through protests and intervention of protecting powers as the rights of our citizens against foreign governments are vindicated only by Presidential intervention." *Id.* (emphasis added).

The Framers also established mechanisms for the U.S. Government to respond to allegations like those raised in the Complaint. These mechanisms have been utilized in this case. *First,* Congress, in connection with its "plenary constitutional authority over the military" – and based on its ability to consider and address comprehensively the sensitive political and logistical issues inherent to the functioning of the U.S. military – has established a comprehensive scheme for adjudicating military affairs, including investigating and administering appropriate sanctions for violations of law by American soldiers. U.S. Const. art. I, § 8, cl. 10 (authorizing Congress to oversee national trials for those committing criminal offenses against the law of nations); 10 U.S.C. §§ 801 *et seq.* For over fifty years, this system has provided for resolution of complaints involving military personnel, including complaints based on alleged mistreatment of alien prisoners. *See* 64 Stat. 107-149 (*codified at* 10 U.S.C. § 801 *et seq.*).

*Second*, the Framers conferred upon Congress and the President the ability, authority, and resources to address circumstances such as those raised by Plaintiffs' allegations through investigation and legislation – tools that remain unavailable to the judiciary. Specifically, the political branches are able to conduct hearings, commission investigations, propose and debate legislation, and, ultimately, make changes or add clarity to the standards of conduct to which

American soldiers are held.  In devising solutions to address findings of wrongful conduct or insufficient guidance, Congress has the ability to consider carefully *all* of the various factors, policy considerations, and available data to make the informed decisions necessary to promote the interests of the United States.  Particularly in the context of war and national security, where the risks to the United States are at their greatest, it is of utmost importance that elected officials are able to perform their duties, unimpeded by judicial "legislation."[22]

The U.S. political branches and military leaders *have* responded to the allegations of abuse at Abu Ghraib in the manner contemplated by Framers and the Constitution.  As discussed, *supra*, Congress responded promptly to the disclosure of abuse at Abu Ghraib with a series of investigations and, ultimately, resolutions providing clear and specific guidance for the military regarding the parameters for military interrogations.  *See* supra at 7-9.  Members of Congress concluded that the "cruel and degrading treatment" witnessed in Iraq was the "logical consequenc[e] of muddled and often contradictory policies" and passed legislation, *i.e.*, the Army Field Manual Act, to resolve existing ambiguities.  *See, e.g.*, 151 Cong. Rec. S11,061-03, S11,069 (2005).  In addition to these prospective measures, the U.S. military initiated court-martial proceedings pursuant to the comprehensive scheme established for military discipline resulting in the trials, and in certain cases, punishment, of soldiers for actions undertaken at the Iraqi prison.  *These* are the appropriate mechanisms contemplated by the Constitution through which the U.S. Government is authorized to respond to the circumstances at issue in this case.

---

[22]     In the domestic sphere, the Supreme Court has recognized that "Congress is in a far better position than a court to evaluate the impact of a new species of litigation" based on its "considerable familiarity with balancing governmental efficiency and the rights of [potential claimants], and its ability to "inform itself through factfinding procedures such as hearing that are not available to the Courts." *Bush*, 462 U.S. at 389.  These considerations are enhanced considerably when applied to decisions made in the field of war.

As the court stated in *Khalid*:  "Safeguards and mechanisms are in place to prevent such conduct [resulting in "deplorable" conditions of military confinement] and, if it occurred, to ensure that it is punished."  355 F. Supp. 2d at 325, n.18 (discussing Congressional legislation (*i.e.*, the "Reagan Act") dealing specifically with standards governing detention of foreign prisoners in war on terror; "Congress, however, recognized that the punishment of those in violation of the Act is and should remain with the military and the military judicial process").

Notably, Congress neither created nor recognized any judicial remedies exercisable by alien prisoners in federal courts for alleged misconduct by their captors.  Both the Supreme Court and the D.C. Circuit have held that where Congress' omission of such remedies is not "inadvertent," courts should defer to the political branches and should not allow damages claims to go forward.  *See Schweiker*, 487 U.S. at 423; *Spagnola*, 859 F.2d at 227-28.  Thus, where, as here, "Congressional attention to problems [raised by plaintiffs] has … been frequent and intense," *Schweiker*, 487 U.S. at 425, the Court must abstain from supplementing Congress' remedial scheme with *Bivens* remedies, "unless, of course, Congress has clearly expressed a preference that the judiciary preserve *Bivens* remedies."  *Spagnola*, 859 F.2d at 228-29 ("courts must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies").  Congress expressed no such preference here.

