# EXHIBIT 2

## APPENDIX OF UNPUBLISHED CASES

| Exhibit Number | Title |
|---|---|
| **2-A** | *Rasul v. Rumsfeld*, ___ F. Supp. 2d. ___, 2006 WL 266570 (D.D.C. Feb. 6, 2006) |
| **2-B** | *Chung v. U.S. Dept. of Justice*, No. 00-1912, 2001 WL 34360430 (D.D.C. Sept. 20, 2001) |
| **2-C** | *Jones v. Dept. of Defense*, No. 94-5294, 1995 WL 225125 (D.C. Cir. Mar. 14, 1995) |
| **2-D** | *Olaniyi v. District of Columbia*, ___ F. Supp. 2d ___, 2006 WL 389743 (D.D.C. Feb. 17, 2006) |

# EXHIBIT 2-A

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Shafiq RASUL et al., Plaintiffs,
v.
Donald RUMSFELD et al., Defendants.
**Civil Action No. 04-1864 (RMU).**

Feb. 6, 2006.

Eric Leslie Lewis, Lois J. Schiffer, Anne Katherine Toomey, Baach Robinson & Lewis PLLC, Washington, DC, for Plaintiffs.
Forrest Christian, U.S. Department of Justice, Washington, DC, for Defendants.

MEMORANDUM OPINION

RICARDO M. URBINA, District Judge.

GRANTING IN PART AND DEFERRING RULING IN PART ON THE DEFENDANTS' MOTION TO DISMISS

I. INTRODUCTION

*1 On September 11, 2001, this nation experienced the worst terrorist attacks in its history. The September 11 attacks claimed over 3,000 American lives and severely undermined this nation's sense of security. The actions of the terrorist perpetrators, fueled by ignorance and intolerance, launched this nation's quest to identify, apprehend and bring to justice terrorist criminals who threaten this country. The plaintiffs herein, former detainees at the United States Naval Station at Guantanamo Bay, Cuba ("GTMO" or "Guantanamo"), now petition this court for relief alleging acts which recast the roles of victim and wrongdoer. These allegations assert various forms of torture, which include hooding, forced nakedness, housing in cages, deprivation of food, forced body cavity searches, subjection to extremes of heat and cold, harassment in the practice of their religion, forced shaving of religious beards, placing the Koran in the toilet, placement in stress positions, beatings with rifle butts, and the use of unmuzzled dogs for intimidation. Most disturbing, however, is their claim that executive members of the United States government are directly responsible for the depraved conduct the plaintiffs suffered over the course of their detention. In essence, the plaintiffs assert that their captors became the beasts they sought to suppress. [FN1]

> FN1. "It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties ... which makes the defense of the Nation worthwhile." *United States v. Robel,* 389 U.S. 258, 264 (1967). As Mahatma Ghandi stated, "[w]hat difference does it make ... whether the mad destruction is wrought under the name of totalitarianism or the holy name of liberty and democracy?"

Currently before the court is the defendants' motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim on which relief can be granted. Because the defendants are immune from claims arising under international law, the court substitutes the United States as a defendant for these claims in place of the individual defendants. Because the plaintiffs have not exhausted their administrative remedies by bringing their international law claims to an appropriate Federal agency, the court dismisses those claims. Because the defendants are entitled to qualified immunity from the plaintiffs' constitutional claims, the court dismisses those claims. Lastly, although the Religious Freedom Restoration Act may apply to United States action in Guantanamo Bay, the court considers the parties' briefing on this issue and the applicability of the doctrine of qualified immunity inadequate. Accordingly, the court defers ruling on the defendants' motion to dismiss as to this claim pending further briefing by the parties.

II. BACKGROUND

The plaintiffs allege the following:

In the months immediately following the September 11 attacks on America, the plaintiffs, all citizens of the United Kingdom, were in Afghanistan conducting humanitarian relief and trying to return to England. Compl. ¶ ¶ 2-3, 35. On November 28, 2001, an Uzbek warlord, General Rashid Dostum, captured

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 2
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

three of the plaintiffs; Shafiq Rasul, Asif Iqbal, and Rhuhel Ahmed. *Id.* ¶ 2. One month later, General Dostum handed them over to the United States for a bounty. *Id.* ¶ ¶ 2, 42-44. After two weeks of suffering extensive abuse and interrogations under United States' custody, the military transported Rasul and Iqbal from Afghanistan to GTMO. *Id.* ¶ ¶ 37-64. Ahmed, however, stayed in Afghanistan for six weeks under United States custody, eventually succumbing to the pervasive interrogation techniques and falsely confessing to having ties with Al Qaeda. *Id.* ¶ 62. Only then, in February 2002, did the United States transport Ahmed to Guantanamo. *Id.* ¶ 63.

**\*2** The Taliban was the first to capture the fourth plaintiff, Jamal Al-Harith in Afghanistan. *Id.* ¶ 3. The Taliban accused Al-Harith of being a British spy and tortured him. *Id.* When the Taliban fell, Al-Harith was released and immediately contacted the British embassy officials to coordinate his evacuation. *Id.* After a month of coordinating with British officials, United States forces detained him and, in February of 2002, transported him to GTMO. *Id.* ¶ ¶ 3-4, 63.

Shortly before the plaintiffs' arrival in Guantanamo Bay in December 2002, defendant Donald Rumsfeld signed a memorandum approving more aggressive interrogation techniques that allegedly departed from the standards of care normally afforded military prisoners. *Id.* ¶ 9. Some of these previously prohibited techniques includes forcing the prisoners to endure stress-positions for up to four consecutive hours, disrobing prisoners, intimidating prisoners with dogs, twenty-hour interrogation sessions, forcing prisoners to wear hoods, shaving their hair, isolating the prisoners in total darkness and silence, and using physical contact. *Id.* In April 2003, Rumsfeld withdrew approval of these tactics. *Id.* ¶ ¶ 10-11.

Following this revocation, however, the detainees at GTMO continued to suffer from inhumane treatment. *Id.* ¶ ¶ 65-158. During the United States' detainment of the plaintiffs at GTMO, which has lasted over two years, the plaintiffs suffered repeated beatings and forced body cavity searches. *Id.* ¶ ¶ 4, 6. Furthermore, prison guards frequently shackled the plaintiffs for many hours, causing wounds and permanent scarring, and also forced them to remain in stressful positions for hours, injected unknown substances into their bodies, and required them to live in cramped cages without protection from the elements. *Id.* ¶ ¶ 6, 70, 72, 85. In addition, the guards deprived the plaintiffs of adequate food, sleep, and

communication with family members. *Id.* ¶ 6. The guards also humiliated and harassed the plaintiffs as they tried to practice their religion. *Id.* After months of extreme hardship and relentless interrogations, Rasul and Iqbal relented and confessed (falsely) to having ties with Al Qaeda. *Id.* ¶ ¶ 110, 127. Despite their confessions, after more than two years in United States custody without having any charges brought against them, in March of 2004, the United States released all of the plaintiffs, and they returned to their homes in the United Kingdom. *Id.* ¶ 137.

The plaintiffs filed the instant case against various military officials on October 27, 2004. [FN2] On March 16, 2005, the defendants filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim pursuant to the Federal Rules of Civil Procedure 12(b)(1) and (6). The court turns to the defendants' motion.

FN2. The defendants are Donald Rumsfeld, Secretary of Defense; Air Force General Richard Myers, Former Chairman of the Joint Chiefs of Staff; Air Army Major General Geoffrey Miller, Former Commander of the Joint Task Force at Guantanamo Bay Naval Base; Army General James Hill, Commander of the United States Southern Command; Army Major General Michael Dunlavey, Former Commander of the Joint Task Force at Guantanamo Bay Naval Base; Army Brigadier General Jay Hood, Commander of the Joint Task Force at Guantanamo Bay Naval Base; Marine Brigadier General Michael Lehnert, Commander of the Joint Task Force-160 at Guantanamo Bay Naval Base; Army Colonel Nelson Cannon, Commander at Camp Delta at Guantanamo Bay Naval Base; Army Colonel Terry Carrico, Commander of Camp X-Ray-Camp Delta at Guantanamo Bay Naval Base; Army Lieutenant Colonel William Cline, Commander of Camp Delta at Guantanamo Bay Naval Base; Army Lieutenant Colonel Diane Beaver, Legal Advisor to General Dunlevey; and John Does 1-100. *See* Compl.

### III. ANALYSIS

#### A. Legal Standards

1. Legal Standard for a 12(b)(1) Motion to Dismiss

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                      Page 3
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

**\*3** Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." _Kokkonen v. Guardian Life Ins. Co. of Am.,_ 511 U.S. 375, 377 (1994); _St. Paul Mercury Indem. Co. v. Red Cab Co.,_ 303 U.S. 283, 288-89 (1938); _see also Gen. Motors Corp. v. Envtl. Prot. Agency,_ 363 F.3d 442, 448 (D.C.Cir.2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.' " _Akinseye v. District of Columbia,_ 339 F.3d 970, 971 (D.C.Cir.2003) (quoting _Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxite de Guinea,_ 456 U.S. 694, 702 (1982)). On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. _Lujan v. Defenders of Wildlife,_ 504 U.S. 555, 561 (1992). The court may dismiss a complaint for lack of subject-matter jurisdiction only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " _Empagran S.A. v. F. Hoffman-Laroche, Ltd.,_ 315 F.3d 338, 343 (D.C.Cir.2003) (quoting _Conley v. Gibson,_ 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. _Macharia v. United States,_ 334 F.3d 61, 64, 69 (D.C.Cir.2003); _Grand Lodge of Fraternal Order of Police v. Ashcroft,_ 185 F.Supp.2d 9, 13 (D.D.C.2001). Moreover, the court is not limited to the allegations contained in the complaint. _Hohri v. United States,_ 782 F.2d 227, 241 (D.C.Cir.1986), _vacated on other grounds,_ 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. _Herbert v. Nat'l Acad. of Scis.,_ 974 F.2d 192, 197 (D.C.Cir.1992).

2. Legal Standard for a 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. _Browning v. Clinton,_ 292 F.3d 235, 242 (D.C.Cir.2002). The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. _Kingman Park Civic Ass'n v. Williams,_ 348 F.3d 1033, 1040 (D.C.Cir.2003) (citing FED. R. CIV. P. 8(a)(2) and _Conley v. Gibson,_ 355 U.S. 41, 47 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." _Conley,_ 355 U.S. at 47-48 (internal quotation marks omitted). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, _Swierkiewicz v. Sonoma N.A.,_ 534 U.S. 506, 511-14 (2002), or "plead law or match facts to every element of a legal theory," _Krieger v. Fadely,_ 211 F.3d 134, 136 (D.C.Cir.2000) (internal quotation marks and citation omitted).

**\*4** Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. _Warren v. Dist. of Columbia,_ 353 F.3d 36, 37 (D.C.Cir.2004); _Kingman Park,_ 348 F.3d at 1040. Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations-including mixed questions of law and fact-as true and draw all reasonable inferences therefrom in the plaintiff's favor. _Macharia v. United States,_ 334 F.3d 61, 64, 67 (D.C.Cir.2003); _Holy Land Found. for Relief & Dev. v. Ashcroft,_ 333 F.3d 156, 165 (D.C.Cir.2003); _Browning,_ 292 F.3d at 242. While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. _Warren,_ 353 F.3d at 39; _Browning,_ 292 F.3d at 242.

B. The Court Grants the Defendants' Motion to Dismiss the International Law Claims

The plaintiffs bring three actions against the defendants for alleged violations of the law of nations, and one action for alleged violations of the Geneva Conventions. [FN3] Compl. ¶ ¶ 159-84. Specifically, the plaintiffs allege that they were subjected to prolonged arbitrary detention, _id._ ¶ 159-166, torture, _id._ ¶ 167-172, and cruel, inhumane, and degrading treatment, _id._ ¶ 173-179.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 4
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

FN3. The plaintiffs invoke the Alien Torts Statute, 28 U.S.C. § 1350, as the jurisdictional basis for their suit. Compl. ¶ ¶ 159-84. That statute provides, *inter alia*, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

The Attorney General's designee, however, certified that the defendants were acting within the scope of their employment "at the time of the conduct alleged in the complaint." Defs.' Mot. to Dismiss ("Defs.' Mot."), Ex. 1. Because of this certification, the defendants argue that the plaintiffs' claims are barred by the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "Westfall Act"), 28 U.S.C. § 2679, which directs that the Federal Torts Claims Act ("FTCA") provides the exclusive remedy for tortious conduct committed by government employees acting within the scope of their employment. Defs.' Mot. at 4; 28 U.S.C. § 2679(b)(1).

The plaintiffs, however, contend that as a matter of law, the defendants were not acting within the scope of their employment, Pls .' Opp'n at 8-13, or alternatively, that the entirety of their claims fall within either of the two exceptions to the exclusive remedy provision of the FTCA. Pls.' Opp'n at 18. As discussed below, the plaintiffs' claims against the defendants under customary international law and the Geneva Conventions [FN4] are barred by the Westfall Act. For this reason, the court substitutes the United States as a defendant for these claims and dismisses them for the plaintiffs' failure to exhaust their administrative remedies.

FN4. The plaintiffs argue that the Geneva Conventions are enforceable by the plaintiffs. Pls.' Opp'n at 25. Since the parties submitted their briefs to the court, however, the D.C. Circuit has ruled that the Geneva Conventions do not incorporate a private right to enforce its provisions in court. *Hamdan v. Rumsfeld*, 415 F.3d 33, 40 (D.C.Cir.2005), *cert. granted*, 126 S.Ct. 622. Thus, the Geneva Conventions do not give the plaintiffs an independent vehicle for their lawsuit.

1. The Westfall Act Requires that the Court Substitute the United States as a Defendant in Place

of the Individual Defendants.

a. Legal Standard for Immunity of Federal Officers Under the Westfall Act

**\*5** The Westfall Act confers immunity on federal employees "by making an FTCA action against the Government the exclusive remedy for torts committed by Government employees in the scope of their employment." *United States v. Smith*, 499 U.S. 160, 163 (1991); 28 U.S.C. § 2679(b)(1). The Act provides:
Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1). In a case where the Attorney General, or by designation the United States Attorney in the district where the claim is brought, files a certification that the original defendant was acting within the scope of his employment, such certification has the following consequences: (1) if the suit originated in state court, then the Attorney General or his designee is required to remove it to federal court; (2) the United States shall be substituted as the sole defendant; and (3) if the plaintiff has not brought suit pursuant to the FTCA, the suit converts to one against the United States under the FTCA. 28 U.S.C. § 2679(d)(2); 28 C.F.R. § 15.3(a) (2002); *Haddon v. United States*, 68 F.3d 1420, 1423 (D . C.Cir.1995). The certification is conclusive for purposes of removal. The substitution and conversion consequences, however, are subject to judicial review; that is, they are contingent on whether the court finds that the original defendant acted within the scope of his employment. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995) (stating that "[t]he Attorney General's certification that a federal employee was acting within the scope of his employment ... does not conclusively establish as correct the substitution of the United States as defendant in place of the employee"); *Haddon*, 68 F.3d at 1423 (noting that "the federal court may determine independently whether the employee acted within the scope of employment and, therefore, whether to substitute the federal government as the proper defendant").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                           Page 5
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

When the court reviews the validity of a certification filed by the Attorney General or his designee, the certification is entitled to *"prima facie* effect" that the defendants acted within the scope of their employment. *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C.Cir.1994) (internal citations omitted). The burden then shifts to the plaintiffs to first allege facts that, if true, would exceed the scope of the defendants' employment. *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C.Cir.2003). Upon allegations of such facts, the plaintiffs are entitled to discovery and evidentiary hearings to resolve material issues of fact. *Id.* However, the plaintiffs must still prove by a preponderance of the evidence that the defendants' actions were outside the scope of their employment for their claims to survive. *Kimbro*, 30 F.3d at 1509; *Schneider v. Kissinger*, 310 F.Supp.2d 251, 264 (D.D.C.2004), *aff'd* 412 F .3d 190 (D.C.Cir.2005); *Maron v. United States*, 126 F.3d 317, 322 (4th Cir.1997) (applying identical factors to determine scope of employment). To determine whether a federal employee was acting within the scope of his employment, a federal court must apply the law of the state where the tortious act occurred. *Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C.Cir.1994); *Garber v. United States*, 578 F.2d 414, 415 (D.C.Cir.1978). In this case, however, the alleged tortious acts occurred at GTMO. Since Guantanamo does not provide adequate guidelines for determining scope of employment and the acts are "inextricably bound up with the District of Columbia in its role as the nation's capital[,]" the relevant law to apply is that of the District of Columbia. *Mundy v. Weinberger*, 554 F.Supp. 811, 818 (D.D.C.1982). The law of the District of Columbia is drawn from the Restatement (Second) of Agency. *Haddon*, 68 F.3d at 1423. The Restatement provides that

*6 [c]onduct of a servant is within the scope of employment if, but only if: (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the master; and (4) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

RESTATEMENT (SECOND) OF AGENCY § 228 (1957); *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 n. 5 (D.C.2000).

b. The Defendants Were Acting Within the Scope of their Employment [FN5]

FN5. As a threshold concern, the plaintiffs argue that violations of international law (specifically torture, cruel and degrading treatment, and prolonged arbitrary detention), as a matter of law, fall outside the scope of employment because they are contrary to the official position of the United States. Pls.' Opp'n at 11 (citing a State Department report to the United Nations Committee Against Torture). This argument is unavailing for three reasons. First, Congress established a framework where state law, not State Department representations to the United Nations, governs the scope of employment determination. 28 U.S.C. § 2679(d)(2)-(3); *see also Haddon*, 68 F.3d 1420, 1424-25 (D.C.Cir.1995) (applying District of Columbia law to determine federal employee's scope of employment under the FTCA). Second, to the extent the Executive Branch can make legal representations to this court regarding the scope of an employee's conduct, they have done so through the Attorney General's certification. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995). Finally, "[d]efining an employee's scope of employment is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines *who* may be held liable for that conduct, an employee or his boss." *Schneider v. Kissinger*, 310 F.Supp.2d 251, 265 (D.D.C.2004) (emphasis in original), *aff'd* 412 F.3d 190 (D.C.Cir.2005). Accordingly, the court construes the scope of a government employees' employment by looking at the specific process detailed in the statute rather than by consulting State Department reports to the United Nations.

i. Nature of the Conduct

To constitute action within the scope of one's employment, first, the conduct must be "of the same general nature as that authorized" or "incidental to the conduct authorized." RESTATEMENT (SECOND) OF AGENCY § 229 (1957). The District of Columbia "liberally construes the doctrine of respondeat superior ... with respect to the first prong of the Restatement (Second) of Agency § 228(1)." *Stokes*, 327 F.3d at 1216 (citing *Haddon*, 68 F.2d at 1425-26 and *Weinberg v. Johnson*, 518 A.2d 985, 988-90 (D.C.1986)). It is undisputed that the named

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

defendants initially acted pursuant to directives contained in a December 2, 2002 memorandum from defendant Rumsfeld. Compl. ¶ ¶ 9, 10. In April 2003, defendant Rumsfeld withdrew explicit authorization for use of torture. *Id.* ¶ 11. The plaintiff alleges that despite this removal of authorization to torture, the defendants persisted in utilizing these tactics. *Id.* For this reason, the crux of the dispute here is whether the defendants' actions after April 2003 were "incidental to the conduct authorized." RESTATEMENT (SECOND) OF AGENCY § 229.

Analyzing the meaning of "incidental conduct," the D.C. Circuit has stated:

[C]onduct is "incidental" to an employee's legitimate duties if it is "foreseeable." "Foreseeable" in this context does not carry the same meaning as it does in negligence cases; rather, it requires the court to determine whether it is fair to charge employers with responsibility for the intentional torts of their employees. To be foreseeable, the torts must be "a direct outgrowth of the employee's instructions or job assignment." It is not enough that an employee's job provides an "opportunity" to commit an intentional tort.

*Haddon,* 68 F.3d at 1424. (citations omitted). The defendants argue that their actions were incidental to the conduct authorized. Defs.' Reply at 8.