Plaintiffs may be dissatisfied with Congress' choice in determining how alleged constitutional violations by military personnel – including alleged torture – are to be addressed.  Indeed, like the plaintiffs in *Schweiker* and *Bush*, Plaintiffs may feel that their injuries will not be remedied fully by the military tribunals charged with taking action in response to their

complaints or by Congressional legislation. *See Schweiker*, 487 U.S. at 428-29 ("[t]he trauma to respondents, and thousands of others like them, must surely have gone beyond what anyone of normal sensibilities would wish to see imposed on innocent disabled citizens"). But this was Congress' choice to make, and it is not for the Courts to supplant Congress' decisions. "Whether or not [the courts] believe that [Congress'] response was the best response, Congress is the body charged with making the inevitable compromises required in the design of [the U.S. military infrastructure]. Congress has discharged that responsibility to the extent that it effects the case before us, and [the court should find] no legal basis that would allow [it] to revise [Congress'] decision." *Schweiker*, 487 U.S. at 429 (citations omitted).

This Court could determine that the conduct alleged by Plaintiffs was reprehensible or heinous, or perhaps that it was a necessary evil under the unique circumstances. Reasonable minds *have* differed on this point. But the question in this case is not whether the conduct was morally justifiable, but whether the case presents special factors which counsel against this Court exercising jurisdiction over Plaintiffs' claims. It does.

### B.   Defendant Karpinski is Entitled to Qualified Immunity From Suit On Each of Plaintiffs' Claims.

Although the Court need not even reach the issue because Plaintiffs' claims should be dismissed in their entirety under the "special factors doctrine," *see supra* at 16-27, and the political question doctrine, *see infra* at 34-44, all counts should be dismissed against Karpinski because she is entitled to qualified immunity from suit.

The Supreme Court has recognized that *Bivens* suits "frequently run against the innocent," and impose a heavy cost "not only to the defendant officials, but to society as a whole," including "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow v.*

*Fitzgerald,* 457 U.S. 800, 814 (1982). For this reason, the doctrine of qualified immunity "shield[s officials] from liability for civil damages," and a *Bivens* claim must be dismissed, unless the plaintiff can demonstrate that the defendant violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. The doctrine "provides not simply a defense to liability, but also an 'entitlement not to stand trial or face the other burdens of litigation.'" *Farmer v. Moritsugo,* 163 F.3d 610, 613 (D.C. Cir. 1998) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). Thus, it is imperative that the court resolve the issue of qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991); *see also Mitchell,* 472 U.S. at 526 (because the doctrine provides for "an *immunity from suit* rather than a mere defense to liability … it is effectively lost if a case is erroneously permitted to go to trial").

The qualified immunity bar is set purposefully high. *See Rogan v. City of Boston,* 267 F.3d 24, 29 n.4 (1st Cir. 2001) (qualified immunity is a "formidable obstacle[]" to plaintiff's claims). Plaintiffs must demonstrate that (1) Karpinski deprived them of an "actual constitutional right" they possessed; (2) was clearly established *at the time* of her alleged conduct; and (3) *no reasonable officer* would have believed Karpinski's actions to be reasonable under the circumstances. *See Kalka v. Hawk,* 215 F.3d 90, 94-95 (D.C. Cir. 2000). Judge Urbina recently rejected a nearly identical claim on qualified immunity grounds. *See Rasul,* 2006 WL 266570, at *11-15. These Plaintiffs, as well, cannot meet their high burden to overcome Karpinski's qualified immunity defense.

      **1.**      **Plaintiffs Cannot Establish the Deprivation of a Constitutional Right.**

When deciding whether Plaintiffs have established an "actual constitutional right" courts "must be careful to avoid defining the right in overly general terms 'lest [it] strip the qualified

immunity defense of all meaning.'  Instead, the court must identify the right with the appropriate level of specificity so as to allow officials to reasonably anticipate when their conduct may give rise to liability for damages."  *Rasul*, 2006 WL 266570, at *11 (quoting *Butera v. District of Columbia* , 235 F.3d 637, 646 (D.C. Cir. 2001), and *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  Plaintiffs cannot meet their burden in this case because the U.S. Constitution does not apply to alien enemy prisoners located outside the jurisdiction of the United States.[23]

The unavailability of constitutional remedies to non-resident aliens may be traced back to the Supreme Court's decision in *Eisentrager* – a decision particularly applicable to Plaintiffs' current allegations.  In *Eisentrager*, a group of foreign nationals captured during World War II and detained by U.S. forces in a U.S. military prison sought relief alleging violations of their rights under the U.S. Constitution.  339 U.S. at 765-66.  The Supreme Court refused to extend constitutional protections to the prisoners because they were at all times "beyond the territorial jurisdiction of any court of the United States."  *Id.* at 778.  The Court noted that an alien is accorded "a generous and ascending scale of rights as he increases his identity with our society," but cautioned that "the Court has been at pains to point out that it was the alien's presence within [the U.S.'s] territorial jurisdiction that gave the Judiciary power to act."  *Id.* at 770-71.