The law of the District of Columbia supports the defendants' position. The courts in the District of Columbia categorize practically any conduct as falling within the scope of, or incidental to, that authorized by their employer so long as the action has some nexus to the action authorized. For example, in *Weinberg v. Johnson,* the D.C. Court of Appeals ruled that a laundromat employee's decision to shoot a customer over clothes which the employee had a duty to remove from a laundry machine if left unattended constituted conduct done "in virtue of his employment and in furtherance of its ends." 518 A.2d at 988 (internal quotations omitted) (stating that the employer will be liable under the *respondeat superior* doctrine so long as the employee's conduct does not include a "personal motive"). Applying this principle, the D.C. Circuit ruled that a delivery person's sexual assault of a customer, following an argument over inspecting and paying for the delivered goods, was incidental to his employment for a trucking company. *Lyon v. Carey,* 533 F.2d 649 (D.C.Cir.1976) (stating that though "the assault was perhaps at the outer bounds of respondeat superior ... [i]t is within the enterprise liability of vendors like furniture stores and those who deliver for them that deliverymen,

endeavoring to serve their masters, are likely to be in situations of friction with customers" which may lead to "altercations" and "violence").

*7 Here, the United States authorized military personnel in Guantanamo to exercise control over the detainees and question the detainees while in the custody of the United States. Authorization for Use of Military Force, Pub.L. No. 107-40, 115 Stat. 224 (2001); *Khalid v. Bush,* 355 F.Supp.2d 311, 319 (D.D.C.2005) (stating that through the Authorization for Use of Military Force, Congress "gave the President the power to capture and detain those who the military determined were either responsible for the 9/11 attacks or posed a threat of future terrorist attacks"). [FN6] Like *Lyon* and *Weinberg,* the complaint points to actions which arose specifically from authorized activities. Additionally, the plaintiffs' complaint alleges torture and abuse tied exclusively to the plaintiffs' detention in a military prison and to the interrogations conducted therein. *See generally* Compl. If the doctrine of *respondeat superior* is panoptic enough to link sexual assault with a furniture deliveryman's employment because of the likely friction that may arise between deliveryman and customer, it must also include torture and inhumane treatment wrought upon captives by their captors. Stated differently, if "altercations" and "violence" are foreseeable consequences of a furniture deliveryman's employment, then torture is a foreseeable consequence of the military's detention of suspected enemy combatants. For these reasons, the court rules that the defendants' conduct was incidental to their roles as military officials. Accordingly, the alleged activity of the defendants was "a direct outgrowth of the employees instructions [and] job assignment" and within the scope of their employment. *Haddon,* 68 F.3d at 1424 (citations omitted).

> FN6. The court notes that *Khalid v. Bush* is on appeal with the D . C. Circuit. *Khalid v. Bush,* 355 F.Supp.2d 311 (D.D.C.2005), *appeal docketed,* No. 05-5063 (D.C.Cir. notice of appeal March 2, 2005). The court cites *Khalid* solely to demonstrate that the defendants sued in this case were acting pursuant to a congressional authorization, not for that case's ultimate legal conclusions regarding the legality of the Authorization.

ii. Space and Time Limitations

Under the Restatement (Second) of Agency, the

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

Page 7

court's second line of inquiry concerns whether the defendants' actions took place within the space and time limitations authorized by the employer. RESTATEMENT (SECOND) OF AGENCY § 228. Because the parties do not dispute that the defendants' actions took place within the time and place limitations sanctions by the United States, Pls.' Opp'n at 9-10, the court proceeds to the third and fourth prongs of the scope of employment inquiry.

### iii. The Purpose of the Conduct [FN7]

FN7. The plaintiffs assert that the defendants' actions were, as a matter of law, outside the scope of their employment because they were not "legitimate executive acts." Pls.' Opp'n at 12. The plaintiffs fail to adequately explain why all actions within a federal employee's scope of employment must be "legitimate executive acts" but rather make vague analogies to "foreign tyrants seeking to avoid liability in U.S. courts." *Id.* The plaintiffs state that because foreign tyrants are not allowed immunity for acts of torture, neither should the defendants in this case. *Id.* at 12-13 (citing *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980); *Trahano v. Marcos,* 878 F.2d 1439 (9th Cir.1989); *In re: Estate of Marcos Human Rights Litig.,* 978 F.2d 493, 497-98 & n. 10 (9th Cir.1992); *In re: Estate of Marcos Human Rights Litig.,* 910 F.Supp. 1460, 1463 (D.Haw.1995); *In re: Estate of Marcos Human Rights Litig.,* 25 F.3d 1467, 1472 (9th Cir.1994); *Xuncax v. Gramajo,* 886 F.Supp. 162, 175-76 (D.Mass.1995)). The plaintiffs' argument lacks merit. These cases do not align with the facts presently before the court in that they involve foreign officials ineligible under the FTCA to receive immunity but eligible for immunity under various legislative acts and principles of international law (e.g., Foreign Sovereign Immunity Act, 28 U.S.C. § 1605; Torture Victims Protections Act, 28 U.S.C. § 1350 Note; Act of State Doctrine; Head of State Immunity). By enacting the FTCA, Congress directed that state law governs the scope of employment for claims brought against federal employees. For this reason, case law interpreting legislation governing foreign officials is inapplicable to the present circumstance.

Next the court addresses whether the alleged actions were perpetrated, at least in part, to for the purpose of serving the master. RESTATEMENT (SECOND) OF AGENCY § 228. "[W]here the employee is in the course of performing job duties, the employee is presumed to be intending, at least in part, to further the employer's interests." *Weinberg,* 518 A.2d at 989 (citation omitted). Furthermore, the D.C. Circuit has stated that, "[t]he intent criterion focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace any intentional tort arising out of a dispute that 'was originally undertaken on the employer's behalf.' " *Stokes,* 327 F.3d at 1216 (quoting *Weinberg,* 518 A.2d at 992). Moreover, "[t]he employer does not avoid liability for the employee's intentional torts ... if the tort is committed partially because of a personal motive, such as revenge, as long as 'the employee [is] actuated, at least in part, by a desire to serve his principal's interest.' " *Weinberg,* 518 A.2d at 988 (citing *Jordan v. Medley,* 711 F.2d 211, 214 (D.C.Cir.1983) and RESTATEMENT (SECOND) OF AGENCY § 245 cmt. f (1958)).

**\*8** The plaintiffs do not allege that the tortious actions arose purely from personal motives, but claim that the defendants' actions are inextricably intertwined with their respective roles in the military. Compl. ¶ ¶ 37-137 (detailing the defendants' alleged actions within the context of the United States' military actions in Afghanistan following the September 11, 2001 attacks). As the Supreme Court recently stated, "detention of individuals ... for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use." *Hamdi v. Rumsfeld,* 542 U.S. 507, 518 (2004).

The plaintiffs' allegations of torture, though reprehensible, do not offset the presumption that these individuals were acting on behalf of their employer during "the course of performing job duties." *Weinberg,* 518 A.2d at 989. The plaintiffs have not proffered any evidence that would lead this court to believe that the defendants had any motive divorced from the policy of the United States to quash terrorism around the world. *Weinberg,* 518 A.2d at 990 (excluding actions committed solely for the servant's own purposes from the scope of employment). Thus, the court rules that the individual defendants were acting, at least in part, to further the interests of their employer, the United States.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 8

#### iv. Foreseeability of the Conduct

Finally, the court addresses whether the use of force was foreseeable. RESTATEMENT (SECOND) OF AGENCY § 228. "The inquiry is necessarily whether the intentional tort was foreseeable, or whether it was 'unexpectable in view of the duties of the servant .' " Majano v. Kim, No. CIV.A.04-201, 2005 WL 839546, at *8 (D.D.C. April 11, 2005) (quoting RESTATEMENT (SECOND) OF AGENCY § 245)). However, "a broad range of intentional tortious conduct has been found to be within the scope of employment despite the violence by which injury was inflicted." Id. In fact, employers may be held liable for "foreseeable altercations [that] may precipitate violence ... even though the particular type of violence was not in itself anticipated or foreseeable." Lyon, 533 F.2d at 651.

The court in Majano addressed this issue in depth. In Majano, a manager of the Smithsonian tried to enter a secured building without using her identification card. 2005 WL 839546, at *2. A janitor asked to see her identification before allowing her in, but rather than showing her identification, the manager became angry and assaulted the janitor. Id. The court held that "[a] physical or verbal altercation between fellow employees over the manner of entrance to a Smithsonian building in this heightened security environment is unfortunate-and may be administratively-sanctionable-but nonetheless expectable." Id. at *9.

In the present case, the heightened climate of anxiety, due to the stresses of war and pressures after September 11 to uncover information leading to the capture of terrorists, would naturally lead to a greater desire to procure information and, therefore, more aggressive techniques for interrogations. Indeed, according to the plaintiffs, this increased motivation culminated in defendant Rumsfeld's December 2002 memorandum approving more aggressive interrogation techniques. Compl. ¶ 9. Although these aggressive techniques may be sanctionable within the military command, especially after the 2002 memorandum was revoked, the fact that abuse would occur is foreseeable. Accordingly, the defendants' employment situation did not present a mere opportunity for tortious activity to occur but provided the kindling for such activity to grow without the appropriate supervision. See Boyken, 484 A.2d at 563 (concluding that employment which affords the mere opportunity to pursue a personal venture is

insufficient to make the employer liable). Consequently, the alleged actions of the defendants were within the scope of their employment.

#### 2. The Individual Defendants are not Liable Pursuant to the Exceptions to the Westfall Act

**\*9** The plaintiffs contend, in the alternative, that the individual defendants can be held liable pursuant to one of the two exceptions under the Westfall Act. Specifically, a grant of immunity under the Westfall Act does not apply when a civil action is "brought [1] for violations of the Constitution of the United States, or ... [2] for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(A)-(B). The plaintiffs argue that their claims brought under the Alien Tort Claims Act and international law fall within both exceptions. Pls.' Opp'n at 18-23. For the reasons that follow, the court finds the plaintiff's position unpersuasive.

#### a. Constitutional Exception

The plaintiffs first assert that all of their claims are entitled to a waiver of immunity pursuant to the Westfall Act because they have alleged constitutional violations. Id. at 18. The plaintiffs state that "by its plain language [the Westfall Act] provides that the exclusive remedies of the FTCA do not apply to the plaintiffs' 'civil action' when a constitutional violation is asserted." Id. at 19. The plaintiffs assert that a "civil action" refers to the entire proceeding and not merely an individual claim. Id. (citations omitted).

The plaintiffs' argument, however, has been rejected by the Supreme Court. [FN8] Finley v. United States, 490 U.S. 545, 553-54 (1989), superseded by statute, 28 U.S.C. § 1367. [FN9] In Finley, the Supreme Court declared that Congress' change to the FTCA from "claim against the United States," to "civil actions on claims against the United States," does not mean to "permit[ ] the assertion of jurisdiction over any 'civil action,' so long as that action includes a claim against the United States." [FN10] Id. at 554 (emphasis in original).

> FN8. The plaintiffs argue that because the international law and constitutional law claims arise out of "a common nucleus of operative facts," the defendants are not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

entitled to seek substitution of the United States for the plaintiffs' international law claims. Pls.' Opp'n at 18-19. For the reasons set forth in *Finley*, the court rejects the plaintiffs' argument. *See Finley v. United States,* 490 U.S. 545, 553-556 (1989).

FN9. The plaintiffs argue that Congress' abrogation of the Court's interpretation in *Finley* "clearly indicates a congressional preference that FTCA cases arising out of a single nucleus of operative facts be tried in a single proceeding." Pls.' Opp'n at 22, n. 10. Though Congress' passage of 28 U.S.C. § 1367 indicates its disagreement with the Supreme Court's interpretation of 28 U.S.C. § 1346, the statutory provision at issue in *Finley,* it has no bearing on the Court' interpretation of 28 U.S.C. § 2679.

FN10. The Court attributed Congress' change in the statute to language presented in the adoption of the Federal Rules of Civil Procedure which indicates that "there shall be one form of action to be known as a 'civil action.' " *Finley,* 490 U.S. at 555; Fed.R.Civ.P. 2.

This interpretation is consistent with Congress' intent. H.R.Rep. No. 100-700 at 5950 (1988) (stating that "[t]he 'exclusive remedy' provision ... is intended to substitute the United States as the solely permissible defendant in all common law tort actions"). Furthermore, Congress indicated that the Westfall Act "would provide immunity for federal employees from personal liability for common law torts committed within the scope of their employment." *Id.* at 2. The plaintiffs' suggested interpretation, in addition to conflicting with *Finley,* runs contrary to Congress' intent.

b. Statutory Exemption

The plaintiffs also argue that they can invoke a waiver of immunity for purposes of the Westfall Act because the individual defendants violated the Alien Tort Claims Act ("ATCA") by committing torts "in violation of the law of nations[.]" [FN11] Pls.' Opp'n at 22-24 (citing 28 U.S.C. § 1350). They further assert that the plain meaning of the ATCA establishes both a 'jurisdictional grant and a private right to sue for tortious violations of international law. *Id.* at 23. The Supreme Court, however, recently held that the ATCA is strictly a jurisdictional statute available to

enforce a small number of international norms. *Sosa v. Alvarez-Machain,* 542 U.S. 692, 729 (2004). Before adapting the law of nations to private rights, the Court called on all federal courts to exercise caution and only allow norms that are accepted "among civilized nations" to support a cause of action. *Id.* (citations omitted). [FN12]

FN11. Pursuant to the Alien Tort Claims Act ("ATCA"), "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or treaty of the United States." 28 U.S.C. § 1350.

FN12. The Supreme Court in *Sosa* provided another reason for barring private causes of action for violations of international law. The Court warned that before recognizing these causes, the courts should consider "the potential implications for the foreign relations of the United States ... [and be] wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa v. Alvarez-Machain,* 542 U.S. 692, 727 (2004). A more thorough discussion of the foreign affairs concerns calling for a bar to judicial review of this case is presented *infra* in Part III.B.3.

*10 A review of *Sosa* shows that the ATCA facilitates the bringing of an action for violations of the law of nations. The plain language of the ATCA, however, does not confer rights nor does it impose obligations or duties that, if violated, would trigger the Westfall Act's statutory exception. For the Westfall Act's statutory exception to apply, the ATCA would have to create substantive rights or duties that can be violated for purposes of the Westfall Act. *Schneider,* 310 F.Supp.2d at 266 (relying on *Alvarez-Machain,* 266 F.3d at 1053-54 for the proposition that the ATCA cannot be violated for purposes of § 2679(b)(2)(B)). A claim brought pursuant to the ATCA, therefore, is based on a violation of rights conferred under international law, not the ATCA itself. *Alvarez-Machain,* 266 F.3d at 1053 (citing *Smith,* 499 U.S. at 174). Accordingly, the court concludes that the plaintiffs fail to satisfy the exception under 28 U.S.C. § 2679(b)(2)(B).

The plaintiffs again attempt to obtain a waiver of immunity under 28 U.S.C. § 2679(b)(2)(B) by arguing that their cause of action for violations of international law "arises under" the laws of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

United States for purposes of jurisdiction under 28 U.S.C. § 1331. Pls.' Opp'n at 40-42. They claim that the defendants' obligation to uphold the Constitution follows the defendants wherever they are stationed or located. *Id.* The Westfall Act, however, is explicit in allowing an exception only for "a violation of a statute of the United States [or] a violation of the Constitution of the United States," not federal common law or international law. 28 U.S.C. § 2679(b)(2)(A)-(B); *Schneider,* 310 F.Supp.2d at 267. Moreover, the plaintiffs cannot bring suit for a violation of 28 U.S.C. § 1331 because this statute confers only federal question jurisdiction, not a cause of action for violations of international law. *Schneider,* 310 F.Supp.2d at 267. Accordingly, the court concludes that the plaintiffs fail to satisfy 28 U.S.C. § 2679(b)(2)(B).

In sum, the plaintiffs fail to meet their burden of proving that the individual defendants acted outside the scope of their employment or that their claims fall within one of the exceptions to the exclusive remedy provision of the FTCA. That is, the plaintiffs fail to rebut the Attorney General's certification. Therefore, the Attorney General's certification that the individual defendants acted within their scope of employment maintains its *prima facie* effect,[FN13] *Kimbro,* 30 F.3d at 1509, and the court substitutes the United States in place of the individual defendants. 28 U.S.C. § 2679(d)(2). This substitution effectively grants the defendants absolute immunity for violations of international law. *Mitchell v. Carlson,* 896 F.2d 128, 136 (5th Cir.1990) (stating that "Congress made it clear that, once certified, federal employees remain immune from suit for their tortious actions taken within the scope of their government employment").

> FN13. The court need not conduct discovery or evidentiary hearings because the facts alleged by the plaintiffs, taken as true, do not exceed the defendants' scope of employment. *See Singleton v. United States,* 277 F.3d 864, 871 (6th Cir.2002) (ruling that no hearing is necessary "where even if the plaintiff's assertions were true, the complaint allegations establish that the employee was acting within the scope of his/her employment") (internal quotations omitted).

### 3. The Plaintiffs Have Failed to Exhaust their Administrative Remedies

**\*11** Under the FTCA, "[a]n action shall not be

instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a). Because the plaintiffs in this case did not proceed against the United States, they did not first present their claim to the appropriate Federal agency. Consequently, the plaintiffs have not exhausted their administrative remedies. *McNeil v. United States,* 508 U.S. 106, 113 (1993) (stating that the "FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies"). Therefore, the court grants the defendants motion to dismiss for lack of jurisdiction because 28 U.S.C. § 2675(a) requires the claimant to bring a timely administrative claim before bringing suit against the government. *See also Simpkins v. Dist. of Columbia Gov't,* 108 F.3d 366, 371 (D.C.Cir.1997) (holding that the district court lacked jurisdiction because the claimant had not exhausted its administrative remedies).

### C. The Court Grants the Defendants' Motion to Dismiss the Plaintiffs' Constitutional Violation Claims

In addition to their claims under international law, the plaintiffs claim that the defendant violated the plaintiffs' rights under the Fifth and Eighth Amendments to the U.S. Constitution. Compl. ¶ ¶ 185-202. The defendants argue that under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 389 (1971), they are entitled to qualified immunity. Defs.' Mot. at 14-17. For the reasons that follow, the court agrees.

### 1. Legal Standard for a *Bivens* Claim and the Qualified Immunity Defense

A plaintiff may bring a civil action for money damages against a federal official in his or her individual capacity for a violation of the plaintiffs' constitutional rights. *Bivens,* 403 U.S. at 389. Federal officials may be entitled to a defense of qualified immunity, however. *Wilson v. Layne,* 526 U.S. 603, 614 (1999) (citing *Harlow,* 457 U.S. at 818). Qualified immunity "shield[s officials] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818. It "provides not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

simply a defense to liability, but also an 'entitlement not to stand trial or face the other burdens of litigation.' " *Farmer v. Moritsugu,* 163 F.3d 610, 613 (D.C.Cir.1998) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

In evaluating a *Bivens* claim to which a defendant has raised the qualified immunity defense, the court must follow a two-pronged analysis. *Butera v. Dist. of Columbia,* [FN14] 235 F.3d 637, 646 (D.C.Cir.2001) (citing *Wilson,* 526 U.S. at 609). First, as a threshold matter, the court must determine whether the plaintiff has alleged the deprivation of an actual constitutional right. *Id.; Saucier v. Katz,* 533 U.S. 194, 201 (2001). In defining an "actual constitutional right," a court must be careful to avoid defining the right in overly general terms "lest [it] strip the qualified immunity defense of all meaning." *Butera,* 235 F.3d at 646. Instead, the court must identify the right with the appropriate level of specificity so as to allow officials to reasonably anticipate when their conduct may give rise to liability for damages. *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)). Second, the court must decide whether the constitutional right was clearly established at the time of the defendants' action. *Id.* A right is "clearly established" if "the contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Wilson,* 526 U.S. at 614-15); *see also Crawford-El v. Britton,* 523 U.S. 574, 591 (1998) (stating that "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct"). Although the specific action in question need not have been held unlawful by the courts, its unlawfulness in light of pre-existing law must have been apparent to the defendant. *Butera,* 235 F.3d at 646.

> FN14. *Butera* involved a suit brought against state officials pursuant to 42 U.S.C. § 1983. *Butera,* 235 F.3d at 640-41. The Supreme Court has held, however, that there is no distinction between a *Bivens* suit and suit brought under section 1983 for purposes of immunity. *Butz v. Economou,* 438 U.S. 478, 508 (1978); *Gray v. Poole,* 243 F.3d 572, 577 n. 4 (D.C.Cir.2001).