The availability of Constitutional protections to non-resident aliens is compromised even further for alien *enemies* captured *at war* with the United States.  "It is war that exposes the relative vulnerability of the alien's status.  The security and protection enjoyed while the nation

_____

[23]    Plaintiffs claim for a damages remedy under the Eighth Amendment deserves short shrift.  Even if Plaintiffs were located in the United States, the Eighth Amendment would not apply because that amendment applies only to convicted criminals.  *See Rasul*, 2006 WL 266570, at *12, n.16 (citing *Bell v. Wolfish*, 441 U.S. 520, 579 (1979); *County of Sacramento v. Lewis*, 523 U.S. 833, 859 (1998)).  Plaintiffs here are "former detainees" at a U.S. Military prison in Iraq "who were eventually released from U.S. custody without ever being prosecuted for any wrongdoing."  Compl. ¶ 16.

of his allegiance remains in amity with the United States are greatly impaired when his nation takes up arms against us." *Id.* The *Eisentrager* plaintiffs, like the Iraqi Plaintiffs here, were (a) alien citizens of a country at war with the United States, who (b) were confined in a military prison under the control and supervision of the U.S. military. The Supreme Court held that in those circumstances, the Constitution provides no relief. *Id.* at 777-78.

Following *Eisentrager*, the Supreme Court and the D.C. Circuit repeatedly have held that the Constitution does not apply extraterritorially to protect non-resident aliens during the course of U.S. military operations on foreign soil. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (it is "well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269-74 (1990) ("[r]espondent is an alien who has had no previous significant voluntary connection with the United States, so [cases conferring constitutional rights on aliens] avail him not"); *Jifry v. F.A.A.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("[t]he Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections"); *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) ("foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise") (citations omitted); *Pauling v. McLeroy*, 278 F.2d 252, 254, n.3 (D.C. Cir. 1960) ("the non-resident aliens here plainly cannot appeal to the protection of the Constitution or laws of the United States"); *see also Khalid*, 355 F. Supp. 2d at 320-21 (rejecting identical *Bivens* claims based upon the "Supreme Court's unequivocal and repeated denial of such rights to such non-resident aliens").

In fact, the D.C. Circuit reaffirmed this principle only a few months before the first Plaintiff's detention allegedly began in May 2003, *see* Compl. ¶¶ 17-25, when it reasoned that

"[i]f the Constitution does not entitle the detainees to due process, *and it does not*, they cannot invoke the jurisdiction of our courts to test the constitutionality or legality of restraints on their liberty." *Al-Odah v. United States*, 321 F.3d 1134, 1141 (D.C. Cir. 2003), *rev'd sub nom on other grounds*, *Rasul v. Bush*, 542 U.S. 466 (2004) (emphasis added).[24]    As the *Eisentrager* court held, this Court should not give "our Constitution an extraterritorial application to embrace our enemies in arms." 339 U.S. at 781.    For this reason alone, Karpinski is entitled to qualified immunity and the claims should be dismissed.    *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) (if there is no constitutional right, "there is no necessity for further inquiries concerning qualified immunity").

### 2.    Plaintiffs Have Failed to Identify a Right That Was "Clearly Established" at the Time of the Alleged Violation.

Even if this Court determines, despite *Eisentrager* and its progeny, that the Constitution extends to alien enemy detainees on foreign soil, Plaintiffs still must establish that the rights asserted were "clearly established" at the time of the alleged conduct.    Five decades of case law prevents Plaintiffs from meeting this burden.    At *best*, the fact that the D.C. Circuit currently is considering this issue (based on opinions *subsequent* to the alleged conduct) suggests that it remains an open question.[25]    But the Supreme Court has held that plaintiffs may not overcome a qualified immunity defense where a "legitimate question" exists as to the standards governing

---

[24]    The Supreme Court's subsequent reversal of *Al Odah* does not alter this conclusion for two reasons.    First, *Rasul v. Bush* did not consider the larger constitutional issue, but focused its holding only on the "narrow" question of jurisdiction under the habeas corpus statute in light of the unique nature of the U.S. interest in Guantanamo Bay.    542 U.S. at 475; *see also Rasul*, 2006 WL 2665700, at *15; *Khalid*, 335 F. Supp. 2d at 323.    *But see In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), *appeal docketed*, No. 05-5064 (D.C. Cir. March 7, 2005).    Second, the doctrine of qualified immunity dictates that federal officials cannot be held liable based on developments in the law *after* their actions took place.    *See Harlow*, 457 U.S. at 818; *Murray v. Gardner*, 741 F.2d 434, 439 n.2 (D.C. Cir. 1984).

[25]    In two of the three recent cases dealing with detainees*, Rasul*, 2006 WL 266570, and *Khalid*, 355 F. Supp. 2d 311, the court dismissed the constitutional claims, finding either that the Constitution did not

(continued…)

conduct in particular circumstances. *Mitchell*, 472 U.S. at 535, n.12.