2. The Defendants are Entitled to Qualified Immunity

**\*12** The plaintiffs allege violations of their right to due process under the Fifth Amendment and their right to be free from cruel and unusual punishment under the Eighth Amendment. Compl. ¶¶ 185-202. Specifically, the plaintiffs allege that military personnel subjected them to arbitrary and extended deprivation of liberty without counsel or a hearing to address the deprivation of liberty, frequent beatings, extended interrogations, insufficient shelter and food, and other humiliating treatment. *See generally* Compl.

Before the court can address whether the plaintiffs have alleged a constitutional deprivation, or whether any such rights were clearly established, the rights must be defined at the appropriate level of specificity; that is, "the court must define the right to a degree that would allow officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages[.]' " *Butera,* 235 F.3d at 646 (internal quotation omitted); *Anderson,* 483 U.S. at 639 (rejecting the notion that a mere allegation of a right to "due process of law" is adequate to defeat a qualified immunity defense against a due process claim). Otherwise, defining a constitutional right in overly broad language would "strip the qualified immunity defense of all meaning[.]" *Butera,* 235 F.3d at 646. For this case, the appropriate level of specificity requires inquiry into whether the Constitution affords Fifth Amendment due process protection to aliens captured abroad and brought within the exclusive jurisdiction and control of the United States at Guantanamo.

a. The Court Reserves Judgment as to Whether the Plaintiffs have Stated a Constitutional Right

Though the court might typically hold that the actions alleged by the plaintiffs contravene the Fifth Amendment [FN15] but not the Eighth Amendment, [FN16] the extent to which Guantanamo detainees may avail themselves of constitutional protections is currently before the D.C. Circuit. *Khalid,* 355 F.Supp.2d 311, *appeal docketed,* No. 05-5063 (D.C.Cir. March 4, 2005).

> FN15. *E.g., Foucha v. Louisiana,* 504 U.S. 71, 80 (1992) (stating that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary government action"); *Rochin v. California,* 342 U.S. 165, 209 (1952) (espousing the "shock the conscience" test in determining that methods of gathering evidence that are "so brutal and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

so offensive to human dignity" violate the due process clause); *Brown v. Mississippi, 297 U.S. 278, 285-86 (1938)* (stating that "the rack and torture chamber may not be substituted for the witness stand," and that tortious interrogation constitutes a violation of an individuals' due process rights).

FN16. The Eighth Amendment is not relevant here because it only applies to convicted criminals. *Bell v. Wolfish, 441 U.S. 520, 579 (1979); County of Sacramento v. Lewis, 523 U.S. 833, 859 (1998).* If the plaintiffs' designation as enemy combatants qualified them for Eighth Amendment protections, that protection would further affirm the court's view that the defendants violated the plaintiffs' constitutional rights. *Rhodes v. Chapman, 452 U.S. 337, 346 (1981)* (concluding that "the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain' ") (citation omitted); *Gregg v. Georgia, 428 U.S. 153, 183 (1976)* (holding that "the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering"); *Trop v. Dulles, 356 U.S. 86, 100 (1958)* (noting that "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man"); *Wilkerson v. Utah, 99 U.S. 130, 136 (1879)* (stating that "it is safe to affirm that punishments of torture ... are forbidden by [the Eighth Amendment] to the Constitution").

This determination requires the court to balance the interests of the detainees' constitutional rights, the executive branch's authority to classify individuals as enemy combatants and detain those individuals according to the government's discretion without undue court interference, and the scope of the judiciary's role in this case. Unsure of the way in which the D.C. Circuit will strike such a balance, or at least inform the contours of this trichotomy, a judicial determination by this court regarding the first prong under *Bivens* is imprudent. Because a resolution on this matter is forthcoming and because the court has independent grounds to dismiss the claims under the second *Bivens* prong, the court reserves judgment on whether the Guantanamo detainees enjoy Fifth and Eight Amendments protections. Consequently, the court begins its

analysis with whether the plaintiffs' alleged constitutional rights were clearly established at the time of the alleged abuse.

### b. Any Constitutional Right was Not Clearly Established

**\*13** Assuming *arguendo* that the D.C. Circuit or Supreme Court extends constitutional protections to the detainees, the plaintiffs still have the burden of proving that these rights were clearly established at the time of the alleged conduct. *Butera, 235 F.3d at 646.* To prove their alleged constitutional rights were clearly established, the plaintiffs must show that a reasonable person in the defendants' position would have been aware that such rights existed. *Id.* A reasonable person's understanding must be taken "in light of the specific context of the case, [and] not as a broad general proposition." *Saucier, 533 U.S. at 201.* Although the specific action in question had not been held unlawful by the courts at the time of the plaintiffs' detention, the defendants are not entitled to qualified immunity if the unlawfulness of their alleged actions was *apparent* in light of pre-existing law. *Butera, 235 F.3d at 646* (quoting *Anderson, 483 U.S. at 640).* Accordingly, the court will look to case law that was available to the defendants at the time of the plaintiffs' detention. Only with this foundation can the court determine whether a reasonable person would, at the time of the alleged torture, be aware that the plaintiffs were entitled to the Fifth Amendment rights they claim.

In 1950, the Supreme Court in *Johnson v. Eisentrager,* decided the seminal case on the applicability of constitutional protections to non-resident enemy aliens. *339 U.S. 763 (1950).* Specifically, these non-resident enemy aliens were German citizens detained in China by the United States military after Germany's surrender and designated as enemies by a Military Commission. *Id. at 766.* In determining what rights to afford these individuals, the Supreme Court began by noting that courts have only given an alien constitutional rights when the alien was present within the territorial jurisdiction of the Judiciary. *Id. at 771; accord United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318 (1936)* (stating that "neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect to our own citizens").

Of the aliens present within the Judiciary's territorial jurisdiction, the Court took care in distinguishing the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

Page 13

rights afforded resident aliens and the rights afforded resident *enemy* aliens. *Eisentrager*, 339 U.S. at 770-77. The court stated that although resident aliens are granted a "generous and ascending scale of rights as he increases his identity with our society [,] ... a resident enemy alien is constitutionally subject to summary arrest, internment and deportation whenever a 'declared war' exists." *Id.* at 770, 775; *accord Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (stating that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly"). Indeed, the Court further acknowledged that "[e]xecutive power over aliens, undelayed and unhampered by litigation, has been deemed, throughout our history, essential to war-time security," and "it seems not to have been supposed [by our founders] that a nation's obligations to its foes could ever be put on parity with those to its defenders." *Eisentrager*, 339 U.S. at 774, 775. Therefore, the Court determined that giving constitutional rights to non-resident enemy aliens would "hamper the war effort and bring aid and comfort to the enemy" and be paradoxical in light of the fact that American citizens conscripted into military service are stripped of Fifth Amendment protections. *Id.* at 779, 783. Accordingly, the Court concluded that because the "prisoners were at no relevant time within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial, and their punishment were all beyond the territorial jurisdiction of the United States[,]" non-resident enemy aliens are not entitled to Fifth Amendment protections. *Id.* at 777, 785.

**\*14** The plaintiffs insist, however, that *Eisentrager* is easily distinguishable because none of the plaintiffs in the instant case were charged with a crime, let alone charged and convicted of being enemy combatants as in *Eisentrager*. While this distinction proved crucial in Supreme Court decisions after the plaintiffs' release from Guantanamo, discussed *infra*, the facts in this case are sufficiently similar [FN17] to the situation in *Eisentrager* for a reasonable person to conclude that detainees were not afforded the specific Fifth Amendment protections at issue. Like *Eisentrager*, the plaintiffs are non-resident aliens captured abroad during a time of war and detained within a territory over which the United States does not have sovereignty. *Rasul v. Bush*, 542 U.S. 466, 480 (2004). Thus, the plaintiffs' attenuated connections with the United States coupled with the dispute over whether Guantanamo is within the territorial jurisdiction of the Judiciary [FN18] would

lead a reasonable person to believe that the plaintiffs would not be afforded any constitutional protections even under a "generous and ascending scale of rights[.]" *Eisentrager*, 339 U.S. at 770.

> FN17. *Johnson v. Eisentrager* clearly distinguished between an alien friend (a subject of a foreign state at peace with the United States) and an alien enemy (a subject of a foreign state at war with the United States). 339 U.S. 763, at 769 n. 2 (1950). However, this distinction is difficult to apply to terrorists because they identify with a particular ideology rather than a particular state. Given the pressures after 9/11 to identify and capture terrorists and the added difficulties in identifying terrorists today compared with identifying enemies during World War II, a military official should be afforded some deference in projecting what constitutional rights to afford individuals captured in a wartorn country, under battlefield conditions, and whose legal classification is ambiguous at best. Indeed, the Supreme Court stated that "[i]t is war that exposes the *relative* vulnerability of the alien's status." *Id.* at 771 (emphasis added).

> FN18. As discussed in *Rasul v. Bush,* the nature of Guantanamo remaining under "the ultimate sovereignty of the Republic of Cuba" yet at the same time under the "complete jurisdiction and control" of the United States is problematic in determining the level of rights to afford detainees. 542 U.S. at 471 (citation omitted). Because Guantanamo exists in a jurisdictional vacuum, not until *Rasul* was it clear that a district court could hear habeas petitions brought by detainees held there. Justice Kennedy in his concurrence viewed Guantanamo from "a practical perspective" stating that "the indefinite lease of Guantanamo Bay has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it." *Id.* at 487 (citation omitted). In contrast, Justice Scalia in his dissent declared that Guantanamo is "beyond the territorial jurisdiction of all [U.S.] courts." *Id.* at 488. Justice Scalia added also that, although Guantanamo is under the "jurisdiction and control" of the United States, sovereignty is the threshold test for extending

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 14

constitutional protections to aliens, and moreover, it is up to Congress to give jurisdiction to the courts. *Id.* at 501.

Although *Eisentrager* was the seminal case at the time of the plaintiffs' detainment, other cases illuminate this clouded area of law. For example, in *United States v. Verdugo-Urquidez* the Court affirmed and summarized the holding in *Eisentrager* and its progeny as "establish[ing] only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." 494 U.S. 259, 271 (1990) (citing *Plyler v. Doe, 457 U.S. 202, 212 (1982)*). In *Verdugo-Urquidez,* the respondent, a citizen and resident of Mexico, was arrested by Mexican police officers and transported to the United States. *Id.* at 262. Subsequently, Drug Enforcement Agency agents in concert with Mexican police officers searched his property in Mexico without a warrant. *Id.* The respondent claimed that the evidence submitted against him at trial was obtained in violation of the Fourth Amendment and should therefore be excluded. *Id.* at 263. The Court disagreed because the respondent had no previous voluntary connection with this country and his only connections arose from his brief detainment in California. *Id.* at 271. Furthermore, relying on *Eisentrager,* the Court reaffirmed its desire to avoid applying constitutional rights to aliens when it "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest." *Id.* at 273-74. The Court concluded that at least short term "lawful but involuntary [presence] is not of the sort to indicate any substantial connection with our country[,]" and thus, constitutional protections do not apply to searches of a non-resident alien's property abroad. *Id.* at 271. Thus, while the plaintiffs did have contact with the United States, like the respondent in *Verdugo,* that contact was limited to the detention.

*15 At the time of the plaintiffs' detainment, both *Eisentrager* and *Verdugo-Urquidez* [FN19] cautioned courts from interfering with foreign activities-especially activities related to national security. *Verdugo-Urquidez,* 494 U.S. at 273. These cases indicate that the Constitution applies only once aliens were within the territory of the United States and developed substantial contacts in this country. *Id.* at 271. Indeed, not until the Supreme Court decisions in *Hamdi v. Rumsfeld,* 542 U.S. 507 (2004) (granting Guantanamo detainees the right to counsel) and *Rasul v. Bush,* 542 U.S. 466 (2004) (granting federal courts jurisdiction to hear Guantanamo detainees' habeas

petitions), both decided after the plaintiffs' release from Guantanamo, were military personnel provided their first indication that detainees may be afforded a degree of constitutional protection. These cases provide the first decisions dealing precisely with the facts and basic concerns presented here (9/11, Authorization for Use of Military Force, GTMO). The plaintiffs have provided no case law, and the court finds none, supporting a conclusion that military officials would have been aware, in light of the state of the law at the time, that detainees should be afforded the rights they now claim. Accordingly, due to the unsettled nature of Guantanamo detainees' constitutional rights in American courts, the defendants cannot be said to have been "plainly incompetent" or to have "knowingly violated the law," and therefore are entitled to qualified immunity . [FN20] *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (stating that "the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law' ") (internal quotations omitted).

FN19. *See Nat'l Council of Resistance of Iran v. Dep't of State,* 251 F.3d 192, 201-02 (D.C.Cir.2001) (adopting the *Verdugo-Urquidez* test in applying due process rights to a foreign terrorist organization).

FN20. A final note, which reaffirms the court's holding today, comes from dicta in *Jifry v. Fed. Aviation Admin.,* stating, "[t]he Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." 370 F.3d 1174, 1182 (D.C.Cir.2004).

D. The Court Defers Ruling on the Defendants' Motion to Dismiss the Plaintiffs' Religious Freedom Restoration Act Claims

The plaintiffs allege that the defendants' actions violated their free exercise rights as protected by the Religious Freedom Restoration Act ("RFRA"). Compl. ¶ ¶ 203-208. The defendants, however, contend that the Act does not apply extraterritorially and alternatively, that the defendants are once again entitled to qualified immunity as to this claim. Defs.' Mot. at 24-27.

"Acts of Congress normally do not have extraterritorial application unless such an intent is

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

clearly manifested." _Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 188 (1993)_ (stating that this "presumption has special force when we are construing treaty and statutory provisions that may involve foreign and military affairs for which the President has unique responsibility") (citing _United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936)_). In determining whether RFRA has extra-territorial application, the court looks to the legislative history.

Congress enacted RFRA in response to _Employment Division v. Smith, 494 U.S. 872 (1990); 42 U.S.C. § 2000bb(a)(4)_. As stated in _§ 2000bb(a)(4)_, that decision "virtually eliminated the requirements that the government justify burdens on religious exercise imposed by laws neutral toward religion." _Id._ RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government demonstrates a "compelling governmental interest" and uses the "least restrictive means" of furthering that interest. _42 U.S.C. § 2000bb-1(a)-(b); Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 166-68 (D.C.Cir.2003)_. In _City of Boerne v. Flores, 521 U.S. 507, 514 (1997)_, the Court held the RFRA unconstitutional as applied to state action. _Id._ However, "the portion of RFRA remaining after _City of Boerne_ ... the portion ... applicable to the federal government ... survived the Supreme Court's decision striking down the statute as applied to the States." _Henderson v. Kennedy, 265 F.3d 1072, 1073 (D.C.Cir.2001)_ ("Henderson II").

**\*16** The historical development of RFRA, to undo _Employment Division v. Smith,_ belies any assertion that Congress intended RFRA to have extra-territorial application. The plaintiffs have not pointed to any case law persuading this court of Congress' intentions to apply the Act extraterritorially, and the court finds no such reason to do so now. Nevertheless, GTMO is a "territory over which the U.S. exercises plenary and exclusive authority." _Rasul, 542 U.S. at 466_. As Justice Scalia interpreted the majority opinion in _Rasul_, "not only § 2241 but presumably _all_ United States law applies there-including, for example, the federal cause of action recognized in _Bivens_ [.]" _Rasul v. Bush, 542 U.S. at 500_ (emphasis in original) (Scalia, J., dissenting). Based on Justice Scalia's interpretation, RFRA applies to persons detained at Guantanamo. The parties' briefing on this issue, however, is inadequate.

The defendants argue, in the alternative, that they are

entitled to qualified immunity from suit for damages arising from any violation of RFRA. Defs.' Mot. at 27. The parties' briefing as to this issue is also inadequate. For this reason, the court directs the parties to submit supplemental briefing to the court on these issues within 45 days of this opinion. [FN21] Thus, the court defers ruling on the defendants' motion to dismiss the plaintiffs' RFRA claim.

> FN21. The parties will each then have a period of 20 days within which to file responses to the supplemental briefing.

### IV. CONCLUSION

For the foregoing reasons, the court grants in part and defers ruling in part on the defendants' motion to dismiss. An order directing the parties in a manner consistent with this memorandum opinion is separately and contemporaneously issued this 6th day of February, 2006.

D.D.C.,2006.
Rasul v. Rumsfeld
--- F.Supp.2d ----, 2006 WL 266570 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2878175 (Trial Pleading) Complaint (Oct. 27, 2004)
• 1:04cv01864 (Docket) (Oct. 27, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2-B**

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

► 

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Johnny CHUNG, Plaintiff,
v.
U.S. DEPARTMENT OF JUSTICE, et al.,
Defendants.
**No. Civ. 00-1912(TFH).**

Sept. 20, 2001.

Anne L. Weismann, U.S. Department of Justice, Larry Elliot Klayman, James F. Peterson, Paul J. Orfanedes, Judicial Watch, Inc., Washington, DC, for Plaintiff.
Felicia L. Chambers, U.S. Department of Justice, Washington, DC, for Defendants.

*MEMORANDUM OPINION*

HOGAN, Chief J.

**\*1** Plaintiff Johnny Chung has sued Defendant U.S. Department of Justice ("DOJ") and five unknown officials in DOJ's Washington, D.C. office in their personal capacities, for purported violations of his rights under the Privacy Act, 5 U.S.C. § 552a, *et seq.,* and the First and Fifth Amendments to the U.S. Constitution. Pending before the Court is DOJ's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). Upon careful consideration of the DOJ's motion, the opposition and reply thereto, and the entire record herein, the Court will grant the motion and accordingly dismiss this case.

I. BACKGROUND [FN1]

FN1. Because this matter is before the Court on a motion to dismiss, it construes the complaint liberally, taking all the facts alleged as true, and giving the plaintiff the benefit of all reasonable inferences from those facts. *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.,* 52 F.3d 373, 375 (D.C.Cir.1995); *Henthorn v. Dep't of Navy,*

29 F.3d 682, 684 (D.C.Cir.1994); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994).

The plaintiff is a native of Taiwan, who immigrated to the United States and became a U.S. citizen in 1992. *Id.* ¶ 8. In 1993, he started a fax broadcasting business, which he named Automated Intelligent Systems, Inc. *Id.* ¶ 9. In an effort to promote his business interests, Chung states that he purchased access to high-ranking U.S. officials by contributing approximately $400,000 toward Democratic Party politics from July 1994 through October 1996. *Id.* ¶ 10.

Because of his contributions, DOJ's Campaign Finance Task Force ("Task Force") targeted Chung for an investigation of possible violations of the Federal Election Campaign Act ("FECA"), 2 U.S.C. § § 441a and 441f. A grand jury subsequently indicted Chung in the U.S. District Court for the Central District of California, and on March 16, 1998, he pled guilty to charges of criminal conspiracy to violate the FECA. *Id.* ¶ ¶ 14-15. As part of the plea agreement he entered with the government, Chung promised to cooperate fully with the Task Force in a confidential, ongoing investigation into alleged illegal campaign contributions made by agents of the People's Republic of China ("PRC") to Democrats, including President Clinton and Vice President Gore. *Id.* ¶ 16. Chung specifically agreed to provide information to the Task Force, to testify at any trial or grand jury proceedings when required, to participate in affirmative investigative techniques such as tape recording conversations and telephone calls, and to provide documents or other materials requested by the law enforcement authorities. *Id.* ¶ 17. In return, Chung hoped to earn a departure motion from the government to reduce his ultimate sentence. *Id.* ¶ 16-17. If Chung failed to cooperate, he could have received a sentence of thirty-seven years in prison and fines and assessments totaling $1,450,250. *Id.* ¶ 19.

Chung states that he and his family faced a substantial risk of harm from agents of the PRC if his cooperation became public. On approximately May 14, 1998, a *New York Times* reporter telephoned Chung's attorney, Brian Sun, to request confirmation or comment on a planned story detailing Chung's cooperation with the Task Force. On May 15, 1998,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 2
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

despite Sun's attempt to stop the reporter from publishing the story, the *New York Times* ran the story under the headline, "Democrat Fund Raiser Said to Detail China Tie." *Id.* ¶¶ 21-24. That same day, the Federal Bureau of Investigation ("FBI") took Chung and his family into protective custody and secreted them away to a confidential location. After this information also leaked, NBC News correspondent Lisa Meyers reported on May 26, 1998 that Chung had been taken to a secret location in California for protection. *Id.* ¶¶ 25-26. On May 27, 1998, Chung learned from a *Los Angeles Times* reporter that high-ranking DOJ officials in Washington, D.C. had leaked the information broadcasted by NBC. *Id.* ¶ 27. Chung also believes that the same officials leaked the information about his cooperation that was published in the *New York Times*. *Id.* ¶ 28. On two separate occasions while Chung and his family were in protective custody, the FBI intercepted PRC "hit squads" that it determined were threats to Chung and his family. *Id.* ¶ 30. Because of the leaks, Chung states that he suffered substantial emotional distress and mental anguish, fearing for his life and the lives of his family members. *Id.* ¶ 31.