Plaintiffs may argue that recent decisions portend a possible reversal of the judicial trend established by *Eisentrager*. The "clearly established" standard, however, must be examined based on the state of the law *at the time* the conduct allegedly occurred "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). As Judge Urbina found while considering nearly identical allegations, "[a]t the time of the plaintiffs' detainment," binding precedent "cautioned courts from interfering with foreign activities – especially activities related to national security" and indicated that the Constitution did not apply to alien military detainees on foreign soil. *Rasul*, 2006 WL 2665700, at *15 (citing *Eisentrager*, 339 U.S. 763, and *Verdugo-Urquidez*, 494 U.S. at 273). Not until 2004 was there even a question whether foreign detainees in Plaintiffs' situation were entitled to Constitutional rights let alone a clearly established right. *Id.* Even now, in light of conflicting decisions in this district regarding the availability of habeas relief to detainees in Guantanamo and the D.C. Circuit's pending decision in *Khalid*, Plaintiffs cannot establish that Karpinski "would have been aware, in light of the state of the law at the time, that detainees should be afforded the rights they now claim." *Id.*

As the Supreme Court held in *Wilson v. Layne*, 526 U.S. 603, 618 (1999), "[i]f judges [ ] disagree on a constitutional question, it is unfair to subject [federal officials] to money damages for picking the losing side of the controversy." At the time of the alleged conduct, such a

---

(…continued)

apply to the detainees, or that their rights were not clearly established at the time of the alleged violations. The third, *In re Guantanamo*, relied on the fact that the detention facility was on land "considered the equivalent of a U.S. territory," 355 F. Supp. 2d at 464, a circumstance not applicable here. *Khalid* and *In re Guantanamo* currently are on appeal to the D.C. Circuit.

disagreement did not even exist.  At worst, Plaintiffs allege that Karpinski picked the "losing side" of a *subsequent* debate.  In such a case, Karpinski is entitled to qualified immunity.

### 3.    Karpinski's Actions Were Objectively Reasonable.

Assuming, *arguendo*, that Plaintiffs have alleged a violation of clearly established rights, qualified immunity still protects Karpinski from the instant litigation because the Complaint fails to allege conduct that was objectively unreasonable under the circumstances.  Under this prong of the qualified immunity analysis, federal officials are protected from suit if they "had an objectively reasonable basis for believing that the facts and circumstances surrounding [their conduct] were sufficient to [permit such conduct to take place]" or where they make "reasonable mistakes . . . as to the legal constraints" regarding the particular conduct under the circumstances.  *See Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993); *Saucier*, 533 U.S. at 205.  Thus, to overcome qualified immunity, Plaintiffs must demonstrate that Karpinski was "plainly incompetent" or "knowingly violated the law."  *Rasul*, 2006 WL 2665700, at *15 ("'the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law'") (Walton, J.) (quoting *Hunter*, 502 U.S. at 229); *see also Olaniyi v. District of Columbia*, ___ F. Supp. 2d ___, 2006 WL 389743, *8, *11, *13 (D.D.C. Feb. 17, 2006) (granting motion to dismiss where facts alleged demonstrated that defendants' actions were not objectively unreasonable).

As explained *supra*, at 4-6, there was considerable confusion regarding what interrogation techniques were legal during the course of Plaintiffs' confinement – so much so that Congressional intervention was warranted.  Even assuming that such confusion did not exist, Plaintiffs would have this Court strip Karpinski of her qualified immunity based on her alleged adherence to the orders and guidance of senior military officials (including the Secretary of Defense), *in the middle of a war*, and in the context of "intense pressure … on the ground to

33

produce actionable intelligence from detainees."  Compl. ¶ 89; *see also* Compl. ¶ 100 (discussing

pressure by Secretary of Defense to produce actionable intelligence from detainees at Abu

Ghraib).  Thus, even if the *law* were clear, Plaintiffs readily acknowledge that the *instructions* to

the military personnel responsible for interrogations, if anything, *supported* the aggressive

interrogation techniques which Plaintiffs allege resulted in their injuries.  *See, e.g.*, Compl. ¶ 67

("proliferation of techniques in the various theaters of war 'became confusing'"); Compl. ¶ 85

(discussing how various directives from military superiors led interrogators to be "increasingly

confused about the legal limits of their conduct toward detainees").

Perhaps most telling in this regard is Plaintiffs' allegation that the soldiers who actually

tortured them "*reasonably* understood" directions from Sanchez's staff "as permission from

command headquarters to use harsh interrogation methods" and that their "unlawful

mistreatment of detainees [was] a *direct result* of [these directions]."  Compl. ¶ 70 (emphasis

added).  Accepting Plaintiffs' allegations as true, Plaintiffs cannot establish that no reasonable

officer would have believed Karpinski's alleged actions were lawful.  For this reason, in addition

to those set forth above, Karpinski is entitled to qualified immunity.  *See Lauro v. Charles*, 219

F.3d 202, 216 n.10 (2d Cir. 2000) ("The existence of qualified immunity is further supported by

the fact that [defendant] was apparently following orders given by his superiors" when he

committed the alleged constitutional violation).

III.    **The Political Question Doctrine Renders All of Plaintiffs' Claims Non-Justiciable.**

For all of the reasons set forth above, Plaintiffs' claims against Karpinski all should be

dismissed.  The Court, however, has yet another wholly independent basis to reject Plaintiffs'

claims.  Each of Plaintiffs' claims raise non-justiciable political questions reserved for the

President and Congress and should be dismissed under Rule 12(b)(1).