*2 Chung was sentenced in December 1998, and his plea agreement with the government was unsealed on May 6, 1999. *Id.* ¶¶ 18, 32. He then filed this lawsuit on August 8, 2000 asserting three counts premised upon the aforementioned leaks to the media. Count One charges DOJ with a violation of the Privacy Act, 5 U.S.C. § 552a(b). *Id.* ¶¶ 33-36. Count Two charges five unknown DOJ officials with a violation of his First Amendment rights of free speech. *Id.* ¶¶ 37-42. Count Three charges the same five unknown officials with a violation of his Fifth Amendment right to be secure in his person. *Id.* ¶¶ 43-47.

DOJ has moved to dismiss Chung's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6).

## II. DISCUSSION

### A. Legal Standard

In considering a motion to dismiss for lack of subject matter jurisdiction, the Court accepts as true all material factual allegations in the complaint. *Hohri*

*v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). In addition, a court may consider such materials outside the pleadings as appropriate to resolve the question whether it has jurisdiction to hear the case. *See Herbert v. Nat'l Academy of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992); *Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.1987); *Borg-Warner Protective Servs. Corp. v. EEOC,* 81 F.Supp.2d 20, 23 (D.D.C.2000).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."). In reviewing such a motion, the Court must construe the complaint in the light most favorable to plaintiff and must accept as true all allegations and all reasonable factual inferences drawn from well-pleaded factual allegations. *See Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 411, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *In re United Mine Workers Employee Benefit Plans Litig.,* 854 F.Supp. 914, 915 (D.D.C.1994).

### B. Privacy Act Claim

DOJ first argues that Chung's Privacy Act claim is time-barred. [FN2] An action brought under the Privacy Act must be brought within two years from the date on which the cause of action arises:

> FN2. The section of the Privacy Act relied upon by the plaintiff states in pertinent part: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would" comply with 12 specific exceptions. 5 U.S.C. § 552a(b).

An action to enforce any liability created under this section may be brought in the district court of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, without regard to the amount in controversy, within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation.
**\*3** 5 U.S.C. § 552a(g)(5). "A cause of action under the Privacy Act arises when the plaintiff knew or should have known of the alleged violation." *Griffin v. U.S. Parole Comm'n,* 192 F.3d 1081, 1082 (D.C.Cir.1999) (citing *Tijerina v. Walters,* 821 F.2d 789, 798 (D.C.Cir.1987)).

Chung does not dispute the fact that he filed his lawsuit over two years after his cause of action arose. [FN3] He contends, however, that his Privacy Act claim is nonetheless timely because the limitations period should be tolled. *See* Pl.'s Opp'n at 8 (citing *Braun v. Sauerwein,* 77 U.S. (10 Wall.) 218, 222-23, 19 L.Ed. 895 (1869) (noting state court decisions that "all rest on the ground that [when a] creditor has been disabled to sue, by a superior power, without any default of his own, and, therefore, that none of the reasons which induced the enactment of the statutes apply to his case; that unless the statutes cease to run during the continuance of the supervening disability, he is deprived of a portion of the time within which the law contemplated he might sue")). In Chung's view, that is, two authorities prevented him from filing suit within two years. Pl.'s Opp'n at 8-10 (citing *Ross v. United States,* 574 F.Supp. 536, 542 (S.D.N.Y.1983) ("Federal courts have held that a limitations period is tolled when a paramount authority prevents a person from exercising his legal rights.")). First, he was not sentenced until December 1998, and until that time, he lived under the "onerous threat of a plea agreement that demanded his full cooperation and assistance." Pl.'s Opp'n at 9. If he did not provided substantial assistance, then he could be sentenced to thirty-seven years in prison and $1,450,000 in fines and assessments. He therefore was in no position to initiate a lawsuit until December 1998 because doing so "would necessarily put an end to" his cooperation. *Id.* at 9-10. Second, his plea agreement remained under seal until May 6, 1999. Because the agreement was an integral part of his complaint, Chung contends, he had to wait until it

was unsealed before filing his lawsuit. DOJ rejoins that equitable tolling is disallowed as a matter of law under the Privacy Act, and in any event, equitable tolling should be denied on the facts of this case.

> FN3. As DOJ points out and Chung concedes, the first of the three alleged Privacy Act violations occurred around May 14, 1998, when a *New York Times* reporter called Chung's attorney asking for confirmation about Chung's cooperation with the Task Force. Chung thus had actual knowledge through his counsel that a potential violation had occurred as of May 14, 1998 and through the *New York Times* article published on May 15, 1998. The limitations period on this disclosure therefore ran by no later than May 15, 2000. Chung had knowledge of the second alleged violation on May 26, 1998, when NBC correspondent Lisa Meyers reported that Chung and his family were in hiding in California. Thus, the limitations period on this disclosure ran on May 26, 2000. Chung learned of the third alleged violation on May 27, 1998, when a *Los Angeles Times* reporter told Chung that high-ranking DOJ officials in Washington, D.C. told the reporter that Chung was in protective custody in California. The limitations period on this disclosure therefore ran on May 27, 2000. The plaintiff did not file his lawsuit, however, until August 8, 2000, over two years after he acquired knowledge of each of purported leaks and after his cause of action arose.

In addressing Title VII's filing deadline in *Irwin v. Department of Veterans Affairs,* the Supreme Court noted the inconsistent case law on the applicability of equitable tolling, waiver, and estoppel to statutory deadlines, and it took the "opportunity to adopt a more general rule to govern the applicability of equitable tolling in suits against the Government." 498 U.S. 89, 94-95, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). [FN4] After observing that equitable tolling had been applied to suits between private litigants, the Court stated that "[o]nce Congress has made such a waiver [of sovereign immunity], we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver. Such a principle is likely to be a realistic assessment of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

legislative intent as well as a practically useful principle of interpretation." *Id.* at 95. The Court then held "that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States. Congress, of course, may provide otherwise if it wishes to do so." *Id.* at 95-96. In *United States v. Brockamp,* however, the Supreme Court addressed whether courts may toll, for nonstatutory equitable reasons, the statutory filing limitations for tax refund claims set forth in the Internal Revenue Code, 26 U.S.C. § 6511, and held that they may not. 519 U.S. 347, 348, 350, 354, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997). In so holding, the Court noted an argument made by the defendants that because *section 6511* did not apply against private defendants, the *Irwin* presumption was inapplicable. It nonetheless assumed-but merely for the sake of argument-that if the presumption did apply, there was still sufficient reason to find it rebutted. *Id.* at 350.

FN4. As the Supreme Court noted:
In *United States v. Locke,* 471 U.S. 84, 94, n. 10, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985), we stated that we were leaving open the general question whether principles of equitable tolling, waiver, and estoppel apply against the Government when it involves a statutory filing deadline. But, as Justice White points out in his concurrence ... nearly 30 years earlier in *Soriano v. United States,* 352 U.S. 270, 306, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957), we held the petitioner's claim to be jurisdictionally barred, saying that "Congress was entitled to assume that the limitation period it prescribed meant just that period and no more." *Id.* at 276. More recently, in *Bowen v. City of New York,* 476 U.S. 467, 479, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), we explained that "we must be careful not to 'assume the authority to narrow the waiver that Congress intended,' or construe the waiver 'unduly restrictively.'' (citation omitted). *Irwin,* 498 U.S. at 94.

*4 Some circuits have limited the application of *Irwin'* s rebuttable presumption to causes of action that can be brought against a private defendant as well as the government. For example, the Third Circuit held that a statutory time limit under the Internal Revenue Code, 26 U.S.C. § 6532(c), for wrongful levy actions against the federal government, 26 U.S.C. § 7426(a), was a jurisdictional bar that

could not be equitably tolled. *Becton Dickson & Co. v. Wolckenhauer,* 215 F.3d 340, 341, 348-49 (3d Cir.2000), *cert. denied sub nom, Becton Dickson & Co. v. IRS,* 531 U.S. 1071, 121 S.Ct. 761, 148 L.Ed.2d 663 (2001); *see also Miller v. Tony & Susan Alamo Found.,* 134 F.3d 910, 916-17 (8th Cir.1998); *Amwest Sur. Ins. Co. v. United States,* 28 F.3d 690, 691, 694-95 (7th Cir.1994); *Williams v. United States,* 947 F.2d 37, 39-40 (2d Cir.1991). The *Becton* court, for example, refused to equitably toll the time limit in part because the provision at issue applied only to suits against the government:
[L]ike the time limitation at issue in *Brockamp,* but unlike the time limitation at issue in *Irwin,* the time limitation in section 6532(c) applies only to suits brought against the government and not suits brought against private defendants. Indeed, section 7426(a)(1), which section 6532(c) modifies, authorizes only suits against the government. Thus, *Irwin'* s "rebuttable presumption" does not apply; "making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits" has no meaning in the context of a statute that creates only a cause of action against the government.

215 F.3d at 348-49. [FN5] Other circuits have similarly refused to apply equitable doctrines of tolling and estoppel to the time limit under section 6532(a) of the IRS code for suits filed pursuant to section 7422(a) for the recovery of taxes, penalties, or other sums paid to the government. *See, e.g., RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461-63 (Fed.Cir.1998); *Marcinkowsky v. United States,* 206 F.3d 1419, 1421-22 (Fed.Cir.2000); *Bartley v. United States,* 123 F.3d 466, 471-72 (7th Cir.1997).

FN5. The court further rejected the plaintiff's attempt to analogize a suit at common law for recovery of money converted to a suit brought under section 7426. *Id.* at 349. It stated that "[w]hile this argument is not without intuitive appeal, it fails as matter of law because the time limitation set forth in section 6532(c) does not and would not apply to private suits at common law for the recovery of money converted." *Id.* The court further noted that its analysis was "reinforced by the Supreme Court's skepticism in *Brockamp* that 'a tax refund suit' brought under 26 U.S.C. § 7422 and 'a private suit for restitution' are 'sufficiently similar' to warrant the application of *Irwin's* 'rebuttable

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

presumption." ' *Id.*

In the case at hand, the Court concludes that equitable tolling should not apply to the plaintiff's Privacy Act claim. As an initial matter, the *Irwin* presumption is likely inapplicable to the Privacy Act's filing deadline. As discussed in the cases cited above, there is a difference between the cause of action under Title VII at issue in *Irwin,* which applied against both private and government defendants, and causes of action such as those created under the Internal Revenue Code that apply solely against the government. The relief available under the Privacy Act is akin to the latter. [FN6]

> FN6. Even assuming that the cause of action created under the Privacy Act is analogous to a common law tort cause of action against a private party for invasion of privacy, the analogy is inapposite to the tolling issue because the Privacy Act's limitations period would not apply to such an action. *See, e.g., Becton,* 215 F.3d at 349 (rejecting a similar argument in the context of a wrongful levy action against the United States, because "[w]hile this argument is not without intuitive appeal, it fails as matter of law because the time limitation set forth in [26 U.S.C. § ] 6532(c) does not and would not apply to private suits at common law for the recovery of money converted").

Under the law of this Circuit, in any event, the presumption appears to have been rebutted. That is, the Court of Appeals has held, with respect to the two-year filing deadline of the Privacy Act, that the "[f]ailure to file within the statute of limitations is jurisdictional. Thus an untimely complaint deprives the district court of subject matter jurisdiction." *Griffin,* 192 F.3d at 1082 (citing *Diliberti v. United States,* 817 F.2d 1259, 1262-64 (7th Cir.1987), and *Bowyer v. United States Dep't of Air Force,* 875 F.2d 632, 635 (7th Cir.1989)). [FN7] The court has further stated that "[r]equirements genuinely 'jurisdictional' are not judicially alterable; '[a] court lacks discretion to consider the merits of a case over which it is without jurisdiction....' " *AFL-CIO v. OSHA,* 905 F.2d 1568, 1571 (D.C.Cir.1990) (quoting *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 379, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981)); *see also Action on Smoking and Health v. C.A.B.,* 724 F.2d 211, 225 (D.C.Cir.1984) ("The thirty day time limitation contained in [Equal Access to Justice Act] is not simply a statute of limitations. It is a jurisdictional

prerequisite to governmental liability. ASH's failure to file in timely fashion deprives this court of subject matter jurisdiction to award fees."). [FN8] In holding that the Privacy Act's filing deadline is jurisdictional, the Court of Appeals therefore appears to have foreclosed the application of equitable tolling, waiver, and estoppel. This view is bolstered by the fact that Congress explicitly provided one exception to the two-year filing deadline: "[W]here an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation provided." 5 U.S.C. § 552a(g)(5). In light of the well-known principle that a filing deadline, as a condition to the waiver of sovereign immunity, must be strictly construed, *Irwin,* 498 U.S. at 94 (citing *Library of Congress v. Shaw,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986)); *cf. Tomasello v. Rubin,* 167 F.3d 612, 618 (D.C.Cir.1999) (stating that a damages provision of the Privacy Act, 5 U.S.C. § 552a(g)(4), "is a waiver of sovereign immunity and, as such, 'must be construed strictly in favor of the sovereign, and not enlarge[d] ... beyond what the language requires' ') (quoting *United States v. Nordic Village, Inc.,* 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)), the fact that Congress explicitly delineated one exception to the two-year limit counsels against the recognition of additional grounds for equitable tolling the deadline. *Cf. United States v. Beggerly,* 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998) (holding that equitable tolling is inapplicable to filing deadline of the Quiet Title Act, 28 U.S.C. § 2409a, because "by providing that the statute of limitations will not begin to run until the plaintiff 'knew or should have known of the claim of the United States,' has already effectively allowed for equitable tolling"). Having cited nothing more than general law on equitable tolling in other contexts, therefore, the plaintiff's arguments ultimately are unpersuasive. Equitably tolling is unavailable for the plaintiff's Privacy Act claim.

> FN7. The district court in *Griffin,* 47 F.Supp.2d 12, 15-16 (D.D.C.1999), rejected the plaintiff's argument that equitable tolling should apply to the Privacy Act's limitations period for the same policy reasons underlying equitable tolling permitted for actions under 42 U.S.C. § 1983. Although

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 6
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

the district court also rejected the defendant's argument that the case should be dismissed for lack of subject matter jurisdiction, dismissing it instead for the failure to state a claim upon which relief could be granted, *Griffin,* 47 F.Supp.2d at 15-16, the Court of Appeals made clear in granting summary affirmance that because the plaintiff had filed his complaint well after the two-year limit, "[h]is complaint *should* thus have been dismissed for lack of subject matter jurisdiction." *Griffin,* 192 F.3d at 1082 (emphasis added).

FN8. As the court in *Action on Smoking* further explained:
The Equal Access to Justice Act significantly abridged the government's immunity from suits for attorneys' fees. As a waiver of sovereign immunity, the Act must be strictly construed. Once the government agrees to allow such suits, "the terms of its consent to be sued in any court define that court's jurisdiction to entertain that suit." Courts have consistently held that a statutory time limitation is an integral condition of the sovereign's consent. Compliance with that condition is a prerequisite to jurisdiction. 724 F.2d at 225 (footnotes omitted).

**\*5** Even if equitable tolling was available, Chung has made an inadequate showing to apply the doctrine in this case. As stated above, Chung asserts two bases for equitable tolling. First, he claims that until he was sentenced in December 1998, he lived under the "onerous threat of a plea agreement that demanded his full cooperation and assistance," and filing a lawsuit against the government "would necessarily have put an end to" his cooperation. Pl.'s Opp'n at 9-10. In other words, Chung pleads duress. *See, e.g., Ross v. United States,* 574 F.Supp. 536, 542 (S.D.N.Y.1983).

As a general rule, "[f]ederal courts have typically extended equitable relief only sparingly"; the Supreme Court has "allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin,* 498 U.S. at 96. Respecting duress as a basis for equitable tolling, "[e]xcept for the case of *Ross v. United States,* 574 F.Supp. 536 (S.D.N.Y.1983), courts have universally rejected the theory that duress

tolls the statute of limitations when, as here, duress is not an element of the underlying cause of action." *Pahlavi v. Palandjian,* 809 F.2d 938, 942 (1st Cir.1987) (citing Annotation, 121 A.L.R. 1294, 1295 (1939); *Baratta v. Kozlowski,* 94 A.D.2d 454, 464 N.Y.S.2d 803, 807 (1983)); *accord Moses v. Phelps Dodge Corp.,* 818 F.Supp. 1287, 1289 (D.Ariz.1993) (citing *Pahlavi,* 809 F.2d at 942; 54 C.J.S. *Limitation of Actions,* § 92 (1987)). The plaintiff has not pleaded duress as an element of his Privacy Act claim, and therefore, it may not serve as a basis for tolling the applicable limitations period.

Even if Chung were allowed to plead duress apart from his Privacy Act claim, he offers nothing but conclusory speculation that the government would have deemed his cooperation insufficient for filing a departure motion if he had filed a lawsuit prior to his sentencing. In the context of a motion to dismiss, the Court does not have to "accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994) (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). Chung nowhere alleges facts to substantiate his speculation as to the government's reaction to his filing a lawsuit. He does not allege that any government official threatened him or took any specific action that prevented him from filing his lawsuit, let alone that the terms of the plea agreement prevented him from filing his suit. Instead, he casts his legal conclusion of duress as a factual allegation by identifying the possibility that in reaction to his lawsuit the government would deem his cooperation insufficient for the purposes of a departure motion. In so doing, he has failed to sufficiently plead facts upon which a claim of duress can be made for the purpose of equitable tolling. *Cf., e.g., Moses,* 818 F.Supp. at 1289 ("Plaintiff must do more than simply allege a subjective fear that retaliation might occur. Instead, Plaintiff must show some act or threat by the Defendants that precluded the exercise of her free will and judgment, and prevented her from exercising her legal rights.").

**\*6** As a second basis for tolling the limitations period, Chung claims that before his plea agreement was unsealed on May 6, 1999, he could not file his lawsuit because the agreement was an integral part of his claim. But the plaintiff has not explained away the fact that he voluntarily entered the plea agreement. Nor has he even explained why he had to reveal the terms of the plea agreement in order to prosecute his Privacy Act claim. The section relied upon by the plaintiff for his Privacy Act claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would" comply with twelve specific exceptions. 5 U.S.C. § 552a(b). The existence of the plea agreement in the government's system of records therefore appears to be the only necessary fact that had to be revealed to file his action. And, as pointed out by the defendant, the plaintiff through his attorney acknowledged the existence of the plea agreement in the *New York Times* article that is at issue in his Privacy Act claim. *See* Def.'s Reply at 14, Ex. 1 ("A lawyer for Chung, Brian Sun, declined to comment on his client's conversations with investigators, citing his client's sealed plea agreement with the Justice Department.").[FN9] The Court, therefore, is not persuaded that the sealed agreement prohibited him from filing his lawsuit. For all of these reasons, the Court would not toll the filing deadline, even if equitable tolling could be applied.

FN9. The Court notes in conjunction with its citation of the defendant's exhibit that because the failure to file a Privacy Act claim within the statute of limitations is a jurisdictional matter, *Griffin,* 192 F.3d at 1082, it may consider such materials outside the pleadings as appropriate to resolve the question whether it has jurisdiction to hear the case. *See Herbert v. Nat'l Academy of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992); *Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.1987); *Borg-Warner Protective Servs. Corp. v. EEOC,* 81 F.Supp.2d 20, 23 (D.D.C.2000).

### C. *Bivens* Claims

DOJ also moves to dismiss the constitutional claims Chung has made pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). DOJ first argues that the Court lacks jurisdiction over the unknown officials in Chung's complaint, because Chung has not properly named and served the officials. DOJ also contends that, in any event, the Privacy Act precludes a *Bivens* action in this case. Chung rejoins that he should be permitted discovery to learn the identities of the officials and that the Privacy Act is wholly distinct from his First and Fifth Amendment claims and therefore cannot preclude

them.