A.    **The Political Question Doctrine**

The D.C. Circuit recently observed that "[t]he principle that the courts lack jurisdiction over political decisions that are by their nature 'committed to the political branches to the exclusion of the judiciary' is as old as the fundamental principle of judicial review." *Schneider*, 412 F.3d at 193 (citations omitted).  The court traced this long line of authority back to *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), in which Chief Justice Marshall first recognized the existence of a class of cases involving "political act[s], belonging to the Executive department alone, for the performance of which entire confidence is placed by our Constitution in the supreme executive; and for any misconduct respecting which, the injured individual has no remedy." *Schneider*, 412 F.3d at 193 (quoting *Marbury* 5 U.S. at 164).  The D.C. Circuit noted that this "political question" doctrine "has evolved as a limitation of the jurisdiction of the courts *particularly applicable to foreign relations*." *Id*. (emphasis added).  From its origins, therefore, the doctrine has recognized that foreign policy questions "belong more properly to [the political branches] … who can place the nation in such a position with respect to foreign powers as to their own judgment shall appear wise, *to whom are entrusted all its foreign relations*, than to that tribunal whose power as well as duty is confined to the application of the rule which the legislature may prescribe for it." *Id*. (emphasis in original) (quoting Justice Marshall in *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818)); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) ("[t]he Judiciary is particularly ill suited to make such decisions [as are constitutionally committed to the political branches] as 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature'") (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C. Cir. 1981)).

In *Baker v. Carr*, the Supreme Court set forth six independent tests for determining the existence of a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
> [2] a lack of judicially discoverable and manageable standards for resolving it; or
> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
> [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or
> [5] an unusual need for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962). A case must be dismissed if *any* of these factors are present. *Schneider*, 412 F.3d at 194. In this case, *all* of the factors favor dismissal.

**B.     The Factors Established By the Supreme Court In *Baker v. Carr* All Support Dismissal Under Rule 12(b)(1).**

In *Schneider*, the D.C. Circuit affirmed the District Court's decision that it lacked jurisdiction over claims by the children of a Chilean General that the President of the United States, the National Security Advisor, and the Director of the CIA caused their father to be kidnapped, tortured, and murdered in connection with a military coup. The plaintiffs had alleged seven causes of action, including "(1) summary execution; (2) torture; (3) cruel, inhumane, or degrading treatment; (4) arbitrary detention; (5) wrongful death; (6) assault and battery; and (7) intentional infliction of emotional distress." *Id.* at 192. Given the substantial political issues involved in the case – including the decision by the President to support the military coup – the D.C. Circuit held that the political question doctrine required dismissal of the case for want of jurisdiction pursuant to Rule 12(b)(1).

The *Schneider* court held that the first four *Baker* factors each counseled for dismissal of the plaintiffs' claims. As discussed more fully below, the court's analysis applies directly to this case, which also involves a challenge by foreign nationals to U.S. military and foreign policy decisions which allegedly resulted in their injuries. Here, the last two *Baker* factors mandate dismissal of Plaintiffs' claims as well.

**1.    Plaintiffs' Claims Raise Policy Questions That Are Textually Committed to the Political Branches of Government.**

For over two centuries, the Supreme Court has recognized that "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' – Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Schneider*, 412 F.3d at 194 (citing *Marbury* and quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)). Stated otherwise, "foreign policy decisions are the subject of just such a textual commitment" contemplated by *Baker v. Carr. Id.* (quoting *Comm. of United States Citizens v. Reagan,* 859 F.2d 929, 933-34 (D.C. Cir. 1988)). Perhaps the most important of such decisions are those that pertain to the use of the military to protect our national security. For this reason, "[i]t is well-established that decisions pertaining to national security, such as whether and how to use military forces, are entrusted to the political branches." *See El-Shifa Pharm. Indus. v. United States*, 402 F. Supp. 2d 267, 274 (D.D.C. 2005) ("the Constitution has a 'specific textual commitment of decision-making responsibility in the area of military operations in a theater of war to the President, in his capacity as Commander in Chief'") (citation omitted).

In *Schneider,* the court held that the policy decision by Executive Branch officials during the Cold War – *i.e.*, a *non*-military conflict – to support covert actions which resulted in the alleged torture and murder of a foreign national, "may have been unwise," but was "classically

within the province of the political branches, not the courts."  *Id.* at 195.  So, too, it is beyond

the province of the Court in this case to second-guess the policy decisions of Congress, the

President, and other Executive Branch officials, including the Secretary of Defense, which

Plaintiffs allege caused their injuries.  Thus, for the same reasons which support dismissal under

the "special factors" doctrine – *i.e.*, the constitutional commitment of decision-making authority

in the fields of foreign policy, national security, and military affairs to the political branches, *see*

*supra* at 16-27. – there can be little question that the conduct alleged in this case raises policy

questions that are textually, and exclusively, committed to the political branches of

government.[26]  *See Schneider*, 412 F.3d at 195 ("[i]t cannot then be denied that decision-making

in the areas of foreign policy and national security is textually committed to the political

branches").  For the reasons set forth herein, *see also supra* at 18-27, the first *Baker* factor

requires dismissal.