The Court will not dismiss Chung's claims against the unknown officials for a failure to identify them in the complaint or serve them at this stage. In a case similarly postured in this Court some time ago, a plaintiff filed a lawsuit against U.S. Park Police, identified as "John Doe" defendants, for alleged constitutional violations. *Saffron v. Wilson,* 70 F.R.D. 51, 53-54, 56 (D.D.C.1975). The federal defendants there moved to dismiss, arguing that federal courts should not entertain fictitious party suits. The Court denied the motion without prejudice, stating:
Eventually the 'John Doe' defendants must be dismissed from the action. However, at this time, before plaintiff has had an opportunity to engage in discovery which could disclose the exact identity of the officers whom plaintiff presently is able to partially identify ... the Court discerns no purpose in dismissal of the 'John Doe' defendants.

*7 *Id.* at 56. Other courts have done the same. In *Lowenstein v. Rooney,* for example, a former candidate for Congress sought declaratory and injunctive relief and damages against unknown FBI agents, "John Doe and Richard Doe," who allegedly violated the plaintiff's First, Fourth, Fifth, and Ninth Amendment rights. 401 F.Supp. 952, 954 (E.D.N.Y.1975). The federal defendants there, too, moved to dismiss on the ground that it is improper to sue fictitious parties. That court also denied the motion:If the basis for jurisdiction of this action were diversity of citizenship, the contention might have merit ... but here jurisdiction is based upon a federal question. Moreover, these defendants are sued as 'unknown employees of the F.B.I. and other agencies of the federal government.' In other words, they are real persons whose names are not yet known to plaintiff. They are like the 'Six Unknown Agents of the Federal Bureau of Narcotics' in *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

*Id.* at 960. Here, DOJ relies exclusively on Ninth Circuit law to the effect that such denials of dismissal and grants of discovery to identify the defendants, as a general rule, are not automatic and are, in fact, "rare." *Columbia Ins. Co. v. Seescandy.com,* 185 F.R.D. 573, 576 (N.D.Cal.1999). This Court long ago recognized such "authority, confined principally to the Ninth Circuit, that fictitious defendants should be eliminated by motion." *Saffron,* 70 F.R.D. at 56. Despite the fact that the use of fictitious names to identify a defendant is not favored there, however, the Ninth Circuit itself has recognized that "situations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 8
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

arise ... where the identity of alleged defendants will not be known prior to the filing of a complaint. In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir.1980). And the cases relied upon by the defendants cite examples of cases permitting the use of fictitious names in cases similar to the one at hand:As a general rule, discovery proceedings take place only after the defendant has been served; however, in rare cases, courts have made exceptions, permitting limited discovery to ensue after filing of the complaint to permit the plaintiff to learn the identifying facts necessary to permit service on the defendant. *See e.g., Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir.1980) (finding the district court abused its discretion in dismissing the case with respect to the John Doe defendants without requiring the named defendants to answer interrogatories seeking the names and addresses of the supervisors in charge of the relevant facilities during the relevant time period); *Estate of Rosenberg by Rosenberg v. Crandell,* 56 F.3d 35, 37 (8th Cir.1995) (permitting a suit naming fictitious parties as defendants to go forward because the allegations in the complaint were "specific enough to permit the identity of the party to be ascertained after reasonable discovery"); *Maclin v. Paulson,* 627 F.2d 83, 87 (7th Cir.1980) (approving of fictitious name pleadings until such time as the identity of the plaintiffs "can be learned through discovery or through the aid of the trial court").

**\*8** *Columbia Ins.,* 185 F.R.D. at 577. Chung has narrowed the individuals' identifications to high-ranking officials in the D.C. office of DOJ, and discovery could reasonably be expected to help him identify them by name, permitting him to properly perfect service on them. The Court therefore will not dismiss the plaintiff's claims on this ground, merely because Chung has been unable to ascertain their exact identities at this stage.

However, the Court will nonetheless dismiss the plaintiff's *Bivens* claims because they are precluded by the Privacy Act. In *Bivens,* the Supreme Court held that a plaintiff was entitled to recover money damages for injuries suffered as a result of federal agents' violation of the Fourth Amendment. 403 U.S. at 397. [FN10] It conditioned its holding, however, upon the fact that there were "no special factors counseling hesitation in the absence of affirmative action by Congress," and upon the fact that there was "no

explicit congressional declaration that persons injured by [the constitutional violations] may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress." *Id.* at 396-97. There are thus two exceptions that will defeat a *Bivens* claim:

> [FN10.] Pertinent to the plaintiff's specific claims in this case, *Bivens* actions against federal officials have also been recognized for violations of the First Amendment, *Dellums v. Powell,* 660 F.2d 802 (D.C.Cir.1981), and the Fifth Amendment, *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

The first is when defendants demonstrate "special factors counseling hesitation in the absence of affirmative action by Congress." ... The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective. *Carlson v. Green,* 446 U.S. 14, 18-19, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). The defendant argues that the former exception applies to this case. [FN11]

> [FN11.] In its motion, DOJ is careful to point out that by makings its arguments on behalf of the officials respecting Counts Two and Three, "defense counsel does not purport to represent them" and that if the claims survive and the officials are identified, "they would entitled to seek DOJ representation or their own private counsel." Def.'s Mot. at 8 n. 6. The plaintiff retorts, "By what authority, then, does the Clinton-Gore DOJ advance what it claims as dispositive arguments on behalf of individuals it doesn't even purport to represent? Clearly, if the Clinton-Gore DOJ does not represent these officials, then it cannot advance arguments on their behalf." Pl.'s Opp'n at 15. The Court will accept DOJ's arguments on behalf of the unknown officials at this stage for two reasons. First, the officials, if and when identified, would be entitled to DOJ representation. Second, DOJ sets forth prevailing arguments on the officials' behalf. The Court therefore will not, merely as a futile exercise, refuse to entertain the arguments at this stage just so discovery may progress and the officials *may* be

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

identified only to arrive at the same conclusion at a later date.

The Supreme Court has since elaborated on the "special factors" exception at issue in this case. In *Bush v. Lucas,* an aerospace engineer employed at the George C. Marshall Space Flight Center, a major facility operated by the National Aeronautics and Space Administration in Alabama, filed a First Amendment claim against his superiors alleging that he was demoted because of public statements he made that were highly critical of the agency. 462 U.S. 367, 369, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). The Court refused to recognize the plaintiff's *Bivens* claims because they arose "out of an employment relationship that is governed by comprehensive procedural and substantive provisions [under the Civil Service Commission regulations] giving meaningful remedies against the United States." *Id.* at 368, 390. The Court stated for the first time that "[w]hen Congress provides an alternative remedy, it may, of course, indicate its intent, by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself, that the Court's power should not be exercised." *Id.* at 378. Thus, it was unnecessary for Congress to expressly declare that it had provided an alternative remedy. The Court then stated that the question as to whether a cause of action should be recognized could not "be answered simply by noting that existing remedies do not provide complete relief for the plaintiff." *Id.* at 388. Instead, the Court found many conflicting policy considerations in designing the appropriate relief that were best left to Congress, and it therefore found special factors counseling against the creation of *Bivens* relief. *Id.* at 389-90. In *Schweiker v. Chilicky,* 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), the Supreme Court again addressed the special factors exception. Specifically, the Court refused to recognize a cause of action for money damages against officials who allegedly violated the plaintiffs' due process rights as the result of the improper denial of their Social Security disability benefits. *Id.* at 414-20. With respect to its own case law, the Court observed:

*9 In sum, the concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

*Id.* at 423. Then, in light of the comprehensive and elaborate review and benefit-restoration procedures available under the Social Security Disability Benefits Reform Act of 1984, the Court found the case indistinguishable from *Bush* and refused to recognize a *Bivens* cause of action. *Id.* at 425-29. In interpreting these cases, the D.C. Circuit stated:As we read *Chilicky* and *Bush* together, then, courts must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has "not inadvertently" omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies. In these circumstances, it is not for the judiciary to question whether Congress' "response [was] the best response, [for] Congress is the body charged with making the inevitable compromises required in the design of a massive and complex ... program."

*Spagnola v. Mathis,* 859 F.2d 223, 228 (D.C.Cir.1988) (en banc) (refusing to recognize *Bivens* action for purported First Amendment violations in light of remedial scheme provided claimants by the Civil Service Reform Act).

DOJ argues that the Privacy Act is a comprehensive scheme governing the dispute at issue in this case-namely, the improper disclosure of information pertaining to Chung-and that Congress did not express an intention to preserve *Bivens* remedies in the Privacy Act. Thus, contends DOJ, the existence of the Privacy Act and its remedial scheme constitutes a special factor counseling against the judicial creation of *Bivens* liability in this case. Chung counters that the violations of the First and Fifth Amendments he alleges in this case are not at all what Congress sought to remedy when it enacted the Privacy Act; rather, it merely sought to create a statutory right and accompanying remedies for violations thereof.

Case law, however, forecloses the plaintiff's position. In *Williams v. Department of Veteran Affairs,* for example, a plaintiff veteran of the Vietnam War alleged violations of his constitutional right to privacy under the First, Fourth, Fifth, and Ninth Amendments and his due process right to a valuable properly interest, namely his entitlement to Veterans Affairs services as a disabled veteran under the Fifth Amendment. 879 F.Supp. 578, 580-81 (E.D.Va.1995). After a thorough discussion of *Bivens*, the "special factors" exception thereto, and the Privacy Act, the court held that the constitutional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

claims sought were unavailable "given the comprehensive remedial structure of the Privacy Act." *Id.* at 585-88. In pertinent part, the court explained:

*10 Importantly, the Privacy Act also provides extensive, albeit incomplete, remedies for violations of the disclosure and access requirements. § 552a(g). Although the Privacy Act does not provide remedies against individual officials who disobey its terms, *see, e.g., Schowengerdt v. General Dynamics Corp., 823 F.2d 1328, 1340 (9th Cir.1987),* it does provide aggrieved parties with significant remedies against the offending agency. Specifically, an agency that fails to comply with any provision of the Privacy Act "in such a way as to have an adverse effect on an individual," § 552a(g)(1)(D), is subject to suit in United States District Courts. § 552a(g)(1). Among the available remedies against the agency are: ... the greater of actual damages or damages in the amount of $1000 for improper disclosures that were made willfully, plus reasonable attorney fees, § 552a(g)(4). Thus, Congress has specifically addressed the circumstances alleged by Williams and has provided significant and meaningful remedies that he may pursue. As in *Bush* and *Chilicky,* the fact that the remedies are not exhaustive neither mandates nor invites the creation of an alternative avenue of relief under the Constitution. Congress has crafted what it considers to be appropriate remedies for disclosure and record access violations. Given the extensiveness of this remedial scheme, its failure to include additional remedies, such as damages against individual officials or punitive damages, does not appear to be inadvertent. Therefore, it would be improper to permit Williams to augment his claims under the Privacy Act with additional remedies under the Constitution.

*Id.* at 586-87. Other courts, including this Court, have reached the same conclusion. *See, e.g., Mittleman v. U.S. Treasury, 773 F.Supp. 442, 451, 453-54 (D.D.C.1991)* ("Like the CSRA, the Privacy Act provides a comprehensive scheme for addressing plaintiff's concerns about the inaccuracy of the records and about disclosure of them to third parties. In establishing the Privacy Act, Congress has undertaken to balance the individual interests of the subjects with the interest in protecting certain records and assuring an efficient government. Therefore, pursuant to the *Bush* mandate that courts should refrain from implying a *Bivens* remedy when 'special factors' counseling hesitation, such as Congressionally-provided remedies for constitutional violations, are present, the Court concludes that plaintiff's constitutional claims regarding her records

and any disclosures by defendants about those records are barred."); *Blazy v. Tenet, 979 F.Supp. 10, 27 (D.D.C.1997)* ("Read most generously, the complaint might be construed to allege that plaintiff was retaliated against for having complained of his supervisor's behavior in violation of the First and Fifth Amendments. This claim is analogous to his Privacy Act claim that the agency acted willfully in maintaining inaccurate information; as discussed above, plaintiff has not borne his burden on this issue. Even if such a claim were not completely encompassed by the Privacy Act, however, it does not rise to the level of a redressable constitutional violation."); *Alexander v. Federal Bureau of Investigation, 971 F.Supp. 603, 610 (D.D.C.1997)* (citing *Blazy* and *Mittleman* for their holdings "that the Privacy Act would not allow the plaintiffs to pursue a *Bivens* claim against the individual FBI employees who they allege improperly maintained their files" and "agree[ing] with the outcome of these cases"); *Khalfani v. Sec'y, Dep't of Veterans Affairs,* No. 94-CV-5720 (JG), 1999 WL 138247, *6-7 (E.D.N.Y. Mar.10, 1999)* ("[T]he Privacy Act provides an alternative basis for dismissing this aspect of Khalfani's *Bivens* claim.... [C]ourts have viewed the Privacy Act's detailed provisions as a 'special factor counselling hesitation in the absence of affirmative action by Congress,' and have thus held that the Privacy Act bars claims under *Bivens.... The same result applies here."); *Mangino v. Dep't of Army, 1994 WL 477260, *9 (D.Kan. Aug.24, 1994)* ("[T]he court observes that any *Bivens* claims that plaintiff might have had with respect to the disclosures are barred by the Privacy Act.... The Privacy Act provides a comprehensive scheme for addressing plaintiff's concerns about the disclosure of records to third parties and possible inaccuracies in those records."); *Patterson v. Federal Bureau of Investigation, 705 F.Supp. 1033, 1045 n. 16 (D.N.J.1989)* ("The Court notes that to the extent plaintiff's First Amendment claim involves damages as a result of the FBI's maintenance of records on plaintiff, such an action is apt to be foreclosed by the existence of the Privacy Act. This is in keeping with the principle that a *Bivens* action is foreclosed if Congress provides an alternative, adequate remedy."); *Fagot v. FDIC, 584 F.Supp. 1168, 1178 n. 3 (D.P.R.1984)* ("We need not consider defendants' arguments on ... whether a *Bivens* action can be extended to include the type of constitutional infringement here asserted given the specific remedies and procedures afforded by the FOIA and the Privacy Act.").

*11 Chung attempts to avoid such precedent by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

Page 11

pointing to certain provisions contained in the Privacy Act's congressional findings and purposes. The findings and purposes of the Privacy Act state:
(A) The congress finds that-
(1) the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by federal agencies;
(2) the increasing use of computers and sophisticated information technology, while essential to the efficient operations of the government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information;
(3) *the opportunities for an individual to secure employment, insurance, and credit, and his right to due process, and other legal protections are endangered by the misuse of certain information systems;*
(4) *the right to privacy is a personal and fundamental right protected by the Constitution of the United States;* and
(5) *in order to protect the privacy of individuals identified in information systems maintained by federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies.*
(B) The purpose of this act is to provide certain safeguards for an individual against an invasion of personal privacy by requiring federal agencies, except as otherwise provided by law, to-
(1) permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by such agencies;
(2) permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent;
(3) permit an individual to gain access to information pertaining to him in federal agency records, to have a copy made of all or any portion thereof, and to correct or amend such records;
(4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information;
(5) permit exemptions from the requirements with respect to records provided in this act only in those cases where there is an important public policy need for such exemption as has been determined by specific statutory authority; and
(6) be subject to civil suit for any damages which occur as a result of willful or intentional action *which*

*violates any individual's rights under this act.*

Privacy Act of 1974, Pub.L. No. 93-579, § 2, 88 Stat. 1896 (Dec. 31, 1974) (emphasis added). Chung cites only subsection (B) of these congressional statements to support his theory that Congress did not intend the Privacy Act to cover the constitutional claims he avers, relying almost entirely upon the final three words, "under this act ." In the broader context, however, as evidenced by the language employed by Congress in the preceding subsection that was conspicuously omitted by the plaintiff, it is quite clear that Congress found constitutional implications and concerns respecting privacy matters as part of its reason for enacting the Privacy Act of 1974. It simply does not follow, therefore, that Congress inadvertently ignored those explicit constitutional concerns. Accordingly, the indications are "that congressional inaction has not been inadvertent." Chilicky, 487 U.S. at 423; accord Spagnola, 859 F.2d at 228; see also infra note 12. This view is bolstered by the fact that Congress has at no time since it enacted the Privacy Act amended the statute to explicitly preserve *Bivens* liability to cover such concerns.

**\*12** Chung also attempts to distinguish all the cases cited above on their facts-that is, he claims they only addressed the constitutional right of privacy-or on their procedural posture-namely, some stated their conclusion only in dicta, which need not be followed by this Court. The purported distinctions highlighted by the plaintiff, however, are incorrect and without analytical difference for current purposes. In *Williams,* for example, the plaintiff did not simply aver a constitutional right to privacy, as Chung would have this Court believe. Pl.'s Opp'n at 18. Rather, it is quite clear that the plaintiff there also alleged that the "defendants deprived him of his *Fifth Amendment due process right to a valuable property interest, namely his entitlement to VA services as a disabled veteran." Williams,* 879 F.Supp. at 581 (emphasis added).[FN12]

FN12. Chung also attempts to derail the proper focus of this Court on the factors set forth in *Spagnola,* 859 F.2d at 228, by proffering his unsubstantiated theory that "it is only where a plaintiff seeks damages resulting from an allegedly unconstitutional denial of a statutory right, i.e., where the harm resulting from the alleged constitutional violation cannot be separated from the harm resulting from the denial of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 12
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

the statutory right, that a *Bivens* remedy will be precluded." Pl.'s Opp'n at 17 (citing *Schweiker, 487 U.S. at 428-29).* But Chung cites no authority that has employed this "test." And the discussion in *Schweiker* he does cite merely stands for the unremarkable proposition that *"Bush* thus lends no support to the notion that statutory violations caused by unconstitutional conduct necessarily require remedies in addition to the remedies provided generally for such statutory violations." *Schweiker, 487 U.S. at 428.* In other words, in neither *Bush* nor *Schweiker* "does the presence of alleged unconstitutional conduct that is not *separately* remedied under the statutory scheme imply that the statute has provided 'no remedy' for the constitutional wrong at issue." *Id.* at 428-29 (emphasis in original). The Court thus can find no support for the plaintiff's proffered theory.

Ultimately, therefore, the Court finds that all of the plaintiff's claims stem from the alleged leaks-namely, the allegedly wrongful disclosure of government records, *e.g., Mittleman, 773 F.Supp. at 453-54; Blazy, 979 F.Supp. at 27,* that the Privacy Act comprehensively covers such claims and accordingly has not inadvertently omitted damages remedies, and that Congress has not plainly expressed an intention to preserve *Bivens* remedies. *Williams, 879 F.Supp. at 580-81; Mittleman, 773 F.Supp. at 453-54; Blazy, 979 F.Supp. at 27; Alexander, 971 F.Supp. at 610.* Thus, the Court will not recognize a *Bivens* action for the plaintiff's constitutional claims in this case. *Spagnola, 859 F.2d at 228.*

### III. CONCLUSION

For the foregoing reasons, the Court will dismiss the plaintiff's Privacy Act and constitutional claims, and accordingly, will dismiss this case. An appropriate order will accompany this Memorandum Opinion.

D.D.C.,2001.
Chung v. U.S. Dept. of Justice
Not Reported in F.Supp.2d, 2001 WL 34360430 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:00cv01912 (Docket) (Aug. 08, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2-C**

Westlaw.

Not Reported in F.3d
Not Reported in F.3d, 1995 WL 225125 (C.A.D.C.)
(Cite as: Not Reported in F.3d)

Page 1

Only the Westlaw citation is currently available.
United States Court of Appeals, District of Columbia
Circuit.
Rossel E. JONES, Appellant,
v.
DEPARTMENT OF DEFENSE, U.S. Department of
the Air Force, et al.
No. 94-5294.

March 14, 1995.

Before: EDWARDS, Chief Judge; SILBERMAN
and BUCKLEY, Circuit Judges.

*ORDER*

PER CURIAM.
*1 Upon consideration of the motion for a stay of
these proceedings; the motion for appointment of
counsel; and the motion for summary affirmance and
the response thereto, it is

ORDERED that the motion for appointment of
counsel be denied. Except in defending against a
criminal charge and on direct appeal from a judgment
of conviction, appointment of counsel is unwarranted
when the movant has not demonstrated sufficient
likelihood of success on the merits. *See D.C. Circuit
Handbook of Practice and Internal Procedures* 51
(1994). It is

FURTHER ORDERED that the motion for summary
affirmance be granted. To the extent appellant's
claims sound in habeas, *see Chatman-Bey v.
Thornburgh,* 864 F.2d 804, 808-10 (D.C.Cir.1988)
(en banc), the district court properly determined that
it had no jurisdiction to entertain those claims
because the court lacked jurisdiction over appellant's
custodian, the Commandant of the United States
Disciplinary Barracks, Fort Leavenworth, Kansas.
*Id.* at 813. In addition, appellant must first exhaust
his military court remedies before he can pursue
habeas relief in federal court. *See Noyd v. Bond,* 395
U.S. 683, 698 (1968); *Gusik v. Schilder,* 340 U.S.
128, 131-32 (1950).