> **2.      There Are No Judicially Discoverable and Manageable
>           Standards For Resolving Plaintiffs' Claims.**

For this Court to adjudicate Plaintiffs' claims, it would have to make a determination

whether it was proper for Executive Branch officials to authorize severe interrogation techniques

to facilitate information gathering to combat wartime aggression and terrorist activities which

threatened the United States.  It also would be required to pass judgment on the wartime actions

of military personnel, themselves at daily risk of their lives, charged with making command life

and death decisions bearing on the security of U.S. soldiers in the line of fire, as well as of

---

[26]      In *Schneider*, the D.C. Circuit cited no fewer than fourteen separate sections and clauses of the
Constitution evidencing the textual commitment of military and foreign policy matters to the Executive
and Legislative Branches.  412 F.3d at 194-95.  "By contrast," the court observed, the Constitution
confers upon the Judicial Branch limited *jurisdictional* authority over certain foreign policy officials but
no other authority in the realm of foreign policy or national security.  *Id*. at 195.

citizens at home. The sensitivity and complexity of these issues cannot be understated, particularly in the context of the unprecedented conflict in which the United States was embroiled against an invisible and catastrophically dangerous enemy. It is because of the uniquely difficult nature of such issues that the D.C. Circuit recently stated that "it is within the role of the executive to acquire and exercise the expertise of protecting national security." *Schneider*, 412 F.3d at 196 (quoting *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir. 2003)).

The political branches are equipped with the Constitutional authority and practical tools to make and execute policy decisions related to military engagement and national security. They have utilized those tools in this case. *See supra* at 6-9, 22-27. The judiciary, on the other hand, "has no covert agents, no intelligence sources, and no policy advisors … [and] are therefore ill-suited to displace the political branches in such decision-making." *Id.*; *see also Crockett v. Reagan*, 720 F.2d 1355, 1356 (D.C. Cir. 1983); *El-Shifa*, 402 F. Supp. 2d at 274-75 ("[f]ederal courts … lack the resources to evaluate so many of the executive's policy decisions on issues of national security, foreign relations, or military engagement"). "For this court 'to attempt to decide such a matter without the necessary expertise and in the absence of judicially manageable standards,'" particularly in the post-9/11 world, "'would be to entangle the court in matters constitutionally given to the executive branch.'" *Id.* at 274 (citation omitted).

Plaintiffs may argue that this is a straightforward case about whether torture is objectively right or wrong. It is not so simple.[27] In *Schneider*, the D.C. Circuit rejected the

---

[27]    To the extent military personnel overstep their authority and/or violate international norms, their conduct is reviewed and appropriate sanctions are determined by military tribunals who, unlike the courts, specifically have been commissioned to adjudicate such matters. *See supra* at 26-27. As discussed, *supra*, the political branches *have* taken action in response to the allegations at Abu Ghraib and elsewhere

(continued…)

plaintiffs' attempt to "recast[ ] foreign policy and national security questions in tort terms [in order to] provide standards for making or reviewing foreign policy judgments." *Id*. at 197. That is precisely what Plaintiffs are doing here. Adjudication of their claims would require this Court to define the standard for the Government's use of specific interrogation techniques in the theater of war, and to make a policy determination whether the circumstances in Iraq and the threat posed by terrorist activity justified the policy judgments made by Karpinski's superiors. That task is reserved expressly for the political branches, and for good reason. *See, e.g.*, *Schneider*, 310 F. Supp. at 262 (inquiry into torts allegedly committed by U.S. officials against foreigners outside the United States "would be fraught with national security considerations and unmanageable political and military issues") (quoting *Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154, 1161 (D.D.C. 1991)). As in *Schneider*, "[t]here are no justiciably discoverable and manageable standards for the resolution of such a claim." 412 F.3d at 197. In sum, "it is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role." *Id*. at 196. The second *Baker* factor also supports dismissal.

> **3.** **It Would Be Impossible to Adjudicate Plaintiffs' Claims Without Making an Initial Policy Determination Clearly Reserved For the Political Branches.**

"To determine whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking." *Id*. at 197; s*ee also El-Shifa*, 402 F. Supp. 2d at 275-76 (review of President's decision to bomb suspected weapons-

---

(…continued)

and have passed legislation providing clearer interrogation standards for military personnel – including, specifically, a prohibition on "cruel, inhuman, or degrading treatment or punishment." Pub. L. No. 109-

(continued…)

related facility was beyond court's discretion:  "[a] judicial inquiry into the reasonableness of the

judgments made regarding the [ ] plant could mimic the executive's role in formulating foreign

policy, could improperly interfere with the executive's role in commanding the country's

military forces, and could require inappropriate second-guessing of executive branch decisions")

(citations omitted).  There is no question that to resolve Plaintiffs' claims, this Court must pass

judgment on the political branches' policy decisions that Plaintiffs allege resulted in their being

tortured in a military prison.[28]  Compl. ¶ 10.  This is a matter reserved "clearly for nonjudicial

discretion."  *Baker*, 369 U.S. at 217.  The third *Baker* factor requires dismissal.