To the extent appellant stated colorable constitutional
claims for money damages, independent of his
challenge to his detention, his claims were properly

dismissed because there is no *Bivens* remedy
available for injuries arising out of, or in the course
of, activity incident to military service. *See United
States v. Stanley,* 483 U.S. 669, 684 (1987) (referring
to *Bivens v. Six Unknown Federal Narcotics Agents,*
403 U.S. 388 (1971)). It is

FURTHER ORDERED that the motion for stay be
denied. In light of this court's determination that
appellant's claims were properly dismissed, a stay of
these proceedings would be inappropriate.
Moreover, as appellant acknowledges, he is required
to first exhaust his military court remedies (which he
has not done) before he can seek relief in federal
court.

The Clerk is directed to withhold issuance of the
mandate herein until seven days after disposition of
any timely petition for rehearing. *See* D.C.Cir. Rule
41.

C.A.D.C.,1995.
Jones v. Department of Defense
Not Reported in F.3d, 1995 WL 225125 (C.A.D.C.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2-D

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2006 WL 389743 (D.D.C.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
David Olabayo OLANIYI, Plaintiff,
v.
DISTRICT OF COLUMBIA, et. al., Defendants.
**No. Civ.A. 05-455(RBW).**

Feb. 17, 2006.

David Finley Williams, McKenna Long & Aldridge,
Llp, Lory C. Stone, Cadwalader, Wickersham & Taft,
Washington, DC, for Plaintiff.
Melvin W. Bolden, Jr., Office of the Corporation
Counsel for DC Equity Division, Beverly Marie
Russell, U.S. Attorney's Office, Washington, DC, for
Defendants.

*MEMORANDUM OPINION*

WALTON, J.

**\*1** Plaintiff David Olabayo Olaniyi brings this action
against multiple federal and District of Columbia
("D.C.") defendants for alleged constitutional and
common-law violations stemming from his arrest in
the United States Capitol Building ("Capitol
Building" or "Capitol") on March 6, 2003. [FN1]
Currently before the Court is the Federal Defendants'
Motion to Dismiss Plaintiff's Amended Complaint
("Def.'s Mot."), [FN2] which seeks to dispose of the
*Bivens* actions filed against Officer Preston Nutwell
and Officer Joseph DePalma, who are both members
of the United States Capitol Police ("USCP"), and
unidentified John Doe defendants employees of the
USCP and the Federal Bureau of Investigation
("FBI"). For the reasons set forth below, the Court
grants in part and denies in part the federal
defendants' motion to dismiss.

> FN1. The plaintiff sues the federal
> defendants pursuant to *Bivens v. Six
> Unknown Named Agents of Fed. Bureau of
> Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29
> L.Ed.2d 619 (1971), and the D.C.
> defendants pursuant to 42 U.S.C. § 1983
> (2000).

> FN2. The following papers have been

submitted in connection with this motion:
(1) Memorandum of Points and Authorities
in Support of Federal Defendants' Motion to
Dismiss ("Def.'s Mem."); (2) Plaintiff's
Opposition to Federal Defendants' Motions
to Dismiss ("Pl.'s Opp."); and (3) Plaintiff's
Opposition to Federal Defendants' Motion to
Dismiss First Amended Complaint ("Pl.'s
Am. Opp."). The federal defendants initially
filed a Motion to Dismiss on May 6, 2005.
After the plaintiff filed an opposition to that
motion, the federal defendants filed a Reply
to Plaintiff's Opposition to Federal
Defendants' Motion to Dismiss on June 24,
2005. Ten days earlier, however, the
plaintiff had filed an Amended Complaint
("Am.Compl."), which therefore had
rendered moot all pending motions and
associated pleadings, including the federal
defendants' reply. Although the federal
defendants have now refiled their motion to
dismiss the plaintiff's complaint, they did
not file another reply following the filing of
the plaintiff's second opposition, nor did
they in any way incorporate the contents of
their first reply into the motion to dismiss
the plaintiff's amended complaint.
Accordingly, in deciding the federal
defendants' motion to dismiss, the Court
cannot, and does not, consider any
arguments or factual information raised in
the earlier June 24, 2005 reply.

### I. *Background*

The plaintiff alleges the following facts in support of
his claims. On March 6, 2003, the plaintiff and his
now-wife, Reena Patel Olaniyi, then residents of
Michigan, visited the United States Capitol Building
"to tour and conduct research for [the plaintiff's]
stage play." [FN3] Amended Complaint ("Am.Compl.")
¶ ¶ 3, 16. In preparation for the visit, the plaintiff
constructed and wore a costume consisting of
"various materials from the D.C. environment,
including newspapers, shampoo bottles, [and] empty
honey jars ... wrapped in duct tape which was formed
into a harness shape over [the plaintiff's] chest." *Id.* ¶
16. The plaintiff states that he wore the costume into
the Capitol Building "in an effort to study people's
interactions with him [and] spread a message of
tolerance and understanding during times of war." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The plaintiff also had with him "a small, hand-carved mask sculpture," which he carried "for entertainment purposes." *Id.* ¶¶ 17, 20.

> FN3. The plaintiff's amended complaint states that he is "an artist, philosopher, scholar, performer, and director." Am. Compl. ¶ 3.

Clad in his costume, the plaintiff passed through several security checkpoints before gaining entry into the Capitol Building. *Id.* ¶ 18. The first security checkpoint "consisted of a magnetometer, x-ray machines, explosive detectors, and security dogs ." *Id.* At the second and third checkpoints, the plaintiff was examined by metal detectors, including a hand-held device employed by a USCP guard. *Id.* Finally, the plaintiff was required to present a Capitol pass, *id.,* which he presumably had obtained earlier at one of the USCP checkpoints. At each security checkpoint, the plaintiff interacted with USCP officers and was permitted to continue further into the Capitol complex. *Id.* When asked about the costume he was wearing, the plaintiff "explained to the guards that he was an artist doing research for an upcoming performance and was allowed through" the checkpoints. *Id.* Once inside the Capitol Building, the plaintiff "performed for tourists by dancing and singing." *Id.* ¶ 19. The plaintiff states that some of the tourists approached him, took photos with him, and engaged him in conversation. *Id.* During these conversations, the plaintiff described his stage play "David/Dafidi" and his artistic philosophy "Life is a Performance." *Id.*

**\*2** The plaintiff alleges that he was then approached by one of the defendants, Officer Preston Nutwell of the USCP, while in the Crypt area of the Capitol Building. *Id.* ¶ 20. Officer Nutwell asked what the plaintiff was holding, and the plaintiff identified the object as a hand-carved mask sculpture. *Id.* After instructing the plaintiff to drop the sculpture, Officer Nutwell allegedly "grabbed the piece and shattered it on the ground." *Id.* The plaintiff was then placed in handcuffs. *Id.* ¶ 21. According to the plaintiff, Officer Nutwell later stated in an affidavit that he heard the plaintiff say, "We['re all children of Allah." [FN4] *Id.* ¶ 20. The plaintiff represents, however, that he "was raised Catholic, is not Islamic, and never said the word 'Allah.' " *Id.*

> FN4. Neither party has introduced Officer Nutwell's affidavit, which allegedly was

taken in conjunction with the plaintiff's criminal proceedings. Am. Compl. ¶ 20.

After the plaintiff was handcuffed, "[t]hirty to forty more" officers purportedly arrived in the Crypt, including members of the Capitol Police Hazardous Device Unit ("HDU"), the FBI's Joint Terrorism Task Force, and defendant Joseph DePalma. *Id.* ¶ 21. When asked if there were wires or explosives in his costume, the plaintiff responded in the negative and stated that he was wearing the costume for artistic purposes. *Id.* The plaintiff's costume was then cut from his body and x-rayed. *Id.* The officers present at the scene determined that the costume tested negative for explosives and that the plaintiff was unarmed. *Id.*

While searching the plaintiff, the officers discovered a set of keys, which the plaintiff told the officers were for the use of his van. *Id.* ¶ 23. The police located the van in the 300 block of 3rd Street NE, approximately four blocks from the Capitol Building, and conducted a warrantless and non-consensual search of the vehicle's interior. *Id.;* Def.'s Mem. at 13. The search produced no evidence of explosives, and purportedly resulted in "numerous pieces of original artwork" that were in the van being damaged or destroyed. Am. Compl. ¶ 23. The search of the van occurred after the police had determined that the plaintiff did not have any explosive devices on his person. *Id.;* Def.'s Mem. at 13.

According to the plaintiff, an hour and a half after his initial detention in the Capitol Building, he was arrested and taken to the USCP prisoner processing center, where he was questioned "for two or three hours" by unidentified FBI agents and USCP officers. Am. Compl. ¶ 22. The plaintiff alleges that he requested an attorney before being questioned but was not provided one. *Id.* The plaintiff also alleges that he was not informed of his *Miranda* rights [FN5] at the time of his arrest or at any time prior to his interrogation at the processing center. *Id.* ¶ 56. Following the interrogation, the plaintiff was transferred to another facility, where he was held overnight. *Id.* ¶ 22. It was only then that the plaintiff was afforded access to an attorney. *Id.* ¶ 56.

> FN5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**\*3** On March 10, 2003, after spending three nights in the Mental Health Unit of the District of Columbia Jail, [FN6] the plaintiff was charged with (1) demonstrating in the Capitol Building; [FN7] (2)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 3
Slip Copy, 2006 WL 389743 (D.D.C.)
(Cite as: Slip Copy)

making a false bomb threat; [FN8] (3) aiding and abetting; [FN9] and (4) assault or threatened assault. [FN10] *Id.* ¶ 26. Ms. Patel Olaniyi was also charged with these same offenses, and she and the plaintiff were subsequently released on bond. *Id.* ¶¶ 26-27. On April 1, 2003, the plaintiff and Ms. Patel Olaniyi were indicted on all of these charges. *Id.* ¶ 27. Both pled not guilty at their arraignment on May 29, 2003, and on August 13, 2003, the Court dismissed all charges upon motion of the government. [FN11] *Id.* ¶¶ 27-28.

> FN6. The plaintiff also brings suit against the District of Columbia and John Doe employees of the District of Columbia Department of Corrections, alleging violations of 42 U.S.C. § 1983 and several common-law torts for events that allegedly occurred during the plaintiff's confinement in the Mental Health Unit. Am. Compl. ¶¶ 25, 57-74. Because the District of Columbia defendants are not presently moving to dismiss the claims that have been filed against them, the Court does not address these claims at this time.

> FN7. 40 U.S.C. § 193f(b)(7) (2000) (currently codified at 40 U.S.C.A. § 5104(e)(2)(G) (2004)). The plaintiff's amended complaint characterizes the violation of 40 U.S.C. § 193f(b)(7) as being "Disorderly Conduct on Capitol Grounds." Am. Compl. ¶ 26. The statutory provision, however, is more specific, and states that an individual may not "parade, demonstrate, or picket within any of the Capitol Buildings."

> FN8. 18 U.S.C. § 844(e) (2000).

> FN9. 18 U.S.C. § 2 (2000).

> FN10. D.C.Code § 22-404 (2001).

> FN11. In his amended complaint, the plaintiff alleges that he was further harassed and threatened by Officer DePalma over a period of time beginning with the plaintiff's return to Washington, D.C., in January 2004 and culminating in a visit to the plaintiff's iowa home soon thereafter by two named Secret Service agents who are not defendants in this action. Am. Compl. ¶¶ 29-32. However, the plaintiff does not make any claims for relief arising out of these

allegations, *see generally id.* ¶¶ 43-77, and thus the Court need not consider them.

On March 3, 2005, the plaintiff initiated this action, alleging violations of the First, Fourth, and Fifth Amendments against the federal defendants and seeking compensatory and punitive damages. Compl. ¶¶ 27-40, 44; Am. Com pl. ¶¶ 43-56, 75. Specifically, the plaintiff claims (1) that the federal defendants [FN12] violated his First Amendment rights by arresting him based on his costume and behavior, which "were forms of symbolic and political speech," Am. Compl. ¶¶ 51-52; (2) that Officer Nutwell also abridged his First Amendment rights by arresting him based in part on his alleged use of the word "Allah," *id.* ¶ 53; (3) that the federal defendants' detention and search of his person in the Capitol Building did not comport with the requirements of the Fourth Amendment, *id.* ¶¶ 45, 49; (4) that the destruction of his mask sculpture by Officer Nutwell amounted to an unconstitutional seizure under the Fourth Amendment, *id.* ¶ 48; (5) that the federal defendants lacked probable cause to arrest him once it was determined that he had no explosives on his person, therefore violating his Fourth Amendment rights against false arrest and imprisonment, *id.* ¶¶ 46, 49; (6) that the warrantless search of his van by the federal defendants, and the resulting damage and destruction of his artwork, violated the Fourth Amendment, [FN13] *id.* ¶¶ 45, 47-48; (7) that the federal defendants violated the Fifth Amendment by failing to apprise the plaintiff of his *Miranda* rights prior to his interrogation at the processing center, *id.* ¶ 56; and (8) that the federal defendants violated his Fifth Amendment due process rights by denying his request for an attorney, *id.*

> FN12. Unless otherwise noted, the term "the federal defendants" as used herein is intended to refer to Officer Nutwell, Officer DePalma, and all unidentified John Doe defendants who were employed by the FBI and the USCP.

> FN13. The plaintiff's amended complaint is not a model of clarity, often failing to set forth with specificity which federal defendants are alleged to have committed which constitutional violations. For example, the plaintiff alleges that "the USCP and FBI ... conducted a search of the interior of [his] van during which numerous pieces of original artwork were destroyed," Am. Compl. ¶ 23, yet then excludes the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USCP when making his claim for relief, stating that "[t]he FBI violated [his] Fourth Amendment rights by searching his van," *id.* ¶ 47, and that "[t]he seizure, destruction and damage to [his] art by ... the FBI also constituted a Fourth Amendment violation," *id.* ¶ 48. Moreover, the plaintiff does not make clear whether defendants Nutwell and DePalma were among the USCP officers who searched his van, a question which becomes important in the context of the Court's **qualified immunity** analysis. Considering the plaintiff's factual allegations in their entirety, the plaintiff appears most likely to be claiming that Officer Nutwell and/or Officer DePalma were culpable in ordering that the plaintiff's van be searched, but that neither officer was present during the search itself. *See id.* ¶ 23. In determining whether the federal defendants are entitled to **qualified immunity** on each of the plaintiff's constitutional claims, the Court will couch its conclusions in language encompassing all federal defendants to whatever extent the plaintiff is alleging their individual participation in the purportedly violative conduct.

In return, the federal defendants contend that the plaintiff's action against them should be dismissed on two bases. [FN14] First, the federal defendants argue that the Court lacks personal jurisdiction over the unidentified USCP and FBI John Doe defendants. [FN15] Def.'s Mem. at 6-7. Second, the federal defendants claim that they are shielded from suit for the actions alleged by virtue of their **qualified immunity** and that, consequently, the plaintiff has failed to state any claim against them upon which relief can be granted. [FN16] *Id.* at 7-15. The Court will examine these arguments in turn.

FN14. The federal defendants also argue that sovereign immunity bars any claims against the defendants in their official capacity. Def.'s Mem. at 5-6. Because the plaintiff subsequently conceded this point and amended his complaint accordingly, the Court need not visit the question. Pl.'s Opp. at 7-9.

FN15. The federal defendants mistakenly move to dismiss the John Does under Federal Rule of Civil Procedure 12(b)(1), which governs dismissal for lack of subject-matter jurisdiction. Def.'s Mot. at 1; Def.'s Mem. at 3-4. The Court will treat the federal defendants' motion to dismiss for lack of personal jurisdiction as properly made under Federal Rule of Civil Procedure 12(b)(2).

FN16. The memorandum submitted in support of the federal defendants' motion to dismiss states only that "[d]efendants Nutwell and DePalma are entitled to **qualified immunity**," and does not argue in the alternative as to the **qualified immunity** of the John Doe defendants in the event the Court is not persuaded that it lacks personal jurisdiction over the John Doe defendants. Nevertheless, in the interests of judicial economy and because the factual circumstances are nearly identical as to all of the federal defendants, the Court will analyze the defendants' **qualified immunity** claims as to the John Doe defendants as well as Officers Nutwell and DePalma.

II. *Standards of Review*

A. Rule 12(b)(2)

*4 Under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing that the Court has personal jurisdiction over the defendants. *Rong v. Liaoning Provincial Gov't, 362 F.Supp.2d 83, 90 (D.D.C.2005)* (citing *Jacobsen v. Oliver, 201 F.Supp.2d 93, 104 (D.D.C.2002)*). This burden, however, is "only a minimal one," *Jacobsen, 201 F.Supp.2d at 104* (internal brackets and citation omitted), and the plaintiff "need only make a *prima facie* showing of personal jurisdiction in order to defeat [the] defendant's motion," *Rong, 362 F.Supp.2d at 90* (quoting *Jacobsen, 201 F.Supp.2d at 104*) (internal quotation marks omitted). Moreover, "[a]ll factual disputes concerning jurisdiction must be resolved in favor of the plaintiff[ ]," *id.,* and the plaintiff's factual assertions "are presumed to be true unless directly contradicted by affidavit ... or other evidence," *id.* (quoting *DSMC, Inc. v. Convera Corp., 273 F.Supp.2d 14, 20 (D.D.C.2002)*) (internal quotation marks omitted).

B. Rule 12(b)(6)

When evaluating a motion for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "must

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2006 WL 389743 (D.D.C.)
**(Cite as: Slip Copy)**

treat the complaint's factual allegations as true and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Airlines, Inc.,* 216 F.3d 1111, 1113 (D.C.Cir.2000) (internal quotation marks and citations omitted). "Given the Federal Rules' simplified standard for pleading," a Rule 12(b)(6) complaint may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (internal quotation marks and citation omitted); *see also Williams v. Chertoff,* No. 05-211(RCL), 2005 WL 3200794, *2 (D.D.C. Nov.1, 2005) (stating that "the [Rule 12(b)(6) ] movant is entitled to judgment if there are no allegations in the complaint which, even if proven, would provide a basis for recovery") (citing *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987)). However, the Court need not accept "inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations." *Browning v. Clinton,* 292 F.3d 235, 242 (D.C.Cir.2002) (internal quotation marks and citation omitted).

### III. *Legal Analysis*

### A. Personal Jurisdiction Over the Unidentified John Doe Defendants

The federal John Doe defendants argue that because they have not "voluntarily ma[de] an appearance or otherwise waive[d] the lack of personal jurisdiction defense, the Court lacks personal jurisdiction" over them. [FN17] Def.'s Mem. at 6. In response, the plaintiff states that the time prescribed by Federal Rule of Civil Procedure 4(m) to identify and serve the John Doe defendants has not yet run, and that the defendants' motion is therefore premature. Def .'s Opp. at 18. The Court agrees with the plaintiff.

> FN17. The defendants incorrectly rely on *Shipkovitz v. Mosbacher,* No. 90-2159(CRR), 1991 WL 251864 (D.D.C. Nov.12, 1991), *aff'd,* No. 92-5030, 1992 WL 394489 (D.C.Cir. Jan.22, 1992), for the proposition that the Court lacks personal jurisdiction over John Doe defendants who have not voluntarily appeared or otherwise waived service. Def.'s Mem. at 6. The

*Shipkovitz* Court, however, held simply that in tort cases under District of Columbia law, constructive service cannot be made upon John Doe defendants as the basis for conferring personal jurisdiction over them in this Court. *Shipkovitz,* 1991 WL 251864 at *5 ("[S]tate law determines whether constructive service may be made upon John Doe defendants in tort cases.... Because the District of Columbia Code does not provide for such constructive service, the claims against John Doe must be dismissed for lack of personal jurisdiction."). Here the plaintiff is not contending that the Court should recognize constructive service on the John Doe defendants, but rather that he has not had sufficient time under Rule 4(m) to identify and serve them; thus, *Shipkovitz* is inapposite. More relevant to the argument at hand is *M.K. v. Tenet,* 99 F.Supp.2d 12 (D.D.C.2000). In *M.K.,* the defendants argued that the claims against thirty John Doe defendants allegedly employed by the CIA should be dismissed because the John Does had not been identified or served. *M.K.,* 99 F.Supp.2d at 17. The Court there noted that although the 120 day period provided by Rule 4(m) for identification and service had long since elapsed, it was nevertheless appropriate, in light of the plaintiffs' contention that some discovery was needed before identification could take place, to allow the plaintiffs additional time to identify and serve the John Does. *Id.* at 17-18.