### 4.    It Would Be Impossible For This Court to Resolve Plaintiffs' Claims Without Expressing a Lack of Proper Respect For the Political Branches.

Each of the *Baker* factors is concerned with respecting the constitutional separation of

powers between branches of government.  The fourth *Baker* factor focuses specifically on the

possibility that a court will render judgment that is inconsistent with, or calls into question,

decisions already made by the political branches.  In *Schneider,* this factor required dismissal

where the covert operations which allegedly resulted in the torture and murder of the plaintiffs'

father "already [had] been the subject of congressional investigation."  412 F.3d at 198.  In this

case, too, the political branches and military infrastructure spent countless hours investigating the

conduct alleged in the complaint, and administering sanctions in accordance with military law.

_____

(…continued)

148, § 1003, 119 Stat. 2680.  *That* is the mechanism authorized by the Constitution for making and executing such policy-decisions, *not* damages claims in United States courts.

[28]      The severity of Plaintiffs' allegations does not alter the analysis.  In *Schneider*, the district court noted Congressional findings that certain officials "were actively engaged in committing and covering up serious human rights abuses."  310 F. Supp. 2d at 263.  The court nonetheless concluded that "[c]ourts are decidedly ill-equipped to consider such questions as they are not  privy to all relevant intelligence

(continued…)

*See*, *e.g.*, *supra* n. 3.  Many more hours were spent on the Congressional floor debating and executing an appropriate response to the "confusing and constantly changing array of standards" believed to have resulted in the alleged abuse at Abu Ghraib. 151 Cong. Rec. S11,061-03 (2005).

Now that the military tribunals, Congress, and the President all have spoken on the issue, it would reflect a profound lack of respect for the other branches of government were this Court to consider granting additional or different remedies that have not been approved by the political branches or that may be inconsistent with the findings and decisions of those authorities.  *See, e.g.*, *Schneider*, 310 F. Supp. 2d at 264 (dismissing complaint on political question grounds where "[i]t would be virtually impossible for the Court to resolve [the] case without either condemning officials of the Executive Branch for their actions or undermining the conclusions reached by Congress [pursuant to its investigation]").  "A court should refrain from entertaining a suit if it would be unable to do so without expressing a lack of respect due to its coequal Branches of Government."  *Id.*  The fourth factor, as well, requires dismissal of this case.

> **5.**    **There is an "Unusual Need" in the Area of Wartime Military Affairs for "Unquestioning Adherence" to the Political Decisions Made by Congress and the Executive Branch.**

Congress and the President made a calculated decision following the September 11 attacks to initiate a "war on terror" designed to make Americans – and, indeed, the entire world – safer from the threat of terrorism.  Upon a determination that Iraq was not only harboring and assisting terrorists, but itself posed an independent threat, the political branches also decided on the use of force to counter the threat posed by Iraq and individuals residing therein.  *See* Pub. L.

---

(…continued)

information, and they have no appropriate legal standard to determine the gravity of the threat to the United States … or the likelihood that certain …actions would ameliorate or exacerbate that threat." *Id.*

No. 107-243.  In light of these national security concerns, the Secretary of Defense and senior

military personnel (*i.e.*, Karpinski's superiors) authorized and/or directed the use of aggressive

interrogation tactics – including those alleged in the Complaint – to facilitate discovery of

information critical to the protection of American soldiers in the field and citizens world-wide.

*See*, *e.g.*, Compl. ¶¶ 8, 27-28, 56-57, 71-75, 81-85.

As discussed at length, *supra*, there is no area which requires more deference to the

decisions of the political branches, and those acting pursuant to the authorization thereof, than

the area of military affairs and national security.  Plaintiffs allege that their injuries were the

direct result of orders from the Secretary of Defense and other senior military officials pursuant

to the authorization for use of force by the President and Congress.  There is an "unusual need

for unquestioning adherence to [the] political decision[s] already made" in connection with the

war on terror and the war in Iraq.  *See Bancoult v. McNamara*, 370 F. Supp. 2d 1, 16-17 (D.D.C.

2004) (quoting *Baker*, 369 U.S. at 217) (dismissing claims by foreign nationals for, *inter alia*,

forced relocation, torture, racial discrimination, cruel, inhuman, and degrading treatment, and

genocide, where alleged conduct occurred pursuant to Congressional decision to build and

expand military operations on claimants' land).  The fifth *Baker* factor, too, supports dismissal.