**\*5** Rule 4(m) provides that defendants shall be served "within 120 days after the filing of the complaint," and, if such service has not been timely effected, the Court "shall dismiss the action without prejudice as to the defendant or direct that service be effected within a specified time." Fed.R.Civ.P. 4(m). The Rule goes on to state that "if the plaintiff shows good cause for the failure [to timely serve a defendant], the [C]ourt shall extend the time for service for an appropriate period." *Id.* Here, the plaintiff's initial complaint was filed on March 3, 2005. On June 1, 2005, well within the 120 days allowed by Rule 4(m), the plaintiff, with the consent of the defendants, moved to extend the time for identification and service of the John Doe defendants. The plaintiff stated in his motion that because limited discovery would be necessary to identify the John Doe defendants, the time for identification and service should be extended until after the Court had ruled on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 6
Slip Copy, 2006 WL 389743 (D.D.C.)
**(Cite as: Slip Copy)**

the defendants' pending motions to dismiss. Before the Court was able to grant the parties' consent motion for an extension of time, the plaintiff filed his amended complaint. On September 16, 2005, and December 9, 2005, the plaintiff filed renewed motions for extensions of time to identify and serve the John Doe defendants. Again both motions were consented to by the federal defendants. On December 12, 2005, pursuant to its authority under Rule 4(m), the Court issued an order granting the plaintiff's motions for extension of time. In the order, the plaintiff was directed to identify and serve all John Doe defendants by March 16, 2006. Accordingly, because the plaintiff still has time to identify and serve the federal John Doe defendants, the Court denies the defendants' motion to dismiss the claims against them on grounds of lack of personal jurisdiction.

### B. The Federal Defendants' Assertion of **Qualified Immunity**

A plaintiff may bring an action for money damages against federal officials, including law enforcement officers, in their individual capacities for alleged constitutional violations. FN18 _Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,_ 403 U.S. 388, 389, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). However, the officers are entitled to **qualified immunity** from suit "insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." _Int'l Action Ctr. v. United States,_ 365 F.3d 20, 24 (D.C.Cir.2004) (quoting _Harlow v. Fitzgerald,_ 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)) (internal quotation marks omitted). A grant of **qualified immunity** is thus appropriate in circumstances in which "the burden of trial is unjustified in the face of a colorable claim that the law on point was not clear when the official took action, [or that] the action was reasonable in light of the law as it was." _Will v. Hallock,_ --- U.S. ----, ----, 126 S.Ct. 952, 959, ---L.Ed.2d ----, ---- (2006). In evaluating a claim of **qualified immunity**, the Court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right. If the [C]ourt establishes the violation of a constitutional right, it must then proceed to determine whether that right was clearly established at the time of the alleged violation[ ]." _Int'l Action Ctr.,_ 365 F.3d at 24 (quoting _Wilson v. Layne,_ 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)) (internal quotation marks omitted).

FN18. Suits against state officials may be brought under 42 U.S.C. § 1983 (2000). "[T]he **qualified immunity** analysis is identical" in both _Bivens_ and § 1983 actions, and courts treat such actions identically in evaluating claims of **qualified immunity**. _Wilson v. Layne,_ 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); _see also Davis v. Scherer,_ 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("[T]he same **qualified immunity** rules apply in suits against state officers under § 1983 and suits against federal officers under [_Bivens_ ].").

**\*6** Importantly, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts." _Saucier v. Katz,_ 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Recognizing this, the Supreme Court has stated that "[i]f [an] officer's mistake as to what the law requires is reasonable ... the officer is entitled to the immunity defense." _Id._ "This accommodation for reasonable error exists because [officers] should not err always on the side of caution because they fear being sued." _Hunter v. Bryant,_ 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) (internal quotation marks and citation omitted).

"The threshold inquiry a court must undertake in a **qualified immunity** analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." _Hope v. Pelzer,_ 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "In delineating the parameters of [the asserted] constitutional right, the Court must avoid defining the right in overly general terms because to do [so] would strip the **qualified immunity** defense of all meaning." _Dodge v. Trs. of the Nat'l Gallery of Art,_ 326 F.Supp.2d 1, 12 (D.D.C.2004) (internal quotation marks and citations omitted). Rather, the Court must define the asserted right with sufficient specificity to "allow officials reasonably to anticipate when their conduct might give rise to liability for damages." _Butera v. District of Columbia,_ 235 F.3d 637, 646 (D.C.Cir.2001) (quoting _Davis v. Scherer,_ 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)) (internal quotation marks omitted).

If the Court concludes that the plaintiff has alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Barham v. Ramsey,* 434 F.3d 565, 572 (D.C.Cir.2006) (quoting *Saucier,* 533 U.S. at 201) (internal quotation marks omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (internal quotation marks omitted). That is, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640. This determination "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. The action in question need not have been previously held to be unlawful; however, "in light of preexisting law its unlawfulness must be apparent." *Butera,* 235 F.3d at 646 (quoting *Anderson,* 483 U.S. at 640) (internal quotation marks omitted). Therefore, law enforcement officers "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope,* 536 U.S. at 741 (citing *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

*7 At base, then, "the federal **qualified immunity** standard is an objective one; the officer's own views about whether his or her conduct violated the law are generally not relevant." *Liser v. Smith,* 254 F.Supp.2d 89, 104 (D.D.C.2003) (citing *Harlow,* 457 U.S. at 818). "It is no defense that an official was unaware of a law, as a reasonably competent public official should know the law governing his conduct." *Barham v. Ramsey,* 338 F.Supp.2d 48, 55 (D.D.C.2004), *aff'd,* 434 F.3d 565 (D.C.Cir.2006). If the Court finds that "a reasonable officer possessing the same information" would not have believed his actions to be constitutional, then the defendant's **qualified immunity** claim will not prevail. *Id.* On the other hand, "if officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

1. The Plaintiff's First Amendment Claim

The plaintiff contends that his arrest at the United States Capitol violated the First Amendment because his "costume and dance were forms of symbolic and political speech," and his very "presence in the

Capitol amounted to symbolic, political expression," [FN19] Am. Compl. ¶ 52. He states that because "[h]is chanting and dancing engaged other tourists and did not disrupt Capitol security or the House of Representatives," this behavior amounts to protected conduct. Def.'s Opp. at 10. Moreover, according to the plaintiff, he "was not demonstrating while visiting the Capitol, but rather ... touring while dressed in costume in an attempt to both spread a message of peace and tolerance as well as study other tourists' interactions with him." *Id.* at 11.

> FN19. The plaintiff also claims a First Amendment violation because his "alleged use of the word 'Allah' predicated [his] arrest by Officer Nutwell." Am. Compl. ¶ 53. However, the plaintiff himself denies saying "Allah," *id.* ¶ 20, and in evaluating a motion to dismiss the Court must take all of the plaintiff's factual allegations as true, *Sparrow,* 215 F.3d at 113. Therefore, the plaintiff's claim is that Officer Nutwell arrested him based on something that he did not say, which does not implicate an alleged violation of the First Amendment but rather the plaintiff's Fourth Amendment claim for false arrest. To the extent that Officer Nutwell's arrest of the plaintiff *was* based in part on his belief (accurate or otherwise) that the plaintiff used the word "Allah," this is properly viewed not as a separately cognizable First Amendment claim, but as an additional consideration in evaluating the reasonableness of Officer Nutwell's determination that the plaintiff was unlawfully demonstrating. See *Hunter,* 502 U.S. at 228 (assessing the existence of probable cause requires looking to "the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information" at the time of an arrest).

In turn, the federal defendants argue that it was reasonable for them to believe, on the strength of the plaintiff's actions and appearance, that he was demonstrating within the Capitol Building as he danced and sang for tourists, seeking "attention ... and interaction with onlookers" while wearing a duct tape costume. Def.'s Mem. at 11-12. Because demonstrating in the Capitol is unlawful, the federal defendants posit that the plaintiff's conduct "could have been readily perceived by a law enforcement officer" as a violation of law, and the plaintiff

therefore had no clearly established First Amendment right to express himself as he did. *Id* . at 12. Analyzing the circumstances confronting the officers under the **qualified immunity** framework, the Court agrees with the federal defendants.

It has long been unlawful for any person "willfully and knowingly ... to parade, demonstrate or picket within any of the Capitol Buildings." 40 U.S.C. § 193f(b)(7) (2000) (currently codified at 40 U.S.C.A. § 5104(e)(2)(G) (2004)). The plaintiff does not challenge the constitutionality of this statute, nor does he quarrel with the conclusions of the Court in *Bynum v. United States Capitol Police Bd.,* 93 F.Supp.2d 50 (D.D.C.2000), that the United States Capitol Building is a nonpublic forum for First Amendment purposes. [FN20] Am. Compl. ¶ ¶ 51-53; Pl.'s Opp. at 10 (stating that "even within a nonpublic forum such as the Capitol, the type of speech exhibited by [the] plaintiff remains protected under the First Amendment"). And this Court agrees with Judge Friedman's conclusion in *Bynum* that Congress' enactment of § 193f(b)(7) "is a viewpoint neutral, reasonable regulation of both conduct and expressive activity that satisfies the Supreme Court's test for nonpublic fora." *Bynum,* 93 F.Supp.2d at 56. The federal defendants' assertion of **qualified immunity** to the plaintiff's First Amendment claim thus hinges on whether a reasonable officer, "possessing the same information" as the federal defendants, could have viewed the plaintiff's behavior in the Capitol Building as constituting an illegal demonstration within the meaning of § 193f(b)(7). The Court answers this question in the affirmative.

FN20. Both parties cite *Bynum* in support of their positions, Def .'s Mem. at 10-11, Pl.'s Opp. at 10-12, and it is useful to briefly examine why the disposition of that case is not particularly helpful here. The plaintiff in *Bynum,* a minister, challenged the validity of a USCP regulation that interpreted § 193f(b)(7) as prohibiting his tour group from conducting a quiet prayer inside the Capitol Building, in which they "prayed and meditated on topics related to the historic interpretation" of a Capitol site. 93 F.Supp.2d at 54. The *Bynum* Court determined that the purpose of § 193f(b)(7) was to prohibit disruptive and obstructive conduct in the Capitol Building, and held that the regulation swept too broadly by "allow[ing] a police officer to restrict any sort of expressive conduct when, in the eyes

of the particular officer, it *might* attract onlookers-without regard to whether it in fact attracts a crowd of onlookers or whether it in fact disrupts or obstructs." *Id.* at 58 (emphasis in original). In the instant case, of course, the plaintiff's behavior unquestionably attracted onlookers; thus, *Bynum'* s proscription does not apply to the situation here, where the plaintiff was clad in duct tape and honey jars and danced and sang for tourists, actions which could reasonably be seen as violating § 193f(b)(7). Furthermore, the USCP regulation at issue in *Bynum* is not being challenged here; rather, the relevant inquiry in this case is whether a reasonable officer could have viewed the plaintiff's costume and expressive conduct as contravening § 193f(b)(7)'s prohibition against demonstrations in the Capitol.

**\*8** By the plaintiff's own admission, his costume and expressive conduct had political underpinnings. Specifically, he states in his amended complaint that his "costume was created in reaction to an announcement by then Secretary of Homeland Security Tom Ridge instructing people to purchase duct tape to combat terrorism." Am. Compl. ¶ 52. The plaintiff further states that he "wore his costume so that people would learn to accept those who looked different in times of war[, and that h]e was hoping to spread a message of tolerance and understanding." *Id.* The plaintiff also "performed for tourists by dancing and singing," and willingly engaged interested observers in conversation regarding his philosophy that "Life is a Performance." *Id.* ¶ 19. Nevertheless, the plaintiff contends that he was not "demonstrating" within the meaning of § 193f(b)(7), because his "use of [the] costume and duct-tape in response to the war on terror to spread a message of peace and tolerance was passive and unobtrusive." Pl.'s Opp. at 10. Therefore, the plaintiff argues, the federal defendants infringed his right to free speech by arresting him "based on his clothing, peaceful and undisruptive interactions with other tourists, and alleged religious speech." *Id.* at 12.

The Court is unconvinced by the plaintiff's argument, and declines to recognize an interstitial right to "symbolic, political expression," Am. Compl. ¶ 52, undertaken to attract attention and to disseminate a particular message, in a forum in which protest and demonstration is legitimately and concededly prohibited by the First Amendment. The plaintiff, spurred by a statement made by then-Secretary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ridge, constructed a costume composed of duct tape, honey jars, and other "materials from the D.C. environment." Am. Compl. ¶ 16. The plaintiff then wore the costume into the United States Capitol Building to dance and sing before a crowd of onlookers, with the stated intention of "study [ing] people's interactions with him" as he "spread a message of tolerance and understanding during times of war and ... promote[d] acceptance of those who looked different." *Id.* Moreover, the plaintiff himself characterizes his endeavor as a form of "symbolic and political speech," *id.* ¶ 52, devised "in response to the war on terror," Pl.'s Opp. at 10. The Court thus concludes that it was entirely reasonable for Officer Nutwell and the other federal defendants to believe, in light of the information they possessed at the time, that the plaintiff was engaged in unlawful demonstration. [FN21] *See Hunter,* 502 U.S. at 227 (holding that "**qualified immunity** shields agents ... from suit for damages if a reasonable person could have believed [the] arrest to be lawful, in light of clearly established law and the information the arresting officers possessed") (internal quotation marks and citation omitted). Accordingly, the federal defendants are entitled to **qualified immunity** against the plaintiff's First Amendment claim.

FN21. The plaintiff asserts that his arrest was not made pursuant to § 193f(b)(7) because "it is apparent from the allegations in the Complaint that [his] actions do not fall within the [statutory] prohibition" and, thus, the federal defendants "were acting outside of their authority in arresting" him. Pl.'s Opp. at 12. The plaintiff then argues that "[b]ecause the arrest was based on [his] costume and his alleged use of the word 'Allah,' and not made pursuant to a neutral statute, the officers' actions were not viewpoint neutral." *Id.* The Court is not obliged to accept "legal conclusions cast in the form of factual allegations," *Browning,* 292 F.3d at 242, and, as noted above, the Court disagrees that the lawfulness of the plaintiff's actions "is apparent from the allegations in the Complaint," Pl.'s Opp. at 12. Moreover, it is important to distinguish the plaintiff's initial detention on suspicion of possessing a bomb. Am. Compl. ¶¶ 20-21, from his eventual arrest for, among other things, engaging in an unlawful demonstration, *id.* ¶¶ 22, 26. As the Court discusses *infra,* the reasonableness of the plaintiff's detention at 1:17 p.m. and the

reasonableness of his arrest at 2:45 p.m. raise separate issues, and the plaintiff's First Amendment claim attaches only to the latter.

2. The Plaintiff's Fourth Amendment Claims

*9 The federal defendants also assert **qualified immunity** against the Fourth Amendment claims arising out of (a) the plaintiff's initial detention by Officer Nutwell, and the subsequent warrantless and non-consensual search of the plaintiff's person; [FN22] (b) the warrantless and non-consensual search of the plaintiff's van, and the resulting damage and destruction to the plaintiff's artwork; and (c) the warrantless arrest of the plaintiff on charges of engaging in an unlawful demonstration, making a false bomb threat, aiding and abetting, and assault or threatened assault. [FN23] Am. Compl. ¶¶ 43-49; Def.'s Opp. at 12-13. Broadly, the federal defendants maintain that "a reasonable, experienced police officer" would have perceived exigent circumstances sufficient to justify the plaintiff's detention and search, as well as the search of the plaintiff's van. Def.'s Mem. at 12-13 (citation omitted). The federal defendants further state that probable cause existed to arrest the plaintiff even after the searches revealed that the plaintiff did not possess any explosives. *Id.* at 12. The plaintiff takes exception with all of the defendants' arguments. Pl.'s Opp. at 13-16.

FN22. This claim includes Officer Nutwell's alleged destruction of the plaintiff's mask sculpture.

FN23. The Supreme Court has held "that **qualified immunity** applie[s] in the Fourth Amendment context just as it would for any other claim of official misconduct." *Saucier,* 533 U.S. at 203 (quoting *Anderson,* 483 U.S. at 644).

The Fourth Amendment prohibits law enforcement officials from engaging in "unreasonable searches and seizures" of an individual and his property. U.S. Const. amend. IV. Furthermore, "[i]t is well-established that except in certain carefully defined classes of cases, a search ... without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Bernstein v. Roberts,* 405 F.Supp.2d 34, 38 (D.D.C.2005) (internal quotation marks and citation omitted). One exception to the warrant requirement authorizes a police officer to "conduct a brief investigatory stop of an individual if [the officer] has a reasonable suspicion that criminal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

activity is underfoot." _United States v. Brown,_ 334 F.3d 1161, 1164 (D.C.Cir.2003) (quoting _Terry v. Ohio,_ 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotation marks omitted). A search pursuant to a _Terry_ stop, however, must be protective in character and "strictly circumscribed by the exigencies which justify its initiation," _Terry,_ 392 U.S. at 25-26, and may be made only if "a reasonably prudent man in [the officer's] circumstances would be warranted in the belief that his safety or that of others was in danger," _United States v. Mitchell,_ 951 F.2d 1291, 1295 (D.C.Cir.1991) (quoting _Terry,_ 392 U.S. at 27). Moreover, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." _Devenpeck v. Alford,_ 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (citations omitted). It is in this context that the Court evaluates the federal defendants' claims of **qualified immunity** against the alleged Fourth Amendment violations.

(a) The initial detention and search of the plaintiff

**\*10** As noted, the **qualified immunity** analysis properly begins with a determination of "whether a constitutional right would have been violated on the facts alleged." _Saucier,_ 533 U.S. at 200. Here, the plaintiff claims that "it was objectively unreasonable to believe that [he] was in possession of explosives ... in light of the extraordinary security screening procedures in place at the Capitol" and other considerations, [FN24] Pl.'s Opp. at 13, and that the federal defendants therefore violated his Fourth Amendment right to be free from unreasonable searches and seizures, Am. Compl. ¶ ¶ 44-45. The federal defendants, on the other hand, state that no constitutional violation occurred due to their reasonable suspicion that the plaintiff was carrying a bomb and their consequent belief that delaying their search to obtain a warrant "would gravely endanger their lives or the lives of others." Def.'s Mem. at 13 (citation omitted). The plaintiff does not contest that a reasonable belief in the presence of exigent circumstances would vitiate his constitutional claim regarding the initial detention and search; instead, he argues that "police could not have objectively believed that [he] was armed" and that "the USCP itself ... did not perceive any real threat of explosives." Pl.'s Opp. at 14. The question, then, is whether an officer in the defendants' position could have "reasonably but mistakenly conclude[d]" that exigent circumstances were present. _Anderson,_ 483 U.S. at 641. If so, the federal defendants "should not

be held personally liable." _Id._

> FN24. The plaintiff argues, for example, that it was unreasonable for the federal defendants to believe that he would "contemplate detonating an explosive device in the presence of a loved one," Ms. Patel Olaniyi. Pl.'s Opp. at 14. The plaintiff also points to the fact that the federal defendants did not order the evacuation of the House of Representatives, which was then in session, as evidence that the federal defendants did not truly believe that the plaintiff was likely to be carrying explosives. _Id._ at 14-15. The Court accords neither of these arguments significant weight. The defendants cannot reasonably be expected to have known that the plaintiff was not prepared to harm a loved one; similarly, the defendants' ultimate failure to order the evacuation of the Capitol Building sheds minimal light on the reasonableness of their belief that the plaintiff was carrying a bomb at the time of his detention.

The central, and strongest, aspect of the plaintiff's argument is that Officer Nutwell and the other USCP defendants were almost certainly aware of the numerous layers of security through which the plaintiff at least theoretically had to pass before entering the Capitol Building, including a magnetometer, x-ray machines, explosive detectors, and metal detectors. Am. Compl. ¶ 18; Pl.'s Opp. at 14. Although the USCP defendants may not have personally observed the plaintiff being screened by these stringent security procedures, it is safe to impute to them general knowledge of the many safeguards that existed to prevent weapons from entering the Capitol Building, including verbal and physical interaction with other USCP officers at multiple checkpoints during the screening process. Such knowledge, too, surely diminishes the likelihood that an officer could reasonably suspect, _without other information,_ that a tourist within the Capitol could be concealing explosives.