> **6.**   **Permitting Plaintiffs' Claims to Go Forward Would Create a Substantial Risk of Embarrassment For the Government as a Result of "Multifarious Pronouncements" By the Various Branches of Government.**

Finally, were this Court to adjudicate Plaintiffs' claims, it would risk "embarrassment" to

the Government as a result of "multifarious pronouncements" by the various branches.  The

positions already taken by the political branches both in advance of, and in response to, the

conduct alleged in the Complaint have been discussed in detail, *supra*.  Any judicial

pronouncement in this case would "disturb the government's 'single voice' in the realm of

foreign military policy and subject the judiciary and the political departments to potential

embarrassment." *Bancoult*, 370 F. Supp. 2d at 17.  The need for a "single voice" is never more

important than when the country is at war.  Particularly now, when the United States must face

both the ongoing threat of terror and criticism for its political decisions abroad, it is of utmost

importance that the U.S. Government not project a disjointed approach among its own branches.

Moreover, were claims such as this permitted to go forward, the floodgates would open to

countless claims by *any* prisoner of the U.S. military.  Not only would that risk "multifarious

pronouncements" but it would threaten to flood the U.S. judicial system with similar suits, not to

mention detract the military from its mission.  The sixth and final *Baker* factor – like all the

others – counsels for dismissal of all of Plaintiffs' claims.[29]

---

[29]     As the D.C. Circuit aptly observed in *Schneider*, the mere fact that this court lacks authority to oversee the conduct of the Executive Branch, or to provide a monetary remedy to Plaintiffs, does not leave the power of those branches unbounded.  "[T]he nation has recompense, and the checks and balances of the Constitution have not failed.  The political branches effectively exercise such checks and balances on each other in the area of political questions." *Id.* at 200.  In *Schneider,* the court noted that Congress had used its power to draw limits upon the Executive's power in the area of foreign affairs by prohibiting the CIA from funding or participating in efforts to overthrow the Nicaraguan government.  So too, in this case, Congress has acted by passing legislation clarifying that torture is prohibited, even in the war on terror.  *See supra* at 6-9, 22-27.  Should the Executive Branch violate this mandate by authorizing continued action in violation of the resolution, Congress may initiate investigations, or even impeachment proceedings.  *See Schneider*, 412 F.3d at 200.  This is how the Constitution has allocated powers to the various branches of government to respond to allegations such as those raised by this case.  "It is precisely consistent, for it embodies limits and balances between the political branches without intrusion of the courts into areas beyond [their] proper authority and expertise." *Id.*

IV.    __Plaintiffs Cannot State a Claim For Violation of the Geneva Conventions__

Even if this Court were to reject each of the independent bases for dismissal of Count Five set forth above, Plaintiffs' claim for violations of the Geneva Conventions still must be dismissed.  Although the Constitution provides that treaties made under the authority of the United States "shall be the supreme Law of the land," that does not mean that those treaties can support a private cause of action in U.S. courts.  To the contrary, "this country has traditionally negotiated treaties with the understanding that they do *not* create judicially enforceable individual rights."  *Hamdan v. Rumsfeld*, 415 F.3d 33, 38 (D.C. Cir. 2005) (emphasis added). *See also Khalid*, 355 F. Supp. 2d at 327 ("[t]reaties, as a general rule, are not privately enforceable").  In *Hamdan*, the D.C. Circuit held explicitly that military detainees in the war on terror may not seek judicial relief pursuant to the Geneva Conventions.  *Id*. at 39 (citing *Eisentrager*, 339 U.S. 763).  That decision requires dismissal of Count Five.

## CONCLUSION

For the reasons set forth above, Defendant Janis Karpinski respectfully requests that the Court dismiss all claims against her with prejudice.

Respectfully submitted,


_____/s/_____
Michael L. Martinez, DC Bar #347310
Aryeh S. Portnoy, DC Bar #464507
David E. Bell, DC Bar # 477903
Matthew F. Scarlato, DC Bar # 484124
Rhonda M. Galaz, DC Bar # 489999
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, DC 20004
(202) 624-2500

Counsel for Defendant Janis Karpinski

March 6, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March 2006, I caused a copy of Defendant Janis

Karpinski's Motion to Dismiss and Memorandum of Law in Support of Janis Karpinski's Motion

to Dismiss to be served upon all counsel of record via ECF and electronic mail as set forth

below:

**Arthur B. Spitzer**
American Civil Liberties Union
1400 20th Street, NW
Suite 119
Washington, DC 20036
Email: artspitzer@aol.com

*Counsel for All Plaintiffs*

**Mark E. Nagle**
Troutman Sanders LLP
401 Ninth St, N.W.
Suite 1000
Washington DC 20004
mark.nagle@troutmansanders.com

*Counsel for Thomas Pappas*

**Stephen L. Braga**
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
stephen.braga@bakerbotts.com

*Counsel for Ricardo Sanchez*

**J. Marcus Meeks**
United States Department of Justice
Torts Branch, Civil Division
P. O. Box 7146
Ben Franklin Station
Washington, D.C. 20044
Marcus.meeks@usdoj.gov

*Counsel for Donald H. Rumsfeld and the United States*

Dated: March 6, 2006

_____/s/_____
Matthew F. Scarlato

1