Moreover, although the plaintiff was dressed outlandishly and drew a great deal of attention to himself, and although his actions, as discussed above, could be reasonably perceived to be unlawful demonstration, there is little in the record to suggest anything _per se_ suspicious about the plaintiff's demeanor or conduct that would lead ineluctably to a belief that he was possibly carrying explosives.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Neither the plaintiff's costume, as he describes it, nor his interactions with other individuals, including Officer Nutwell, appear to this Court sufficient to engender particularized suspicion that the plaintiff possessed explosives. Indeed, even the federal defendants' motion to dismiss fails to indicate otherwise, merely stating that the plaintiff "was approached by [the USCP] and detained ... for possible possession of explosives" without providing further explanation for why the defendants had reason to believe that the plaintiff posed a security threat or was armed with an explosive device. Def.'s Mem. at 13. The federal defendants do not represent, and the plaintiff's complaint does not reflect, that the plaintiff made any comments or actions that could plausibly be construed as threatening, save for the brandishing of a hand-carved mask (which the plaintiff immediately identified to Officer Nutwell) and the alleged utterance of a phrase containing the world "Allah" (which the plaintiff denies making). Am. Compl. ¶ 20; Def.'s Mem. at 12-13. It is relatively easy, then, for this Court to conclude that a reasonable officer could have perceived that the plaintiff's behavior presented no exigencies to merit the actions taken by the defendants, based on the circumstances known to them.

*11 That, however, is not the question for the Court to resolve. Rather, the federal defendants are entitled to **qualified immunity** on the plaintiff's Fourth Amendment claim unless *no* reasonably competent officer could have viewed the warrantless detention and search of the plaintiff as justified by exigent circumstances, and the Court cannot make that finding on the evidence before it. *See Malley, 475 U.S. at 341* (holding that "if officers of reasonable competence could disagree on [the] issue, immunity should be recognized"). The Court must exercise caution before infringing on the judgment calls made by law enforcement officers, particularly when those officers patrol an area of such heightened security concern as the United States Capitol. *See Hunter, 502 U.S. at 229* (stating that "officials should not err always on the side of caution because they fear being sued") (internal quotation marks and citation omitted). This is not to say that USCP officers must always prevail against *Bivens* actions. Rather, the Court is merely saying that the federal defendants' initial actions *in this case* were sufficiently "within the bounds of appropriate police responses," considering the circumstances, to accord them **qualified immunity** from suit. *Saucier, 533 U.S. at 208.*

In *Saucier,* a demonstrator brought a claim against a

military police officer for using excessive force while arresting him for protesting during a speech by then-Vice President Gore. *Id.* at 198. The Supreme Court held that the officer's use of force, even if mistakenly excessive, was nonetheless reasonable when considering "what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards." *Id.* at 208. Notably, the *Saucier* Court found that because the officer "did not know the full extent of the threat [the demonstrator] posed ... [and] was required to recognize the necessity to protect the Vice President by securing [the demonstrator] and restoring order to the scene," it could not say that "there was a clearly established rule that would prohibit using the force [the officer] did ... to accomplish those objectives ." *Id.* at 208-09. Applying the reasoning of *Saucier,* this Court similarly finds that Officer Nutwell and the other USCP defendants did not, and could not, know the full extent of the threat posed by the plaintiff until they acted on their suspicion and determined that he was not carrying explosives. Furthermore, the Court concludes that the federal defendants' belief that exigent circumstances existed, even if ultimately mistaken, "could reasonably have been thought consistent with the rights they are alleged to have violated." *Liser,* 254 F.Supp.2d at 104 (quoting *Anderson,* 483 U.S. at 638) (internal quotation marks omitted); *see also Malley,* 502 U.S. at 341 (noting that the **qualified immunity** test "provides ample protection to all but the plainly incompetent and those who knowingly violate the law"). It is more than reasonable that the plaintiff's strange costume and distinctive behavior aroused the attention and suspicion of the USCP defendants. Moreover, the defendants could not know *with certainty* that the plaintiff had, in fact, passed through multiple security checkpoints on his way into the Capitol Building or, if he had, that the plaintiff was not carrying a weapon that the earlier checkpoints might have missed. Thus, although the federal defendants' decision to detain and search the plaintiff ultimately proved to be unnecessary, the Court cannot say it was unreasonable. The federal defendants are accordingly shielded from liability against the plaintiff's Fourth Amendment claim.

(b) The search of the plaintiff's van

*12 The plaintiff argues that even if the federal defendants possessed reasonable suspicion to detain and search his person as an initial matter, "any such suspicion dissipated after bomb technicians determined on the scene that [the plaintiff] carried no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 389743 (D.D.C.)
(Cite as: Slip Copy)

Page 12

explosives." Pl.'s Opp. at 15. The Court agrees, and finds that the federal defendants are not entitled to **qualified immunity** against the Fourth Amendment claims arising from the search of the plaintiff's van.

"[T]he determination whether it was objectively legally reasonable to conclude that a given search was supported by ... exigent circumstances will often require examination of the information possessed by the searching officials." _Anderson_, 483 U.S. at 641. In support of their argument that the warrantless search of the plaintiff's van was made pursuant to a reasonable belief that exigent circumstances existed, the federal defendants state that "[t]he proximity of [the] Plaintiff's vehicle to the [Hart] Senate Building [,] combined with the ongoing investigation of [the] Plaintiff, at a minimum meets the standards set out ... to act reasonably and to protect the lives of others who would be in grave danger." Def.'s Mem. at 13. The federal defendants, however, had no reason to believe that anyone was in grave danger at the time the van was searched. Both sides agree that the federal defendants did not obtain information regarding the van's whereabouts until _after_ the HDU had tested the plaintiff's costume and determined that the plaintiff was not carrying explosives, Am. Compl. ¶ 23; Def.'s Mem. at 13, and from the facts alleged, it is clear that once the search of the plaintiff's person revealed no explosives, the officers involved could not reasonably have believed that exigent circumstances "support[ed] the need for an immediate search" of the plaintiff's van. _United States v. Chadwick_, 433 U.S. 1, 15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

In _Chadwick,_ the Supreme Court held that the warrantless search of an individual's foot locker, conducted more than an hour after his arrest, was not "justified by any ... exigency," even though narcotics agents had probable cause to believe that the foot locker contained contraband. _Id._ Accordingly, "warrantless searches of property ... seized at the time of an arrest cannot be justified ... if the search is remote in time or place from the arrest or no exigency exists." _Id._ (internal quotation marks and citation omitted). The District of Columbia Circuit applied _Chadwick_ in _United States v. Six Hundred Thirty-Nine Thousand Five Hundred and Fifty-Eight Dollars,_ 955 F.2d 712 (D.C.Cir.1992), stating that even if "an immediate search without a warrant could have been justified" in a given situation, a warrantless search cannot be sustained "after the exigency ha[s] ended." 955 F.2d at 718. In relying on _Chadwick,_ the Circuit Court distinguished a later case, _California v. Acevedo,_ 500 U.S. 565, 111 S.Ct.

1982, 114 L.Ed.2d 619 (1991), which had held that "the automobile exception permitted police, when they have probable cause, to search containers in a car without a warrant." _Six Hundred Thirty-Nine Thousand Five Hundred and Fifty-Eight Dollars,_ 955 F.2d at 718.

**\*13** Here, the federal defendants lacked probable cause to believe that the plaintiff's van contained any explosives once no explosives were found on the plaintiff's person, and thus the absence of exigent circumstances is fatal to any **qualified immunity** claim as to the warrantless search of the vehicle. Neither side has made any factual representation which, if true, would suggest that the federal defendants had a reasonable basis for searching the plaintiff's van when they did, nor do the defendants explain why the investigation of the plaintiff needed to continue after it was determined that he was unarmed. The federal defendants had no reason to suspect that the plaintiff was carrying explosives on his person once the HDU completed its testing of the plaintiff's costume, and nothing occurred thereafter that gave the USCP or the FBI defendants cause to believe that the plaintiff's vehicle contained explosives. _See Preston v. United States,_ 376 U.S. 364, 367-68, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) (holding that a warrantless search of a vehicle is not justified when the defendant is already in police custody); _cf. United States v. Maiden,_ 870 F.Supp. 359, 361 (D.D.C.1994) (finding that "once [the defendant] was arrested and handcuffed, there were no longer any exigent circumstances that necessitated" a warrantless search). The federal defendants' contentions notwithstanding, the fact that the vehicle was parked "less than two blocks from the Hart Senate Office Building" is plainly not enough, standing alone, to justify a search of the van's interior, Def.'s Mem. at 13, and this was especially so when a canine inspection of the exterior of the van produced negative results, Am. Compl. ¶ 23. [FN25] Thus, a reasonably competent officer should certainly have known that searching the interior of the van would violate the plaintiff's Fourth Amendment rights. _See Fernandors v. District of Columbia,_ 382 F.Supp.2d 63, 70-71 ("An official is not shielded from liability where he could be expected to know that certain conduct would violate ... constitutional rights.") (internal quotation marks and citation omitted). Accordingly, the Court declines the invitation to dismiss the plaintiff's Fourth Amendment claims pertaining to the search of the van's interior.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 389743 (D.D.C.)
(Cite as: Slip Copy)

Page 13

FN25. The inspection of the exterior of the van by "two canine technicians," Am. Compl. ¶ 23, is not itself a cognizable violation of the Fourth Amendment. See *Illinois v. Caballes*, 543 U.S. 405, 410, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (holding that "[a] dog sniff [of a vehicle] that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment"); see also *City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (stating that "[t]he fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search.... [A]n exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics") (internal citations omitted).

(c) The arrest of the plaintiff

The plaintiff next contends that his warrantless arrest was unconstitutional, as the federal defendants lacked probable cause to believe that he was committing, or had committed, any criminal act. Instead, the plaintiff claims that the arrest "was predicated on [his] robe-like clothing, dark skin, and [the] belief that he was Muslim." Pl.'s Opp. at 16. The Court is not persuaded by the plaintiff's argument.

A Fourth Amendment claim for false arrest requires "a showing that there was no probable cause to support a plaintiff's warrantless arrest and detention. Probable cause to arrest exists when the facts and circumstances are sufficient to warrant a prudent person to believe that the individual has committed an offense." *Fernandors*, 382 F.Supp.2d at 71 (internal quotation marks and citations omitted); see also *Hunter*, 502 U.S. at 227 (holding that "**qualified immunity** shields agents ... from suit for damages if a reasonable person could have believed [the] arrest to be lawful, in light of clearly established law and the information the arresting officers possessed") (internal quotation marks and citation omitted). On the basis of the facts before the Court, it is manifestly clear that the federal defendants had no probable cause to arrest the plaintiff for making a false bomb threat. Neither is there any evidence to suggest that a prudent person could have believed that arresting the plaintiff for assault or attempted assault would have been lawful. However, as this Court has already

determined, the federal defendants could reasonably have concluded that the plaintiff's actions amounted to an unlawful demonstration in violation of § 193f(b)(7), a criminal offense for which the punishment included up to six months' imprisonment. 40 U.S.C. § 193h(b) (2000) (current version at 40 U.S.C.A. § 5109(b) (2004)). At the time of the plaintiff's arrest, then, "the facts and circumstances within [the federal defendants'] knowledge and of which they had reasonably trustworthy information" were enough to warrant the belief that the plaintiff "had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (citation omitted). The federal defendants are therefore shielded from suit on the false arrest claim.

3. The Plaintiff's Fifth Amendment Claims

*14 Finally, the plaintiff argues that the federal defendants violated his Fifth Amendment right to counsel when they (1) subjected him to custodial interrogation without first informing him of his due process rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and (2) failed timely to grant his request for access to an attorney. Am. Com pl. ¶¶ 55-56; Pl.'s Opp. at 16-18. The federal defendants contend in return that failure to administer *Miranda* warnings is not, in itself, a constitutional violation, and that while statements made in the absence of counsel once counsel has been requested may not be used to incriminate a defendant, a Fifth Amendment violation does not occur until a statement is used against a defendant in a criminal trial. Def.'s Mem. at 14. Because the charges against the plaintiff were dismissed before his criminal case proceeded to trial, the federal defendants argue that no statements made by the plaintiff during the custodial interrogation were ever admitted into evidence or otherwise used against him in the criminal proceeding, and the plaintiff's Fifth Amendment claim should therefore be dismissed. *Id.* at 14-15.

(a) Failure to administer the *Miranda* warning

Again, in assessing whether an officer is entitled to **qualified immunity**, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Saucier*, 533 U.S. at 200. If so, the Court must then determine "whether the right was clearly established" at the time of the violation. *Id.* The question here thus turns on whether

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the *Miranda* rule could be characterized as a clearly established *constitutional* right when the plaintiff was arrested. After examining relevant legal precedent, the Court concludes that it could not.

The Court begins by noting that if the events at issue in this litigation had occurred several months later, it would be unquestionably clear that custodial interrogation, without first advising an arrestee of his *Miranda* rights, is not an intrinsic constitutional violation. In May 2003, the Supreme Court decided *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), in which six Justices agreed that because "violations of judicially crafted prophylactic rules do not violate the constitutional rights of any person," 538 U.S. at 772 (THOMAS, J.), the "failure to give a *Miranda* warning does not, without more, establish a completed [constitutional] violation when the unwarned interrogation ensues," *id.* at 789 (KENNEDY, J., concurring in part and dissenting in part). Moreover, *Chavez* cites several earlier Supreme Court cases in support of its proposition that *Miranda* does not independently confer or recognize a constitutional right. *See, e.g., id.* at 772 ("*Miranda*' s warning requirement is not itself required by the Fifth Amendment ... but is instead justified only by reference to its prophylactic purpose") (quoting *Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987)) (internal quotation marks omitted); *see also United States v. Patane,* 542 U.S. 630, 641, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (noting that "[o]ur cases also make clear ... that a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights").

*15 Indeed, rather than the recovery of civil damages, the remedy for failing to administer *Miranda* warnings is the suppression and resulting inadmissibility of unwarned statements for most purposes at a criminal trial. *See, e.g., Harris v. New York,* 401 U.S. 222, 224, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (holding that "[i]t does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards"). Neither the Supreme Court nor the District of Columbia Circuit has ever held that the failure to Mirandize an arrestee before engaging in custodial interrogation can form the basis of civil liability under *Bivens* or § 1983. It is therefore difficult for this Court to see how *Miranda* warnings could have been considered a clearly established constitutional right at the time of the plaintiff's arrest.

The best argument the plaintiff has to the contrary revolves around *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), which held that the *Miranda* requirement could not be overruled by an Act of Congress. In reaching this conclusion, *Dickerson* took care to characterize the *Miranda* decision not merely as the creation of a prophylactic procedural safeguard, but as the recognition of a full-fledged "constitutional rule." 530 U.S. at 439 (stating that *Miranda* "is replete with statements indicating that the majority thought it was announcing a constitutional rule"). It is certainly possible that a USCP officer in March 2003, well-versed in constitutional law, could have understood *Dickerson* to have announced that failure to comply with *Miranda* would thenceforth be considered a constitutional violation, at least until May 2003, when the issue was clarified by *Chavez.* Even *Dickerson,* however, did not recognize *Miranda* warnings as a *clearly established* constitutional right. *Cf. Hope,* 536 U.S. at 760 (THOMAS, J., dissenting) ("In any event, an extraordinarily well-informed prison guard in 1995 ... could have concluded only that there was a dispute as to whether handcuffing a prisoner to a restraining bar constituted an Eighth Amendment violation, not that such a practice was clearly unconstitutional."). Other federal courts which addressed the question after *Dickerson* and before *Chavez* largely refused to recognize a constitutional right to *Miranda* warnings. *See, e.g., United States v. Talley,* 275 F.3d 560, 564-65 (6th Cir.2001) (construing *Dickerson* narrowly to avoid characterizing *Miranda* as a constitutional right); *Aderonmu v. Heavey,* No. 00-9232(AGS), 2001 WL 77099, *3 (S.D.N.Y. Jan.26, 2001) ("The failure to provide *Miranda* warnings, standing alone, cannot be the basis of a *Bivens* or Section 1983 action. *Miranda* warnings are not themselves a constitutional right, but merely a procedural safeguard.") (citations omitted); *contra United States v. Patane,* 304 F.3d 1013, 1019-20 (10th Cir.2002), *rev'd,* 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (examining the effect of *Dickerson* on *Miranda* ). The Court therefore cannot conclude, regardless of how *Dickerson* might reasonably have been read, that the plaintiff in this case had a clearly established constitutional right to be administered *Miranda* warnings. Accordingly, the federal defendants are entitled to **qualified immunity** as to the plaintiff's *Miranda* claim.

(b) Failure to accede to the plaintiff's request for counsel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 389743 (D.D.C.)
**(Cite as: Slip Copy)**

**\*16** A similar analysis underlies the Court's conclusion that the federal defendants are entitled to **qualified immunity** against the plaintiff's remaining Fifth Amendment claim. As with the constitutional nature of *Miranda* warnings, *Chavez* made explicit that the Fifth Amendment's protection against self-incrimination, which includes the right to have an attorney present during a custodial interrogation, does not attach until the statements compelled in the absence of an attorney are *used* at some point in the proceedings. *Chavez,* 538 U.S. at 766-72; *see also id.* at 777-79 (SOUTER, J., concurring). In so reasoning, the *Chavez* Court drew on the statement in *United States v. Verdugo-Urquidez* that "[a]lthough conduct by law enforcement officers prior to trial may ultimately impair [a criminal defendant's Fifth Amendment right against self-incrimination], a constitutional violation [of the right] occurs only at trial." 494 U.S. 259, 264, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (citation omitted).

The plaintiff proffers *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), decided ten months after *Vergudo-Urquidez,* in support of the proposition that he had the constitutional right to have counsel present at his custodial interrogation. However, *Minnick'* s holding, that "when counsel is requested, interrogation must cease, and officers may not reinitiate interrogation without counsel present," is less helpful than the plaintiff professes. *Id.* at 153. First, *Minnick* says nothing to contradict the statement in *Vergudo-Urquidez* that a constitutional violation of the Fifth Amendment right against self-incrimination can occur "only at trial ." *Vergudo-Urquidez,* 494 U.S. at 264. Second, and more damning, *Minnick* notes repeatedly that the right to have counsel present at an interrogation "derives from *Miranda."* 498 U.S. at 152. Most notably, *Minnick* looks to *Miranda* when describing the justification for the right, stating that "the presence of counsel would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the Fifth Amendment privilege." *Id.* (quoting *Miranda,* 384 U.S. at 466). The plaintiff fails to cite, and the Court cannot find, any caselaw in this Circuit that treats the right to the presence of counsel during a custodial interrogation as a constitutional right distinct from *Miranda'* s collective procedural safeguards. With *Miranda* as the foundation for the right to counsel at custodial interrogations, the Court likewise concludes that no clearly established constitutional right to counsel was violated by the federal defendants in this case. The Court does not

deny that law enforcement officers are required to provide criminal suspects with counsel upon request, just as they are required to administer *Miranda* warnings. Furthermore, it is an unexceptional proposition that a reasonable officer would be aware of these requirements. The caselaw, however, clearly distinguishes between "[r]ules designed to safeguard a constitutional right" and "the constitutional right itself," *Chavez,* 538 U.S. at 772, and places the Fifth Amendment rights asserted by the plaintiff far more securely in the former category than the latter. The federal defendants are therefore entitled to the protection of **qualified immunity** against the plaintiff's Fifth Amendment right to counsel claim.

*IV. Conclusion*

**\*17** For the foregoing reasons, the Court (1) denies without prejudice the federal defendants' motion to dismiss all claims against the USCP and FBI John Doe defendants for lack of personal jurisdiction; (2) denies the federal defendants' motion to dismiss the Fourth Amendment claims arising out of the warrantless search of the plaintiff's van; and (3) grants the federal defendants' motion to dismiss with respect to all other claims filed against them, due their **qualified immunity** from suit on these claims.

SO ORDERED. FN26

> FN26. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.

D.D.C.,2006.
Olaniyi v. District of Columbia
Slip Copy, 2006 WL 389743 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:05cv00455 (Docket) (Mar. 03, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.